## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FRANKLIN D. RAINES,<br>3131 Connecticut Ave., N.W.<br>Washington, DC 20008<br>　　　　　　　　Plaintiff,<br><br>v.<br><br>OFFICE OF FEDERAL HOUSING<br>ENTERPRISE OVERSIGHT, an Office<br>within the United States Department of<br>Housing and Urban Development, and<br>JAMES B. LOCKHART III, in his official<br>capacity as Director,<br>1700 G Street, N.W.<br>Washington, DC 20552<br>　　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil No. _____<br><br>PLAINTIFF'S MOTION FOR<br>TEMPORARY RESTRAINING ORDER<br>AND PRELIMINARY INJUNCTION |

## FRANKLIN D. RAINES'S MOTION FOR
## TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff Franklin D. Raines, the former Chairman and Chief Executive Officer of

the Federal National Mortgage Association ("Fannie Mae" or the "Company"), moves this Court

for entry of a temporary restraining order and preliminary injunction preventing the Office of

Federal Housing Enterprise Oversight ("OFHEO") from unlawfully depriving him of 58,812

shares of Fannie Mae stock presently owed to him by the Company.  Although both Mr. Raines

and Fannie Mae agree that he is owed these shares, OFHEO has nevertheless instructed Fannie

Mae not to pay the shares to Mr. Raines until OFHEO has made a determination of the

appropriateness of the payment.  As set forth in the accompanying memorandum of law,

OFHEO's attempt to deprive Mr. Raines of these shares is unconstitutional, in contravention of

the statutory scheme established by Congress, and directly at odds with this Court's decisions in

*Brendsel v. Office of Federal Housing Enterprise Oversight*, 339 F. Supp. 2d 52, 61-66 (D.D.C.

2004) and *Clarke v. Office of Federal Housing Enterprise Oversight*, 355 F. Supp. 2d 56, 63-65 (D.D.C. 2004), which together hold that OFHEO possesses neither the authority to order the freeze of assets by "informal" means, such as a letter request, *Brendsel*, 339 F. Supp. 2d at 64-65, nor the authority to freeze termination payments, including the payment of previously awarded shares of stock, *id.* at 57; *Clarke*, 355 F. Supp. 2d at 61.

Counsel for Mr. Raines conferred with Alfred Pollard, counsel for OFHEO, on July 2, 2007, and explained the matter and its urgency. Counsel for OFHEO stated that OFHEO intends to adhere to its course of conduct.

Mr. Raines therefore moves this Court for entry of a temporary restraining order and a preliminary injunction prohibiting OFHEO from continuing its unlawful conduct.

A proposed Order is attached.

Dated: July 2, 2007

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

Kevin M. Downey (D.C. Bar No. 438547)
Paul Mogin (D.C. Bar No. 358759)
Alex G. Romain (D.C. Bar No. 468508)
Joseph M. Terry (D.C. Bar No. 473095)

725 Twelfth St., N.W.
Washington, DC 20005
(202) 434-5000
kdowney@wc.com
*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FRANKLIN D. RAINES,<br>3131 Connecticut Ave., N.W.<br>Washington, DC 20008<br>　　　　　　　Plaintiff,<br><br>v.<br><br>OFFICE OF FEDERAL HOUSING<br>ENTERPRISE OVERSIGHT, an Office<br>within the United States Department of<br>Housing and Urban Development, and<br>JAMES B. LOCKHART III, in his official<br>capacity as Director,<br>1700 G Street, N.W.<br>Washington, DC 20552 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | <br><br><br><br>Civil No. _____<br><br>PLAINTIFF'S MEMORANDUM OF LAW<br>IN SUPPORT OF HIS MOTION FOR<br>TEMPORARY RESTRAINING ORDER<br>AND PRELIMINARY INJUNCTION |
| 　　　　　　　Defendants. | | |

## FRANKLIN D. RAINES'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff Franklin D. Raines, the former Chairman and Chief Executive Officer of the Federal National Mortgage Association ("Fannie Mae" or the "Company"), seeks a temporary restraining order and preliminary injunction barring the Office of Federal Housing Enterprise Oversight ("OFHEO") from unlawfully interfering in the payment of 58,812 shares of Fannie Mae common stock presently owed to him by the Company. Although Mr. Raines and Fannie Mae agree that he is owed these shares, OFHEO has sent Fannie Mae a letter instructing the Company not to pay Mr. Raines these termination benefits until OFHEO has made a determination as to the appropriateness of the payment.

The unlawfulness of OFHEO's actions, as well as Plaintiff's right to preliminary injunctive relief, have previously been established by this Court on two occasions. In both *Brendsel v. Office of Federal Housing Enterprise Oversight*, 339 F. Supp. 2d 52, 61-66 (D.D.C.

2004) and *Clarke v. Office of Federal Housing Enterprise Oversight*, 355 F. Supp. 2d 56, 63-65

(D.D.C. 2004), each of which presented facts nearly identical to this case, this Court found that

OFHEO lacked the authority to order Freddie Mac, through the informal means of a letter

request, to withhold payments owed to its former executives.  In both cases, this Court enjoined

OFHEO from "ordering, directing or suggesting, through any informal procedure, not statutorily

defined, that Freddie Mac withhold those assets and funds to which [the executive] is presently

entitled under his employment agreement."  *Brendsel*, 339 F. Supp. 2d at 68; *Clarke*, 355 F.

Supp. 2d at 66.  That same relief should issue here.

## BACKGROUND

Mr. Raines served as the Chairman and Chief Executive Officer of Fannie Mae

from January 1, 1999 until his retirement, which was announced on December 21, 2004, and

which became effective on June 22, 2005.  During the period he served as Chairman and CEO,

the terms of Mr. Raines's employment were governed by his employment agreements with

Fannie Mae.  Mr. Raines entered into his most recent employment agreement with the Company

on May 3, 2004.  *See* Ex. 1 (May 3, 2004 Employment Agreement between Fannie Mae and

Franklin D. Raines).  That agreement was amended in September 2004 and approved by OFHEO

on November 17, 2004.  *See* Ex. 2 (Dec. 27, 2004 Fannie Mae Form 8-K) at 1.

Pursuant to the terms of his OFHEO-approved employment agreement, Mr.

Raines was entitled to participate in various Fannie Mae compensation and benefits programs,

including the "Performance Share Plan" or "PSP."  Ex. 1 at 8.  The PSP is a long-term incentive

payment plan, under which senior management receives shares of Fannie Mae common stock if,

over the course of a three-year cycle, the Company meets certain financial and non-financial

targets.  *See* Ex. 2 at 2.  If the Company fails to meet its threshold goals, no shares are awarded.

*Id.* If the Company surpasses the threshold, the executives receive a percentage of their target allocation (ranging from 40% to 150% of the target). The target is set at the beginning of the performance cycle, and the Compensation Committee's determination as to the level of corporate performance is determined at the end of the performance cycle. *Id.*

The Compensation Committee set Mr. Raines's target allocation for the 2003 to 2005 cycle (known as PSP Cycle 19) at 107,505 shares. *Id.* The Committee set his target allocation for the 2004 to 2006 cycle (known as PSP Cycle 20) at 99,967 shares. *Id.* Although Mr. Raines retired prior to the conclusion of either PSP Cycle 19 or Cycle 20, his employment agreement nevertheless entitled him to a pro rata share of those awards based on the number of days that he was employed during those cycles. *Id.*; Ex. 1 at 18. Because Mr. Raines was employed by Fannie Mae for 904 days, out of a possible 1096, during Cycle 19, he is entitled to a pro rata share of 82.48% of the award for Cycle 19. Because Mr. Raines was employed by Fannie Mae for 539 days, out of a possible 1096, during Cycle 29, he is entitled to a pro rata share of 49.18% of the award for Cycle 20.

On June 21, 2007, Fannie Mae announced that it had determined to distribute shares for Cycle 19 at the 40% level and for Cycle 20 at the 47.5% level. *See* Ex. 3 (June 21, 2007 Fannie Mae Form 10-K) at 2. Accordingly, for Cycle 19, Mr. Raines is entitled to receive his pro rata share (82.48%) of 40% of his target award, which would amount to 35,459 shares. Similarly, for Cycle 20, Mr. Raines is entitled to receive 23,353 shares. Taken together, Mr. Raines is entitled to 58,812 shares of Fannie Mae common stock.

Although Fannie Mae has distributed shares for PSP Cycles 19 and 20 to most participants without interference by OFHEO, Ex. 3 at 1-2, and although "[s]hares payable to retirees are typically paid out shortly after the conclusion of an award cycle," Fannie Mae

declined to make any payment of shares to Mr. Raines and several other executives. It did so under orders from OFHEO. In its June 21, 2007 SEC filing, Fannie Mae confirmed that all participants in the PSP were entitled to receive payment of these shares. However, at OFHEO's instruction, Fannie Mae withheld payment of shares to a set of current and former Fannie Mae employees including Mr. Raines, purportedly so that OFHEO could "determin[e] the size and appropriateness of the proposed awards" and evaluate "information relating to the proposed payments to former employees." Ex. 3 at 2.

On June 29, 2007, Fannie Mae's General Counsel, Beth A. Wilkinson, responded to a request for distribution of the shares from counsel for Mr. Raines, *see* Ex. 4 (June 25, 2007 Downey letter), by confirming that Fannie Mae owes the shares at issue to Mr. Raines but stating that OFHEO has ordered Fannie Mae not to distribute the shares. According to Ms. Wilkinson, "[o]n June 19, 2007, we received a letter from OFHEO requesting additional information concerning the proposed awards for the 2005 and 2006 award cycles. . . . We are now awaiting OFHEO's approval of the proposed payments. Thus, pending that approval, we are not in a position to provide a distribution of shares to Mr. Raines by Friday, June 29th, as you have requested." *See* Ex. 5 (June 29, 2007 Wilkinson Letter).

Moreover, OFHEO has not simply instructed Fannie Mae to withhold these shares from Mr. Raines; it has also sought to conceal the basis for doing so. OFHEO has instructed Fannie Mae not to provide Mr. Raines with a copy of the letter instructing the Company to deny Mr. Raines's termination benefits. According to OFHEO, the letter purportedly is protected from disclosure by the so-called "bank examination privilege."

## **ARGUMENT**

In ordering Fannie Mae not to pay Mr. Raines termination benefits due to him, OFHEO has disregarded the statutory and constitutional limits on its power, as well as this Court's explicit rulings in *Brendsel v. Office of Federal Housing Enterprise Oversight*, 389 F. Supp. 2d 52, 61-66 (D.D.C. 2004) and *Clarke v. Office of Federal Housing Enterprise Oversight*, 355 F. Supp. 2d 56, 63-65 (D.D.C. 2004). As this Court held in both *Brendsel* and *Clarke*, OFHEO has no authority to freeze a departed executive's employment or termination benefits, much less the authority to do so by an informal letter request, rather than through the proper regulatory process. And, as in *Brendsel and Clarke*, OFHEO's conduct must once again be enjoined.

The requirements for a preliminary injunction are readily satisfied in this case. Such an injunction is appropriate where, as here "(1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will [not] substantially injure the other party; and (4) the public interest will be furthered by an injunction." *Davenport v. Int'l Bd. of Teamsters, AFL-CIO*, 166 F.3d 356, 360-61 (D.C. Cir. 1999) (citation omitted). These factors are treated as a "sliding scale," and as such, "[a]n injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995); *see Cuomo v. U.S. Nuclear Reg. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985).

**I.    MR. RAINES IS SUBSTANTIALLY LIKELY TO PREVAIL ON THE MERITS.**

The question of whether OFHEO possesses the authority to freeze Mr. Raines's compensation and benefits "without any hearing or opportunity to be heard" has already been squarely answered by this Court in *Brendsel* and *Clarke*.

In *Brendsel*, this Court confronted precisely that question in connection with OFHEO's attempt to freeze payments by Freddie Mac to its former Chief Executive Officer. 339 F. Supp. 2d at 60. This Court concluded that "Congress did not intend to implicitly include this authority among OFHEO's powers, and, even if Congress' intention was unclear, OFHEO's interpretation of this authority as implicit is not reasonable such that it should entitled to deference under *Chevron.*" *Id.* at 61.[1] Accordingly, the Court concluded that "Brendsel has a substantial likelihood of success on the merits of his challenge to OFHEO's exercise of this authority under the APA." *Id.*

Similarly, in *Clarke*, this Court enjoined OFHEO's efforts to freeze payments by Freddie Mac to its former Chief Financial Officer. This Court concluded that although the Agency possessed the authority to review and approve termination benefits, it had no retroactive authority to disprove of payments made pursuant to contracts that it had already approved. 355 F. Supp. 2d at 64. Furthermore, this Court held that even if OFHEO possessed the statutory authority to prevent Freddie Mac from paying excessive compensation, the Agency's authority was limited in at least two respects. First, OFHEO's review authority was limited in substance to ensuring that the compensation paid was similar to that received by executives of similar companies. *Id.* Second, OFHEO's authority was limited in process to those cease-and-desist

---

[1] Specifically, this Court held that neither OFHEO's authority to prohibit excessive compensation under 12 U.S.C. § 4518(a), its general authority under 12 U.S.C. § 4513, nor its power to issue permanent and temporary cease-and-desist orders under 12 U.S.C. §§ 4631, 4632 permit the Agency to freeze a former executive's employment or termination benefits. *See Brendsel*, 339 F. Supp. 2d at 61-66; *Clarke*, 355 F. Supp. 2d at 63-65.

procedures set forth in OFHEO's enabling statute, which require a showing that "the conduct or violation alleged will result in insolvency, significant depletion of the core capital of the enterprise, or otherwise cause irreparable harm."  *Id.* at 64-65.

The facts of this case are nearly identical to those at issue in *Brendsel* and *Clarke*:

- As in *Brendsel* and *Clarke*, every dime of compensation owed to Mr. Raines is owed pursuant to an employment agreement that OFHEO approved.  *See* Ex. 2.

- As in *Brendsel* and *Clarke*, OFHEO has sought to evade the procedural requirements of its own cease-and-desist proceedings, by "informally" instructing Fannie Mae, through a letter, to withhold payment from Mr. Raines.  *See* Ex. 4.

- As in *Brendsel* and *Clarke*, OFHEO's concerns appear not to arise from the reasonableness of compensation in light of "comparability to the rest of the industry," *Brendsel*, 339 F. Supp. 2d at 61, but instead represent an attempt to set specific compensation levels for specific employees based on OFHEO's own views of their purported misconduct, *id*. at 62.[2]

Indeed, in at least one respect, the facts of this case are substantially more egregious than those present in either *Brendsel* or *Clarke*.  Here, OFHEO has not only ordered Mr. Raines's payments frozen without the opportunity for a hearing or any other procedural protections, it has also attempted to conceal the very basis for its order.  As this Court noted in *Brendsel*, "[b]ecause the scope of an implied authority cannot, and should not, exceed that of the

---

[2] Given that OFHEO has been on notice for at least two years as to the potential magnitude of Mr. Raines's PSP awards for Cycles 19 and 20, it cannot seriously assert that its freeze has anything to do with an evaluation of the reasonableness of Mr. Raines's compensation. *See* Ex. 2 at 2.

express authority from which it flows, OFHEO cannot informally effect a temporary hold under circumstances where it is unable to effect a formal one." *Id.* at 64-65. That is particularly true where, as here, the Agency has not only sought to avoid the formal requirements for imposing a cease and desist order, but has also failed to inform Mr. Raines of the basis for "informally" imposing such an order. Accordingly, Mr. Raines is substantially likely to prevail on his claim for an injunction against OFHEO's unlawful actions.

## II.  MR. RAINES WILL SUFFER IRREPARABLE HARM IF OFHEO IS NOT ENJOINED.

By depriving Mr. Raines of shares of Fannie Mae stock that are presently owed to him, OFHEO's actions subject Mr. Raines to the risk of irreparable injury.

First, OFHEO's actions do not simply deprive Mr. Raines of the possession of his shares, they subject him to a risk that those shares will be worth substantially less when he ultimately receives them than they are worth today. Because the share price of Fannie Mae fluctuates from day to day, such damages are not readily quantifiable. For example, if Mr. Raines possessed his shares, he could elect to sell them today at their present market price of approximately $66, he could sell them later when he perceived the price to be falling, or he could sell them if the price rose to what he viewed as its maximum. As long as he is denied his shares, he is denied all of these options. If the stock rises $10 tomorrow but drops another $20 before he receives his shares, Mr. Raines will have been permanently deprived of the opportunity to sell at a higher price.[3]

---

[3] The performance of Fannie Mae's stock since OFHEO's illegal action two weeks ago demonstrates the problem. Fannie Mae made its determination regarding the issuance of PSP shares on June 15, 2007. The next trading day, June 18, 2007, the stock traded at a high of $69.82 per share. By the time that the market closed on the last business day before this filing, June 29, 2007, the stock was trading at $65.33 per share, a loss of almost $4.50 per share. *See* Ex. 6 (charting stock price). This differential has caused a loss of potential return to Mr. Raines of $264,065.88, for which no remedy is apparent.

Second, as this Court held in both *Brendsel* and *Clarke*, OFHEO's actions constitute irreparable harm because the Agency may well be immune from liability in any suit to recover damages for its wrongdoing. *See Brendsel*, 339 F. Supp. 2d at 66-67; *Clarke*, 355 F. Supp. 2d at 65-66. Thus, even if Mr. Raines could normally recover for the loss of his right to sell his shares of stock, *see Schultz v. Commodity Futures Trading Comm'n*, 716 F.2d 136, 139-40 (2d Cir. 1983) (due to market volatility, appropriate measure of damages for conversion of stock is highest intermediate value reached), he likely will be unable to recover any damages from OFHEO. Furthermore, as this Court noted in *Brendsel*, to the extent Mr. Raines sought to sue Fannie Mae on a breach of contract theory, Fannie Mae would likely "present the defense that it was acting pursuant to OFHEO's order. This defense is potentially valid even though the orders themselves may be illegal." 339 F. Supp. 2d at 66. As such, Mr. Raines will be irreparably injured unless this Court enjoins OFHEO from its wrongdoing.

## III.    AN INJUNCTION WILL NOT HARM OFHEO.

This Court has already found that such an injunction will not harm OFHEO. In both *Brendsel* and *Clarke*, this Court concluded that the Agency would suffer no harm if it were enjoined from freezing payment of executives' compensation and benefits. *Brendsel*, 339 F. Supp. 2d at 67; *Clarke*, 355 F. Supp. 2d at 66. OFHEO has already initiated an administrative proceeding against Mr. Raines in which it seeks to compel him to return to Fannie Mae tens of millions of dollars in compensation and to pay more than one hundred million dollars in fines. It is difficult to see how that proceeding would not suffice to vindicate whatever interest OFHEO has (if any) in curtailing Mr. Raines's compensation and benefits.

**IV.    THE PUBLIC INTEREST FAVORS AN INJUNCTION.**

This Court has also already found that enjoining OFHEO from such unlawful acts serves the public interest.  As this Court wrote in *Brendsel*, "the public has a profound interest in ensuring that:  (1) OFHEO acts within the limits on its authority established by Congress; and (2) that those whose assets might be frozen by OFHEO are accorded a fair modicum of due process."  339 F. Supp. 2d at 67; *see also Clarke*, 355 F. Supp. 2d at 66; *Nat'l Treasury Employees Union v. U.S. Dep't of Treasury,* 838 F. Supp. 631, 640 (D.D.C. 1993) ("The preservation of the rights in the Constitution and the legality of the process by which government agencies function certainly weighs heavily in the public interest.").  Those very same public concerns require that an injunction be issued in this case.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should enjoin OFHEO from freezing, placing a hold on, or otherwise interfering with or preventing Mr. Raines's immediate receipt of the PSP benefits owed to him under his employment agreement.

Dated:  July 2, 2007

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

Kevin M. Downey (D.C. Bar No. 438547)
Paul Mogin (D.C. Bar No. 358759)
Alex G. Romain (D.C. Bar No. 468508)
Joseph M. Terry (D.C. Bar No. 473095)

725 Twelfth St., N.W.
Washington, DC 20005
(202) 434-5000
kdowney@wc.com
*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FRANKLIN D. RAINES,<br>3131 Connecticut Ave., N.W.<br>Washington, DC 20008<br>　　　　　　　　Plaintiff,<br><br>v.<br><br>OFFICE OF FEDERAL HOUSING<br>ENTERPRISE OVERSIGHT, an Office<br>within the United States Department of<br>Housing and Urban Development, and<br>JAMES B. LOCKHART III, in his official<br>capacity as Director,<br>1700 G Street, NW<br>Washington, DC 20552<br>　　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil No. _____

DECLARATION OF
KEVIN M. DOWNEY

## DECLARATION OF KEVIN M. DOWNEY

I, **KEVIN M. DOWNEY**, hereby state as follows:

1.　　　I am a partner in the law firm of Williams & Connolly LLP, and I represent Plaintiff Franklin D. Raines in the above-captioned matter.  I submit this declaration in support of Mr. Raines's Motion for Temporary Restraining Order and Preliminary Injunction and Memorandum of Law in support thereof.

2.　　　Attached as Exhibit 1 is a true and correct copy of the May 3, 2004 Employment Agreement between Fannie Mae and Franklin D. Raines as disclosed in Fannie Mae's Form 10-Q, filed with the United States Securities and Exchange Commission ("SEC") on May 10, 2004.

3.　　　Attached as Exhibit 2 is a true and correct copy of Fannie Mae's Form 8-K, filed with the SEC on December 27, 2004.

4.      Attached as Exhibit 3 is a true and correct copy of Fannie Mae's Form 8-K, filed with the SEC on June 21, 2007.

5.      Attached as Exhibit 4 is a true and correct copy of a June 25, 2007 letter from Kevin M. Downey to Beth A. Wilkinson, Executive Vice President and General Counsel of Fannie Mae.

6.      Attached as Exhibit 5 is a true and correct copy of a June 29, 2007 letter from Beth A. Wilkinson to Kevin M. Downey.

7.      Attached as Exhibit 6 is a true and correct copy of a printout from MSN Money showing the price performance of shares of Fannie Mae stock from June 18, 2007, to June 29, 2007.

8.      I conferred with David Felt, counsel for OFHEO, on July 2, 2007.  I informed Mr. Felt that Mr. Raines intended to file a motion for a temporary restraining order and preliminary injunction today unless OFHEO permitted Fannie Mae to make the payments owed to Mr. Raines.  Mr. Felt stated that OFHEO intends to adhere to its course of conduct.

9.      Absent immediate issuance of a temporary injunction, Mr. Raines will suffer substantial irreparable injury, the basis of which is forth in detail in the accompanying Memorandum of Law.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 2, 2007.

Washington, D.C.

Kevin M. Downey

**EXHIBIT 1**

Exhibit 10.1

EMPLOYMENT AGREEMENT

between

FANNIE MAE

and

FRANKLIN D. RAINES

Source: FEDERAL NATIONAL MOR, 10–Q, May 10, 2004

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| ARTICLE 1 | DEFINITIONS | 2 |
| Section 1.1. | Agreement Term | 2 |
| Section 1.2. | Annual Incentive Plan | 2 |
| Section 1.3. | Award Period | 2 |
| Section 1.4. | Base Salary | 2 |
| Section 1.5. | Board | 2 |
| Section 1.6. | Cause | 2 |
| Section 1.7. | Compete | 2 |
| Section 1.8. | Corporation | 3 |
| Section 1.9. | Effective Date | 3 |
| Section 1.10. | Employee | 3 |
| Section 1.11. | Employment | 3 |
| Section 1.12. | Executive Pension Plan | 3 |
| Section 1.13. | Existing Agreement | 3 |
| Section 1.14. | Good Reason | 3 |
| Section 1.15. | OFHEO | 3 |
| Section 1.16. | Option | 3 |
| Section 1.17. | Performance Share Award | 4 |
| Section 1.18. | Qualifying Termination | 4 |
| Section 1.19. | Restricted Stock | 4 |
| Section 1.20. | Retirement | 4 |
| Section 1.21. | Serious Illness or Disability | 4 |
| Section 1.22. | Stock Compensation Plan | 4 |
| Section 1.23. | Surviving Spouse | 4 |
| Section 1.24. | Termination of Employment | 4 |
| ARTICLE 2 | PERIOD OF EMPLOYMENT AND DUTIES | 5 |
| Section 2.1. | Period of Employment | 5 |
| Section 2.2. | Duties | 5 |
| ARTICLE 3 | COMPENSATION AND BENEFITS | 6 |
| Section 3.1. | Base Salary | 6 |
| Section 3.2. | Benefits | 6 |
| ARTICLE 4 | TERMINATION OF EMPLOYMENT | 10 |
| Section 4.1. | Termination of Employment By the Corporation | 10 |
| Section 4.2. | Termination of Employment By Employee | 12 |
| Section 4.3. | Other Termination of Employment | 13 |
| Section 4.4. | Resignation as Member of the Board of Directors | 13 |
| ARTICLE 5 | COMPENSATION AND BENEFITS FOLLOWING TERMINATION OF EMPLOYMENT | 14 |

Source: FEDERAL NATIONAL MOR, 10–Q, May 10, 2004

| | | |
|---|---|---|
| Section 5.1. | Termination of Employment (Other Than By Reason of Death) | 14 |
| Section 5.2. | Voluntary Termination Pursuant to Section 4.2(c) | 14 |
| Section 5.3. | Termination for Cause | 15 |
| Section 5.4. | Qualifying Termination (Other Than by Reason Of Death) | 16 |
| Section 5.5. | Termination of Employment By Reason of Death | 19 |
| ARTICLE 6 | MISCELLANEOUS | 21 |
| Section 6.1. | Noncompetition | 21 |
| Section 6.2. | Payment of Certain Expenses | 22 |
| Section 6.3. | Assignment by Employee | 23 |
| Section 6.4. | No Funding Required | 23 |
| Section 6.5. | Nondisclosure of Confidential Information | 23 |
| Section 6.6. | Waiver | 24 |
| Section 6.7. | Notice | 24 |
| Section 6.8. | Applicable Law | 24 |
| Section 6.9. | Taxes | 24 |
| Section 6.10. | Benefit | 24 |
| Section 6.11. | Entire Agreement | 25 |
| Section 6.12. | Arbitration | 25 |
| Section 6.13. | Severability | 26 |
| Section 6.14. | Regulatory Approval | 26 |

Source: FEDERAL NATIONAL MOR, 10–Q, May 10, 2004

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") is between FANNIE MAE (the "Corporation") and FRANKLIN D. RAINES ("Employee").

WHEREAS, the Corporation and Employee are parties to an employment agreement dated as of May 21, 1998, which as extended provides for termination on June 30, 2004 (the "Existing Agreement");

WHEREAS, under the termination provisions of the Existing Agreement, which were approved by OFHEO, Employee is contractually entitled to certain compensation and benefits if, among other circumstances, Employee's employment is not extended;

WHEREAS, Employee has successfully discharged his responsibilities under the Existing Agreement and has earned certain vested amounts, as described in his Existing Agreement, over the course of his employment; and

WHEREAS the Corporation and Employee agree that the terms of the agreement set forth below if approved in their entirety to the extent required would provide compensation and benefits to Employee that are at least as favorable as the compensation and benefits provided under the Existing Agreement, it being understood and acknowledged, however, that absent approval by OFHEO of the provisions set forth below relating to benefits upon termination of employment, the compensation and benefits described below would not be comparable or substantially equivalent to those provided under the Existing Agreement and in the aggregate would be materially less favorable to Employee than those provided under the Existing Agreement;

NOW, THEREFORE, the Corporation and Employee agree as follows:

## ARTICLE 1
### DEFINITIONS

The following terms shall have the meanings set forth below:

Section 1.1. Agreement Term means the period of time beginning on the Effective Date and ending on June 30, 2007 or such later date as may be agreed to pursuant to Section 2.1.

Section 1.2. Annual Incentive Plan means the Federal National Mortgage Association Annual Incentive Plan as from time to time amended and in effect, or any successor plan.

Section 1.3. Award Period is defined in the Stock Compensation Plan.

Section 1.4. Base Salary means the dollar amount of Employee's annual base compensation as determined by the Board. Employee's Base Salary may be paid or provided, as the Board determines, either entirely in cash or partly in cash and partly in long–term, equity–based compensation valued as determined by the Board in its reasonable discretion.

Section 1.5. Board means the Board of Directors of the Corporation, acting without the participation of those of its members who are also officers of the Corporation.

Section 1.6. Cause is defined in Section 4.1(b).

Section 1.7. Compete means directly or indirectly to manage, operate, control, participate in the ownership, management, operation or control of, be connected as an officer, employee, partner, director, consultant or otherwise with, or have any financial interest in, (i) any business if a substantial part of such business involves originating, purchasing, selling, servicing or otherwise dealing in the residential mortgage market (provided, that Employee shall not be deemed, directly or indirectly, to Compete solely by virtue of Employee's employment by a business that engages in transactions in the residential mortgage market so long as Employee himself does not participate directly in the residential mortgage business), (ii) Freddie Mac, or (iii) any part of the Federal Home Loan Bank System (including any one of the Federal Home

–2–

Loan Banks or the Federal Home Loan Banks Office of Finance). Employee shall not be deemed to Compete solely by reason of ownership, for personal investment purposes only, of less than 2% of the voting interests of any business.

Section 1.8. Corporation means Fannie Mae.

Section 1.9. Effective Date means July 1, 2004, subject, however, to the provisions of Section 6.14 ("Regulatory Approval").

Section 1.10. Employee means Franklin D. Raines.

Section 1.11. Employment means Employee's employment by the Corporation under this Agreement.

Section 1.12. Executive Pension Plan means the Executive Pension Plan of the Federal National Mortgage Association as from time to time amended and in effect, or any successor plan.

Section 1.13. Existing Agreement is defined in the preamble to this Agreement.

Section 1.14. Good Reason means (a) a material reduction by the Corporation of Employee's authority or a material change in Employee's functions, duties or responsibilities that in any material way would cause Employee's position to become less important, (b) a reduction in Employee's Base Salary or the dollar amount of the cash salary portion thereof, (c) a requirement by the Corporation that Employee relocate his office outside of the Washington, D.C. area, or (d) a breach by the Corporation of any material obligation of the Corporation under this Agreement, unless, within 30 days of the written notice given by Employee and specifying a circumstance constituting Good Reason, the Corporation eliminates such circumstance.

Section 1.15. OFHEO means the Office of Federal Housing Enterprise Oversight.

Section 1.16. Option is defined in the Stock Compensation Plan.

Source: FEDERAL NATIONAL MOR, 10–Q, May 10, 2004

Section 1.17. Performance Share Award is defined in the Stock Compensation Plan.

Section 1.18. Qualifying Termination means Termination of Employment (i) by the Corporation without Cause, (ii) by Employee for Good Reason, (iii) by Retirement, (iv) by reason of Serious Illness or Disability or (v) by reason of Employee's death.

Section 1.19. Restricted Stock is defined in the Stock Compensation Plan.

Section 1.20. Retirement means (i) Employee's voluntary retirement pursuant to prior written notice as specified in Section 4.2(b) from service with Fannie Mae at or after the attainment of age 55, or (ii) Termination of Employment by reason of the expiration of the Agreement Term, or (iii) Termination of Employment by Employee by reason of Employee's acceptance of an appointment to a senior position in the U.S. Federal Government.

Section 1.21. Serious Illness or Disability means a serious physical or mental illness or disability which, in the reasonable determination of the Board, prevents Employee from performing his duties under this Agreement for a period of at least six months in any twelve–month period.

Section 1.22. Stock Compensation Plan means either or both, as the context requires, of the Fannie Mae Stock Compensation Plan of 1993 and the Fannie Mae Stock Compensation Plan of 2003, in each case as from time to time amended and in effect, or any successor plan.

Section 1.23. Surviving Spouse is defined in the Executive Pension Plan.

Section 1.24. Termination of Employment means the cessation of Employment for any reason.

–4–

Source: FEDERAL NATIONAL MOR, 10–Q, May 10, 2004

## ARTICLE 2
## PERIOD OF EMPLOYMENT AND DUTIES

Section 2.1. Period of Employment. The Corporation shall continue to employ Employee, and Employee shall continue to serve, as Chairman of the Corporation's Board of Directors and Chief Executive Officer of the Corporation, upon the terms and conditions of this Agreement, for the period July 1, 2004 through the last day of the Agreement Term unless there is an earlier Termination of Employment. The Agreement Term may be extended by mutual written agreement of the parties entered into at any time prior to the date the Agreement Term would otherwise expire.

Section 2.2. Duties. Employee shall serve the Corporation under this Agreement as Chairman of the Corporation's Board of Directors and as Chief Executive Officer. Employee shall devote his full business time and attention to the Corporation and shall faithfully and diligently perform such duties for the Corporation, consistent with his position as Chairman of the Corporation's Board of Directors and as Chief Executive Officer, as may be determined from time to time by the Board. Employee shall be subject to the Corporation's standards of conduct and similar policies and procedures applicable generally to members of the Board of Directors or to the Corporation's executive officers, as the case may be. Employee may (a) serve on corporate, civic or charitable boards or committees or (b) manage personal investments, so long as such activities do not materially interfere with the performance of his responsibilities under this Agreement and so long as such activities comply with the aforementioned standards, policies and procedures of the Corporation. During his Employment, Employee shall be nominated for election to the Corporation's Board of Directors and shall be identified as a nominee recommended for election by the Board, at each annual meeting of the stockholders of the Corporation.

–5–

# ARTICLE 3
## COMPENSATION AND BENEFITS

Section 3.1. Base Salary. During Employee's Employment, the Corporation shall pay (or, in the case of non–cash compensation, provide) to Employee Base Salary of not less than his base salary at June 30, 2004. The cash component of Employee's Base Salary shall be paid on the same periodic basis as payments of base salary to other senior executives of the Corporation and shall not be less than the cash component of Employee's base salary at June 30, 2004. The non–cash component, if any, of Employee's Base Salary shall be provided in such form or forms and subject to such terms and conditions as the Board may determine in its reasonable discretion, including, if it so determines, vesting or performance conditions (which, if such non–cash component is part of another award, shall be consistent with the vesting or performance conditions applicable generally to such other award). The Board shall from time to time review Employee's Base Salary and may increase (but in no event decrease) the aggregate dollar amount of such Base Salary by such amounts as it deems proper.

Section 3.2. Benefits.

(a) Executive Pension Plan. The parties acknowledge that the Corporation has previously designated Employee as a participant in the Executive Pension Plan. Notwithstanding any provision of the Executive Pension Plan to the contrary, the following provisions shall apply to Employee:

(i) Employee's "Pension Goal" under the Executive Pension Plan shall at all times be equal to at least 60% of his "High–Three Total Compensation." High–Three Total Compensation shall be as defined in the Executive Pension Plan, except that in determining "Total Compensation" for purposes of such definition, (A) the base salary component of that term shall be determined by Employee's Base Salary hereunder (and,

–6–

for prior years, by his base salary under prior agreements with the Corporation), whether or not currently taxable, and (B) the "other taxable compensation" component of that term shall include, for any year, up to 100 percent of Employee's Base Salary (or, under prior agreements, base salary) for such year, except as provided in Section 5.3. There shall be no actuarial adjustment to any benefits payable under the Executive Pension Plan by reason of the commencement of benefit payments prior to Employee's reaching age 60. If Employee dies after Termination of Employment, his Surviving Spouse shall receive (regardless of her age at the time of Employee's death) monthly payments, commencing on the first day of the month coincident with or next following the date of Employee's death and continuing for her lifetime, equal to 100% of the monthly amount that was being paid to Employee at the time of his death (or, if Employee dies after Termination of Employment but before commencement of payments under the Executive Pension Plan, that Employee would have received had payments commenced prior to his death).

(ii) The Corporation may amend the Executive Pension Plan from time to time; provided, however, that no such amendment shall decrease Employee's Pension Goal or the vested benefits to which Employee or his Surviving Spouse, if any, would have been entitled under such Plan, as modified in this Agreement, as in effect on the Effective Date or, if benefits are improved, as of the date of such improvement.

(b) Options. Employee shall be considered for grants of Options consistent with the compensation philosophy of the Corporation set forth in the charter of the Compensation Committee of the Board.

--7--

(c) <u>Annual Incentive Plan</u>. Employee shall be considered for a potential award under the Annual Incentive Plan for each year during Employment consistent with the compensation philosophy of the Corporation set forth in the charter of the Compensation Committee of the Board.

(d) <u>Performance Share Awards</u>. Employee shall be considered for grants of Performance Share Awards consistent with the compensation philosophy of the Corporation set forth in the charter of the Compensation Committee of the Board.

(e) <u>Restricted Stock</u>. Employee shall be considered for grants of Restricted Stock consistent with the compensation philosophy of the Corporation set forth in the charter of the Compensation Committee of the Board.

(f) <u>Life Insurance and Death Benefits</u>. Employee shall receive life insurance benefits consistent with the Corporation's life insurance policies and programs as from time to time in effect.

(g) <u>Other Benefits</u>. The Corporation shall provide Employee with the following additional benefits during Employment:

(i) The Corporation shall pay or reimburse Employee for reasonable expenses incurred by Employee in obtaining tax and investment assistance and advice.

(ii) The Corporation shall pay or reimburse the legal expenses incurred by Employee in connection with the negotiation of this Agreement.

(iii) The Corporation shall provide Employee with access to a car and driver for transportation relating to the Corporation's business purposes.

—8—

(iv) The Corporation shall pay or reimburse Employee for actual expenses incurred by Employee for a complete annual physical examination at a medical facility of his choice.

(h) General Rights Under Benefit Plans.

(i) Employee shall at all times during the Employment Term be entitled to participate in all long– or short–term bonus, stock option, restricted stock, and other executive compensation plans, and in all perquisite programs and disability, retirement, stock purchase, thrift and savings, health, medical, life insurance, expense reimbursement and similar plans of the Corporation which are from time to time in effect and in which other senior officers of the Corporation generally are entitled to participate. Except as otherwise provided in this Agreement, Employee's participation in such plans and programs shall be in accordance with the provisions of such plans and programs applicable from time to time, it being the intent of the parties hereto that nothing in this Agreement shall decrease the rights and benefits of Employee under any such plans and programs as may be in effect from time to time. Employee's rights as a participant under any compensation, benefit or fringe benefit plan or arrangement of the Corporation that is from time to time in effect and in which other senior officers of the Corporation generally are entitled to participate shall be subject to this Agreement and modified to the extent expressly provided herein, but except as so modified shall be determined under the applicable provisions of such plans and programs; provided, that all such plans and programs and this Agreement shall be construed and administered to avoid any duplication of benefits under any such plan or program and this Agreement.

–9–

Source: FEDERAL NATIONAL MOR, 10–Q, May 10, 2004

(ii) Except as specifically set forth in this Agreement, or as specifically permitted by the terms of any such plan or program, no right or benefit under any such plan or program shall become vested or exercisable after Termination of Employment.

## ARTICLE 4
## TERMINATION OF EMPLOYMENT

Section 4.1. Termination of Employment By the Corporation.

(a) Without Cause. The Corporation shall have the right to terminate Employee's Employment without Cause at any time for any reason in the Corporation's sole discretion by giving thirty (30) days' prior written notice to Employee.

(b) For Cause. The Corporation may terminate Employee's Employment for Cause. For purposes of this Agreement, termination for "Cause" shall have the meaning set forth at Section 4.1(b)(i) below, and Employee's Employment shall not be treated as having been terminated for Cause unless such termination is accomplished in accordance with Section 4.1(b)(ii) below.

(i) For purposes of this Agreement, Employee shall be treated as having been terminated for "Cause" only if Employee has (A) been convicted of, or pleaded *nolo contendere* with respect to, a felony, or (B) participated personally in an act of fraud in the discharge of his duties under this Agreement that demonstrably discredits the Corporation and that cannot be cured, or (C) continued for 30 days following written notice from the Corporation to engage in activities that are not contemplated or permitted by this Agreement and that involve a material conflict of interest with Employee's duties and responsibilities under this Agreement, or (D) continued for 30 days following written notice from the Corporation to fail substantially to perform the material duties of his office (other than as a result of total or partial incapacity due to physical or mental

–10–

Source: FEDERAL NATIONAL MOR, 10–Q, May 10, 2004

illness or disability), or (E) failed to cure, within 30 days following written notice from the Corporation, any material breach of the material terms of this Agreement or of any written noncompetition, nondisclosure or nonsolicitation policy or agreement to which Employee is at the time subject or by which he is at the time bound. The Corporation's written notice to Employee referred to in (C), (D) and (E) above will not be deemed to have been given unless it identifies with particularity the asserted basis or bases for a for–Cause termination and requests, with specific reference to this Section 4.1(b)(i), that it or they be corrected or cured.

(ii) The Corporation by written notice may terminate Employee's employment for Cause at any time following the occurrence of an event described in Section 4.1(b)(i)(A) above. Within 10 days following the occurrence of an act described in Section 4.1(b)(i)(B) above, or following the end of the 30–day correction or cure period described in any of Section 4.1(b)(i)(C), (D) or (E) above, if the basis or bases asserted by the Board for a for–Cause termination thereunder have not been corrected or cured, the Board shall give written notice to Employee setting forth with particularity the asserted basis or bases for a for–Cause termination and giving Employee a reasonable opportunity, including reasonable access to information and documents, to appear with counsel before the Board to contest the asserted basis or bases for such termination. Employee shall not be treated as having been terminated for Cause unless, following such opportunity to contest the basis or bases for termination, the Board determines in writing by the affirmative vote of a majority of its members that the asserted basis or bases for termination exist under Section 4.1(b)(i)(B) through (E), as applicable, above and that Employee is therefore terminated for Cause. During the pendency of any process

–11–

Source: FEDERAL NATIONAL MOR, 10–Q, May 10, 2004

described in the immediately preceding sentence, the Corporation may transfer some or all of Employee's duties and responsibilities to one or more other officers of the Corporation, but until Employee's employment is terminated in accordance with the preceding provisions of this Section 4.1(b)(ii) he shall continue during the Agreement Term to be entitled to all the remuneration and employee benefits to which he would otherwise be entitled as an active employee under this Agreement. In any proceeding before the Board described in this Section 4.1(b)(ii), where Employee's good faith in the performance of his duties is in question, such good faith shall be presumed unless the preponderance of the evidence indicates otherwise.

(c) <u>By Reason of Serious Illness or Disability</u>. In the event of Employee's Serious Illness or Disability during Employment, the Corporation may terminate Employee's Employment by giving Employee at least 60 days' advance written notice specifying the date of termination. If, on or before the date of termination specified in such notice, Employee recovers and is again able to perform his duties hereunder, such notice shall be void, and Employee's Employment shall not be terminated thereby.

Section 4.2. <u>Termination of Employment By Employee</u>.

(a) <u>For Good Reason</u>. Employee shall have the right to terminate his Employment for Good Reason, unless the Corporation prior to such termination shall have cured the asserted basis for the Good Reason claim, by giving not less than 30 days' prior written notice to the Corporation, which notice must be given within six calendar months after the event giving rise to the Good Reason.

(b) <u>By Retirement</u>. Employee shall have the right to terminate his Employment by Retirement by giving not less than six months' prior written notice to the Corporation, which

–12–

Source: FEDERAL NATIONAL MOR, 10–Q, May 10, 2004

notice may not be given after the Corporation has provided a written notice of termination to Employee under Section 4.1(b). Voluntary termination by Employee of his Employment, other than as set forth in Section 1.20, shall not constitute Retirement for purposes of this Agreement but may result in a termination described in Section 4.2(c).

(c) Other Than For Good Reason or Retirement. Employee shall have the right to terminate his Employment at any time for any reason other than Good Reason or Retirement in his sole discretion by giving not less than 30 days' prior written notice to the Corporation, which notice may not be given after the Corporation has provided a written notice of termination to Employee under Section 4.1(b). Upon receipt of any such notice from Employee, the Corporation shall have the option, exercisable by giving Employee written notice within 30 days of such receipt, to designate any date (not earlier than 30 days after the date of Employee's notice) as the date on which Employee's Employment shall cease. The effective date of the Termination of Employment hereunder shall be the date so designated by the Corporation if earlier than the date specified by Employee. In no event shall the Termination of Employment by the Corporation without Cause, by Employee for Good Reason or by reason of Retirement, be deemed to be a Termination of Employment by Employee pursuant to this Section 4.2(c).

Section 4.3. Other Termination of Employment. Employee's Employment shall also terminate on Employee's death.

Section 4.4. Resignation as Member of the Board of Directors. A Termination of Employment shall constitute, unless otherwise requested by the Board, Employee's resignation as a member of the Corporation's Board of Directors and as a member of the Board of Directors of the Fannie Mae Foundation, effective on the date of the Termination of Employment.

–13–

Source: FEDERAL NATIONAL MOR, 10–Q, May 10, 2004

**ARTICLE 5**
**COMPENSATION AND BENEFITS FOLLOWING TERMINATION OF EMPLOYMENT**

Section 5.1. Termination of Employment (Other Than By Reason of Death). If there is a Termination of Employment for any reason other than Employee's death, Employee shall be entitled to receive, and within 30 days of such Termination of Employment shall commence to receive, his vested normal retirement benefit under the Executive Pension Plan as modified by this Agreement and in the form provided in the Executive Pension Plan. Except as provided in the preceding sentence (relating to benefits under the Executive Pension Plan), upon a Termination of Employment Employee shall be entitled to receive only those vested benefits, if any, to which he is entitled under any pension, profit–sharing or stock plan or plans maintained by the Corporation (except as otherwise expressly provided in Sections 5.2 through 5.5, as applicable) and to those payments and benefits, if any, as are specified in Sections 5.2 through 5.5, as applicable.

Section 5.2. Voluntary Termination Pursuant to Section 4.2(c). If the Termination of Employment is a voluntary termination pursuant to Section 4.2(c), then in addition to the benefits payable under Section 5.1 and payment of all accrued but unpaid Base Salary amounts, plus all amounts payable (but unpaid) under any Performance Share Award with respect to an Award Period that had ended on or prior to the Termination of Employment, Employee shall be entitled to the benefits described in Section 5.4(e) (Medical and Dental Coverage) and Section 5.4(f) (Administration), in each case on the same basis as if his Termination of Employment had been by reason of a Qualifying Termination, and to the benefits described in Section 5.4(c) (Performance Share Awards) determined by applying the provisions of Section 5.4(c) as if Employee's Termination of Employment had been by reason of a Qualifying Termination.

–14–

Employee shall be entitled to such rights, if any, under any awards of Restricted Stock as are set forth in the applicable awards.

      Section 5.3. Termination for Cause. In the event of a Termination of Employment for Cause, except as provided in Section 5.1 Employee shall not be entitled to any payments or benefits except as follows: Employee shall be entitled to all amounts payable (but unpaid) under any Performance Share Award with respect to an Award Period commencing prior to July 1, 2004 that had ended on or prior to the Termination of Employment. In addition, Employee shall be entitled to the benefits described in Section 5.4(c) (Performance Share Awards) with respect to Award Periods commencing prior to July 1, 2004 in which at least 18 months had elapsed prior to the date of the Termination of Employment determined by applying the provisions of Section 5.4(c) as if Employee had incurred a Qualifying Termination. Any Performance Share Awards with respect to Award Periods commencing on or after July 1, 2004 shall be forfeited. All Options, vested and unvested, that are granted on or after July 1, 2004 and that are held by Employee at Termination of Employment shall be immediately and automatically canceled. Vested Options granted prior to July 1, 2004 shall continue to be exercisable for the remainder of their stated term, and all unvested Options that were granted prior to July 1, 2004 and that are held by Employee at Termination of Employment shall be immediately and automatically canceled. Employee shall be entitled to such rights, if any, under any awards of Restricted Stock as are set forth in the applicable awards. In the event of a Termination of Employment for Cause, the benefit payable to Employee and/or his Surviving Spouse under the Executive Pension Plan shall be determined by applying Section 3.2(a)(i)(B) for all periods relevant to the determination of the benefit under the Executive Pension Plan with the following modification:

–15–

Source: FEDERAL NATIONAL MOR, 10–Q, May 10, 2004

in lieu of the words "up to 100 percent" under Section 3.2(a)(i)(B), there shall be substituted the words "up to 50 percent".

Section 5.4. Qualifying Termination (Other Than by Reason Of Death). If there is a Qualifying Termination (other than by reason of Employee's death) then in addition to the benefits payable under Section 5.1 Employee shall be entitled to prompt payment of all accrued but unpaid Base Salary amounts, all amounts payable (but unpaid) under the Annual Incentive Plan with respect to any year ended on or prior to the Qualifying Termination, and all amounts payable (but unpaid) under any Performance Share Award with respect to an Award Period that had ended on or prior to the Qualifying Termination, plus the following:

(a) Options. In the event of a Qualifying Termination, Employee's Options shall become exercisable as provided in (i) through (iv) below, as applicable, and except as so provided shall be immediately and automatically cancelled:

(i) If the Qualifying Termination occurs by reason of Serious Illness or Disability or by Employee for Good Reason, all of Employee's Options shall become immediately exercisable.

(ii) If the Qualifying Termination occurs by reason of a termination by the Corporation without Cause, all of Employee's Options granted prior to July 1, 2004 shall become immediately exercisable. Employee's Options granted on or after July 1, 2004 shall also become immediately exercisable, except that the Board in its discretion may determine, taking into account Employee's performance and the interests of the Corporation, that any portion of such Options that would have become exercisable (had Employee continued in employment) more than one year following the date of the

–16–

Source: FEDERAL NATIONAL MOR, 10-Q, May 10, 2004

Termination of Employment shall be canceled, in which event such portion shall be canceled.

(iii) If the Qualifying Termination is by reason of Retirement occurring at the end of the Agreement Term, all of Employee's Options shall become immediately exercisable. If the Retirement occurs prior to the end of the Agreement Term, Employee's Options granted on or after January 1, 2003 and before July 1, 2004 shall become immediately exercisable and his Options granted on or after July 1, 2004 shall become exercisable only for the number of additional shares for which they would have become exercisable had Employee continued in employment for one additional year.

In each of the foregoing cases, Employee's Options, to the extent exercisable, shall remain exercisable for the remainder of their stated term.

(b) <u>Annual Incentive Plan</u>. The Corporation shall pay to Employee at the time of payment of awards to other participants in the Annual Incentive Plan for the year in which the Qualifying Termination occurs (even if Employee is not employed by the Corporation on the last day of such year), except as hereinafter provided, a prorated amount equal to (i) the award that would have been payable to Employee for such year had he remained in Employment, based on actual results for such year, multiplied by (ii) a fraction, the numerator of which is the number of days of Employment during such year and the denominator of which is 365. In the case of a Qualifying Termination by reason of a Retirement described in clause (iii) of Section 1.20, the Corporation shall promptly accelerate the payment of the prorated Annual Incentive Plan payment described in this Section 5.4(b). In the case of any other Qualifying Termination subject to this Section 5.4, the Corporation in its discretion may accelerate the payment of any portion or all of such prorated Annual Incentive Plan payment. In any case where payment

–17–

Source: FEDERAL NATIONAL MOR, 10–Q, May 10, 2004

under this Section 5.4(b) is accelerated, the amount determined under clause (i) above shall be the award that the Board determines Employee would have received for the year in which the Qualifying Termination occurs based on the Board's determination of the likelihood of the Corporation's achievement of targets for such year.

(c) Performance Share Awards. Notwithstanding any provision of the Stock Compensation Plan to the contrary, in the case of any Qualifying Termination, the Corporation shall deliver to Employee, with respect to each Performance Share Award then held by Employee, after the end of the Award Period applicable to such Award, the product of (i) the award that would have been payable to Employee for such Award Period had he remained in Employment, based on actual results for such Award Period, and (ii) a fraction, the numerator of which is the number of days of Employment in such Award Period and the denominator of which is the total number of days in such Award Period. In the case of a Qualifying Termination by reason of a Retirement described in clause (iii) of Section 1.20, the Corporation shall promptly accelerate the payment of all prorated Performance Share Award payments described in this Section 5.4(c). In the case of any other Qualifying Termination subject to this Section 5.4, the Corporation in its discretion may accelerate the payment of any portion or all of any such payments. In any case where payment under this Section 5.4(c) is accelerated, the amount determined under clause (i) above shall be the award that the Board determines Employee would have received for the Award Period in which the Qualifying Termination occurs based on the Board's determination of the likelihood of the Corporation's achievement of targets for such Award Period.

(d) Restricted Stock. Employee shall be entitled to such rights, if any, under any awards of Restricted Stock as are set forth in the applicable awards.

–18–

(e) Medical and Dental Coverage. Employee and Employee's family shall continue to receive medical and dental insurance coverage as follows. To the extent permitted under the Corporation's medical and dental plans, the Corporation shall continue the medical and dental coverage elected by Employee for Employee and Employee's spouse and dependents (but in the case of employee's dependents only for so long as they remain dependents or until age 21 if later), without premium payments by Employee, for Employee's life. After Employee's death, the Corporation shall continue the medical and dental coverage elected by Employee, without premium payments by Employee's family, for Employee's Surviving Spouse for her life, and for the other dependents of Employee on the date of his death, so long as such dependents are under the age of 21 or, under the definitions set forth in such medical and dental plan, such dependents remain dependents of Employee's Surviving Spouse. If, for any reason, it is not possible for Employee, Employee's Surviving Spouse or the other eligible dependents of Employee to participate in medical and dental coverage pursuant to this Agreement, the Corporation shall make arrangements to provide comparable coverage.

(f) Administration. During such time following Employee's Qualifying Termination (during his lifetime) as he is not employed by any person on a full–time basis, the Corporation shall provide administrative services to support the provision of an office and related secretarial and administrative services for Employee's benefit, provided that Employee reimburses the Corporation for the fair market value of such office and services as reasonably determined by the Corporation.

Section 5.5. Termination of Employment By Reason of Death. If there is a Termination of Employment by reason of Employee's death, then in addition to the benefits

–19–

Source: FEDERAL NATIONAL MOR, 10–Q, May 10, 2004

payable under Section 5.1 and the payment to Employee's estate of Employee's accrued but unpaid Base Salary:

(a) <u>Executive Pension Plan</u>. Employee's Surviving Spouse shall receive (regardless of her age at the time of Employee's death) monthly payments, commencing within 30 days of Employee's death and continuing for her lifetime, equal to the monthly normal retirement benefit that Employee would have received under the Executive Pension Plan as modified in this Agreement had he terminated employment on the date of his death.

(b) <u>Options</u>. All Employee's Options shall become immediately exercisable by the person or persons to whom Employee's rights under such Options pass by will or applicable law and shall remain exercisable for the remainder of their respective terms.

(c) <u>Annual Incentive Plan</u>. The Corporation shall pay to Employee's designated beneficiary or, if none, to Employee's estate, as soon as is practicable after the date of Employee's death, all amounts payable (but unpaid) under the Annual Incentive Plan with respect to any year ended on or prior to death plus, for the year of death, a prorated amount equal to (i) the award that the Board determines Employee (had he lived) would have received for the year in which his death occurs based on the Board's determination of the likelihood of the Corporation's achievement of targets for such year multiplied by (ii) a fraction, the numerator of which is the number of days of Employment during such year prior to his death and the denominator of which is 365.

(d) <u>Performance Share Awards</u>. The Corporation shall pay to Employee's designated beneficiary or, if none, to Employee's estate, as soon as is practicable after the date of Employee's death, all amounts payable (but unpaid) under any Performance Share Award with respect to an Award Period that had ended on or prior to the date of death, plus an amount with

–20–

respect to Performance Share Awards made for each Award Period that had not ended prior to the date of death equal to the award that the Board determines Employee (had he lived) would have received for the Award Period in which his death occurs based on the Board's determination of the likelihood of the Corporation's achievement of targets for such Award Period multiplied by a fraction, the numerator of which is the number of days in the Award Period that had elapsed prior to Employee's death and the denominator of which is the total number of days in the Award Period.

(e) Restricted Stock. Any outstanding awards of Restricted Stock shall be treated in accordance with the terms set forth in the applicable awards.

(f) Medical and Dental Benefits. The Corporation shall continue the medical and dental coverage elected by Employee, without premium payments by Employee's family, for Employee's Surviving Spouse for her life, and for the other dependents of Employee on the date of his death, so long as such dependents are under the age of 21 or, under the definitions set forth in such medical and dental plan, such dependents remain dependents of Employee's Surviving Spouse. If, for any reason, it is not possible for Employee's Surviving Spouse or the other eligible dependents of Employee to participate in medical and dental coverage pursuant to this Agreement, the Corporation shall make arrangements to provide comparable coverage.

## ARTICLE 6
## MISCELLANEOUS

Section 6.1. Noncompetition.

(a) Following Termination of Employment for any reason, during the one-year period following the date of the Termination of Employment, Employee shall not, directly or indirectly, (i) Compete in the United States, (ii) solicit any officer or employee of the Corporation or any of

-21-

Source: FEDERAL NATIONAL MOR, 10-Q, May 10, 2004

its affiliates to engage in any conduct prohibited hereby for Employee or to terminate any existing relationship with the Corporation or such affiliate or (iii) assist any other person to engage in any activity in any manner prohibited hereby to Employee.

(b) The need to protect the Corporation against Employee's competition, as well as the nature and scope of such protection, has been carefully considered by the parties hereto in light of the uniqueness of Employee's talent and his importance to the Corporation. Accordingly, Employee agrees that, in addition to any other relief to which the Corporation may be entitled, the Corporation shall be entitled to seek and obtain injunctive relief (without the requirement of a bond) from a court of competent jurisdiction for the purpose of restraining Employee from any actual or threatened breach of the covenant contained in Section 6.1(a).

(c) If for any reason a final decision of any court determines that the restrictions under this Section 6.1 are not reasonable or that the consideration therefore is inadequate, such restrictions shall be interpreted, modified or rewritten by such court to include as much of the duration, scope and geographic area identified in this Section 6.1 as will render such restrictions valid and enforceable.

Section 6.2. Payment of Certain Expenses. As promptly as permitted by law the Corporation shall pay or advance to Employee all legal fees and expenses that Employee may reasonably incur as a result of any contest or arbitration requested by the Corporation, Employee or others of the validity or enforceability of, or liability under, any provision of this Agreement (including any contest initiated by Employee concerning the amount of any payment due pursuant to this Agreement), plus in each case interest at the applicable federal rate provided for in Section 7872(f)(2)(A) of the Internal Revenue Code of 1986, as amended, on any payment of legal fees and expenses that is delayed by more than 10 days following delivery by Employee to

–22–

Source: FEDERAL NATIONAL MOR, 10–Q, May 10, 2004

the Corporation of a proper request for payment. If as to any such contest or arbitration Employee does not prevail, and only in such case, within 10 days following written demand from the Corporation Employee shall repay any advance made by the Corporation pursuant to the immediately preceding sentence with respect to such contest or arbitration, with interest at the applicable federal rate provided for in Section 7872(f)(2)(A) of the Internal Revenue Code of 1986, as amended, from the date of the Corporation's payment.

Section 6.3. Assignment by Employee. Except as otherwise expressly provided herein or in the Corporation's benefit plans, the obligations, rights and benefits of Employee hereunder are personal to him, and no such obligation, right or benefit shall be subject to voluntary or involuntary alienation, assignment, delegation or transfer.

Section 6.4. No Funding Required. Nothing in this Agreement shall be construed as requiring the Corporation to establish a trust or otherwise to fund any payments to be made under this Agreement, but the Corporation in its discretion may establish such nonqualified trusts or other arrangements as it determines to be appropriate to assist it in meeting its obligations under this Agreement.

Section 6.5. Nondisclosure of Confidential Information. Employee acknowledges that he is bound by the terms of an Agreement on Ideas, Inventions and Confidential Information dated April 2001. Nothing in this Agreement shall be construed as limiting Employee's obligations under the aforesaid Agreement on Ideas, Inventions and Confidential Information or any successor thereto, which shall be treated for all purposes also as obligations of Employee under this Agreement. This Agreement in no way limits the ability of Employee to provide information covered by this Agreement to a government entity in order to assist the government entity in the fulfillment of its duties.

–23–

Section 6.6. Waiver. The failure of either party hereto to insist upon strict compliance by the other party with any term, covenant or condition of this Agreement shall not be deemed a waiver of such term, covenant or condition, nor shall any waiver or relinquishment or failure to insist upon strict compliance of any right or power hereunder at any one time or more times be deemed a waiver or relinquishment of such right or power at any other time or times.

Section 6.7. Notice. Any notice required or desired to be given pursuant to this Agreement shall be sufficient if transmitted in writing by hand delivery or sent by prepaid courier or by registered or certified mail, postage prepaid, (i) if notice is to the Corporation, to the Corporation's address hereinafter set forth, or (ii) if notice is to Employee, to Employee's address in the metropolitan District of Columbia area contained in the records of the Corporation, or, in either such case, to such other address of a party as such party may designate in writing and transmit to the other party in such manner. Any such notice shall be deemed given, if transmitted by hand delivery, one business day after deposit with a prepaid courier service or, if sent by registered or certified mail, three business days after deposit in the United States mail.

Section 6.8. Applicable Law. This Agreement shall be governed by the laws of the District of Columbia without regard to any otherwise applicable conflict of laws principles.

Section 6.9. Taxes. The Corporation shall deduct from all amounts payable under this Agreement all federal, state, local and other taxes required by law to be withheld with respect to such amounts.

Section 6.10. Benefit. Except as otherwise expressly provided herein, this Agreement shall inure to the benefit of and be binding upon the Corporation, its successors and assigns, and upon Employee, his spouse, heirs, executors and administrators. The Corporation shall require

–24–

any successor (whether direct or indirect, by purchase, merger, reorganization, consolidation, acquisition of property or stock, liquidation or otherwise) to all or a substantial portion of its assets, by agreement in form and substance reasonably satisfactory to Employee, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Corporation would be required to perform this Agreement if no such succession had taken place. Regardless of whether such an agreement is executed, this Agreement shall be binding upon any successor of the Corporation, and such successor shall be deemed the "Corporation" for purposes of this Agreement.

Section 6.11. Entire Agreement. This Agreement contains the entire understanding and agreement between the parties relating to the terms of Employee's employment by the Corporation and, except as otherwise provided in Section 6.14, supersedes all prior written or oral agreements between them, other than the Agreement on Ideas, Inventions and Confidential Information dated April 2001 and an Indemnification Agreement between the Corporation and Employee. This Agreement cannot be amended, modified or supplemented in any respect except by an agreement in writing signed by both parties hereto.

Section 6.12. Arbitration. Any controversy or claim arising out of or relating to this Agreement or the breach of this Agreement shall be settled by arbitration in the District of Columbia in accordance with the laws of the District of Columbia. The arbitration shall be conducted in accordance with the applicable rules of the American Arbitration Association. The costs and expenses of the arbitrator(s) shall be borne by the Corporation. Except as otherwise provided in Section 6.2, each party shall pay his or its own legal costs and other expenses (other than the costs and expenses of the arbitrator(s)) relating to an arbitration. The award of the

–25–

Source: FEDERAL NATIONAL MOR, 10–Q, May 10, 2004

arbitrator(s) shall be binding upon the parties. Judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction.

Section 6.13. Severability. Except as otherwise provided in Section 6.14, it is the intent and understanding of each party hereto that, if any term, restriction, covenant or promise herein is found to be invalid or otherwise unenforceable, then such term, restriction, covenant or promise shall not thereby be invalid or unenforceable but shall be deemed modified to the extent necessary to make it enforceable and, if it cannot be so modified, shall be deemed amended to delete therefrom such provision or portion found to be invalid or unenforceable, such modification or amendment in any event to apply only with respect to the operation of this Agreement in the particular jurisdiction in which such finding is made.

Section 6.14. Regulatory Approval

The parties hereto acknowledge and agree that pursuant to Section 309(d) of the Federal National Mortgage Association Charter Act, as amended by the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (as so amended, the "Act"), 12 U.S.C. 1723a(d), no provision of this Agreement relating to Employee's benefits upon termination of employment shall be effective unless and until such provision has been reviewed and approved by the Director (the "Director") of the Office of Federal Housing Enterprise Oversight ("OFHEO"). The parties therefore agree as follows:

(a) The Corporation shall promptly hereafter submit this Agreement to the Director for his review and approval of those terms hereof relating to benefits upon termination of employment and shall seek diligently to obtain such approval;

(b) This Agreement shall take effect as of the Effective Date if the Director's approval of terms hereof relating to benefits upon termination of employment is given by January 1, 2005. If

–26–

Source: FEDERAL NATIONAL MOR, 10–Q, May 10, 2004

such approval does not occur by such date, Employee shall have the benefit of all other terms of this Agreement until that date and Employee, in his sole discretion, may designate that failure to obtain approval as a "failure of the Corporation to extend" the Existing Agreement.

**[remainder of page intentionally left blank]**

–27–

Source: FEDERAL NATIONAL MOR, 10–Q, May 10, 2004

IN WITNESS WHEREOF, the Corporation has caused this Agreement to be executed by its duly authorized representative, and Employee has executed this Agreement.

Witness:

/s/ Monica Medina


Date: 4/19/04
Witness:
/s/ Anthony F. Marra

Date: 5/3/04

**FANNIE MAE**
3900 Wisconsin Avenue, N.W.
Washington, D.C. 20016
By: /s/ Anne Mulcahy
Chairman of the Compensation
Committee of the Board
Date: 4/19/04


/s/ Franklin D. Raines
**FRANKLIN D. RAINES**
Date: 5/3/04

–28–

Source: FEDERAL NATIONAL MOR, 10–Q, May 10, 2004

**EXHIBIT 2**


10kWIZARD
SEC POWER SEARCH

# FORM 8–K

## FEDERAL NATIONAL MORTGAGE ASSOCIATION FANNIE MAE – FNM

**Filed: December 27, 2004 (period: December 19, 2004)**

Report of unscheduled material events or corporate changes.

# Table of Contents

**Item 1.02.**   Termination of a Material Definitive Agreement.

**Item 5.02**   Departure of Directors or Principal Officers; Election of Directors; Appointment of Princi

**Item 8.01**   Other Events.

**Item 9.01**   Financial Statements and Exhibits.

SIGNATURE
EXHIBIT INDEX
EX–99.1 (EXHIBIT 99.1)

EX–99.2 (EXHIBIT 99.2)

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION

### Washington, DC 20549

# FORM 8–K

### CURRENT REPORT
### Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): **December 19, 2004**

# Federal National Mortgage Association

*(Exact name of registrant as specified in its charter)*

**Fannie Mae**

| **Federally chartered corporation** | **000–50231** | **52–0883107** |
|---|---|---|
| *(State or other jurisdiction of incorporation)* | *(Commission File Number)* | *(IRS Employer Identification Number)* |

| **3900 Wisconsin Avenue, NW Washington, DC** | **20016** |
|---|---|
| *(Address of principal executive offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code: 202–752–7000**

*(Former Name or Former Address, if Changed Since Last Report):* _____

Check the appropriate box below if the Form 8–K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a–12 under the Exchange Act (17 CFR 240.14a–12)

☐ Pre–commencement communications pursuant to Rule 14d–2(b) under the Exchange Act (17 CFR 240.14d–2(b))

☐ Pre–commencement communications pursuant to Rule 13e–4(c) under the Exchange Act (17 CFR 240.13e–4(c))

**Item 1.02. Termination of a Material Definitive Agreement.**

On December 21, 2004, Fannie Mae (formally the Federal National Mortgage Association) announced the retirement of the company's Chairman and Chief Executive Officer, Franklin D. Raines, and the resignation of the company's Vice Chairman and Chief Financial Officer, J. Timothy Howard.

As a result of his retirement, Mr. Raines' employment under his employment agreement with Fannie Mae and service on the Board of Directors terminated on December 21, 2004. Mr. Howard's employment under his employment agreement with Fannie Mae will terminate on January 31, 2005. Mr. Howard ceased his duties as Chief Financial Officer as of December 21, 2004, upon the appointment of Robert J. Levin as interim Chief Financial Officer as described in item 5.02 below. Mr. Howard will serve on the Board of Directors until January 31, 2005. Copies of the agreements with Messrs. Raines and Howard, as entered into in May 2004 and amended on June 30, 2004, were filed with Fannie Mae's quarterly report on Form 10–Q for the quarter ended June 30, 2004. The agreements were subsequently amended in September 2004, and copies of the amendments were filed as exhibits to a Form 8–K Fannie Mae filed on September 23, 2004. The Office of Federal Housing Enterprise Oversight ("OFHEO") approved the termination benefits in the agreements with Mr. Raines and Mr. Howard on November 17, 2004 and December 13, 2004, respectively.

On December 23, 2004, Fannie Mae received a letter from OFHEO informing Fannie Mae that OFHEO would review Mr. Raines' and Mr. Howard's termination benefits that accrue as a result of Mr. Raines' retirement and Mr. Howard's resignation and requesting information regarding those benefits. OFHEO indicated that, among other matters, it is concerned with whether, at the time of termination, there have been enhancements or modifications to benefits since the termination package was agreed upon. OFHEO also stated in the December 23 letter that Fannie Mae should not pay any termination benefits to Mr. Raines or Mr. Howard until OFHEO has completed its review thereof.

Fannie Mae will provide OFHEO the information it has requested. Fannie Mae will also consider its legal and contractual obligations regarding payment of compensation and benefits to Mr. Raines and Mr. Howard and will discuss these matters with OFHEO.

*Agreement with Mr. Raines*

In accordance with the terms of his employment agreement and Fannie Mae's employee benefit plans, Mr. Raines is entitled to receive the compensation and benefits described below.

- Stock options. As of December 21, 2004, Mr. Raines held vested and exercisable options to purchase a total of 1,628,071 shares of common stock at exercise prices ranging from $60.3125 to $80.95 per share. Based on the closing price of Fannie Mae's common stock on December 21, 2004 of $70.35, the market price of the shares underlying these options exceeded the exercise price by an aggregate of $5,545,270. Upon Mr. Raines' retirement, options to purchase an additional 233,799 shares at $69.43 per share and an additional 135,020 shares at $78.315

–1–

per share became vested and exercisable, and options to purchase 69,334 shares of common stock at $80.95 per share were canceled. The market price of the shares underlying the vesting options exceeded the exercise price by an aggregate of $215,095, based on the December 21, 2004 closing price. Under Fannie Mae's stock compensation plans, all options held at the time of retirement by any option holder who is at least 55 years old and who has at least 5 years of service with Fannie Mae remain exercisable until their initial expiration date, which is generally 10 years after grant. As a result, Mr. Raines' vested options, including those vesting by reason of his retirement, will expire between May 2008 and January 2014.

• Performance Share Payouts. Under Fannie Mae's Performance Share program, as a member of Fannie Mae's senior management Mr. Raines has previously received awards that entitle him to receive shares of Fannie Mae common stock subject to meeting corporate performance objectives over three–year periods. Each year, the Compensation Committee of Fannie Mae's Board of Directors establishes an award cycle of three years. At the beginning of a cycle, Fannie Mae's Board of Directors establishes program targets based on both financial and non–financial goals, equally weighted. The financial goals currently are tied to growth in core business earnings per share and the non–financial goals are tied to Fannie Mae's strategic plan and mission. Fannie Mae will restate its previously issued financial statements for 2001 through 2004 and re–evaluate previously issued non–GAAP financial information, including core business earnings. The Compensation Committee of the Board will consider the impact thereof on both unpaid performance shares and uncompleted performance share cycles. For the performance cycle completed in 2003, Mr. Raines was determined in January 2004 to be entitled to receive 139,155 shares, of which he has been paid 69,577 shares in accordance with the program. For the cycles concluding in 2004 through 2006, Mr. Raines has been granted awards that would result in him receiving no shares if the threshold goals are not attained or receiving an amount of shares between the threshold and maximum numbers set forth in following table based on attainment of the goals at or above the threshold.

| Award Cycle | Range of Potential Performance Share Payments | | |
|---|---|---|---|
| | threshold | target | maximum |
| 2004 to 2006 | 39,987 | 99,967 | 149,951 |
| 2003 to 2005 | 43,002 | 107,505 | 161,258 |
| 2002 to 2004 | 48,185 | 120,462 | 180,693 |

The table above presents the total number of shares that Mr. Raines could have become entitled to had his employment with the company continued. If shares are paid out under the program for a given period, the number of shares Mr. Raines will receive will be reduced on a pro rata basis depending on the length of his service during the applicable award cycle. Shares payable to retirees are typically paid out shortly after the conclusion of an award cycle.

–2–

- Annual cash bonus. If the company pays bonuses under its Annual Incentive Plan for 2004, pursuant to his agreement Mr. Raines will be entitled to be considered for a pro–rated bonus. The total amount of bonuses that may be paid under the Annual Incentive Plan to all eligible employees is typically determined based on the achievement of corporate financial goals, measured by core business earnings per share growth. The Compensation Committee of the Board may adjust the goals, with Board approval, in certain specified situations and has discretion to pay bonuses under the plan for individual performance if financial goals are not achieved. Although corporate performance may result in the creation of a bonus pool, the amount of an individual's bonus is based on personal performance. Fannie Mae will restate its financial statements for periods from January 2001 through the second quarter of 2004 and will re–evaluate corresponding non–GAAP financial information including core business earnings. The Compensation Committee of the Board of Directors will consider the impact of the restatement and re–evaluation of the company's non–GAAP financial information on bonuses under the plan. At this time, it cannot be determined whether Mr. Raines will receive a bonus for 2004.

- Pension plans. Under Fannie Mae's pension plans, estimated monthly payments of $114,393 will be payable during the lives of Mr. Raines and his surviving spouse.

- Payout of compensation that Mr. Raines previously earned and deferred under Fannie Mae's deferred compensation plans. Under company plans, Mr. Raines elected to defer the receipt of earned salary and other compensation. The plans permit participants to invest the deferred compensation in various hypothetical portfolios, all of which are tied to the performance of mutual funds available in the market. As of November 30, 2004, Mr. Raines' deferred balance was approximately $8.7 million. This amount will be paid out to Mr. Raines in accordance with elections he previously made in installments of varying amounts through at least 2020. Pending payout, deferred amounts will be allocated by Mr. Raines among the hypothetical investment options in accordance with the plans and will receive a corresponding rate of return.

- Medical and dental coverage. Pursuant to his agreement, Mr. Raines is entitled to lifetime medical and dental coverage for himself and his spouse, and coverage for his dependents until they reach the age of 21 or so long as they remain his dependents, at no cost to Mr. Raines.

- Life insurance. Consistent with Fannie Mae's executive life insurance program, Fannie Mae will pay the premiums on a life insurance policy for Mr. Raines with a benefit of $5,000,000 until he reaches age 60, and a benefit of $2,500,000 thereafter.

- Retirement savings plan. Mr. Raines will receive retirement savings he has accumulated in the company's retirement savings plan (a 401(k) plan) in accordance with the terms of that plan.

- Charitable gift program. Consistent with Fannie Mae's charitable gift program available to all retirees, Mr. Raines will be eligible to have up to $10,000 in charitable contributions matched by the Fannie Mae Foundation per year, up to $500 of which may be matched at a rate of 2–for–1.

- Administrative support. Pursuant to his agreement, Fannie Mae will provide administrative services to support the provision of an office and related secretarial and administrative services for Mr. Raines' benefit during such time as Mr. Raines is not employed on a full–time basis. Mr. Raines must reimburse the company for the fair market value of this benefit, including Fannie Mae's cost of administration.

The company will provide the compensation and benefits described above based on Mr. Raines' retirement from the company on December 21, 2004 pursuant to Section 4.2(b) of his employment agreement, which governs retirement. The Board of Directors waived the requirement under Section 4.2(b) that Mr. Raines provide the company with six months' notice of his retirement. Mr. Raines has asserted to the company that his retirement is not effective until June 22, 2005, which would result in him being entitled to receive approximately $600,000 in salary between December 22, 2004 and his retirement date, and would also result in related adjustments to the benefits described above. Mr. Raines' monthly pension payments would commence after June 22, 2005 in an estimated monthly amount of $116,300. The increased amount is due to the additional six months of service.

–3–

Mr. Raines has also suggested that he may have "Good Reason" to terminate his employment under Section 4.2(a) of his employment agreement. If Mr. Raines' termination were for Good Reason, he would be entitled to the benefits described above relating to retirement under Section 4.2(b) of his agreement. In addition, options to purchase an additional 69,334 shares of common stock at $80.95 per share would vest. These options would expire in November 2011. Under Mr. Raines' employment agreement, any dispute regarding the terms of the agreement will be resolved through arbitration, with the company bearing Mr. Raines' legal expenses unless he does not prevail.

*Agreement with Mr. Howard*

In accordance with the terms of his employment agreement and Fannie Mae's employee benefit plans, Mr. Howard is entitled to receive the compensation and benefits described below. For purposes of the benefits described below, Mr. Howard's resignation is deemed a retirement due to his age and years of service.

- Salary. Mr. Howard will receive approximately $84,000 in salary for the period from December 20, 2004 through January 2005.

- Stock options. As of January 31, 2005, Mr. Howard and his transferees will hold vested and exercisable options to purchase a total of 481,600 shares of common stock at exercise prices ranging from $27.125 to $80.95 per share. Based on the closing price of Fannie Mae's common stock on December 20, 2004 of $69.42, the market price of the shares underlying these options exceeded the exercise price by an aggregate of $4,395,864. As a result of Mr. Howard's resignation, no additional options will become vested after January 31, 2005, and options to purchase 139,048 shares of common stock at prices ranging from $69.43 to $80.95 per share will be canceled without vesting. Under Fannie Mae's stock compensation plans, all options held at the time of retirement by any option holder who is at least 55 years old and who has at least 5 years of service with Fannie Mae remain exercisable until their initial expiration date, which is generally 10 years after grant. As a result, Mr. Howard's vested options will expire between November 2005 and January 2014.

- Performance Share Payouts. Under Fannie Mae's Performance Share program, which is discussed above in connection with Mr. Raines' compensation and benefits, Mr. Howard was determined in January 2004 to be entitled to receive 48,600 shares for the performance cycle completed in 2003. Of these shares, he has been paid 24,300 shares in accordance with the program. For the cycles concluding in 2004 and 2005, Mr. Howard has been granted awards that would result in him receiving no shares if the threshold goals are not attained or receiving an amount of shares between the threshold and maximum numbers set forth in following table based on attainment of the goals at or above the threshold.

—4—

| Award Cycle | Range of Potential Performance Share Payments | | |
|---|---|---|---|
| | threshold | target | maximum |
| 2003 to 2005 | 11,265 | 28,162 | 42,243 |
| 2002 to 2004 | 13,138 | 32,844 | 49,266 |

The table above presents the total number of shares that Mr. Howard could have become entitled to had his employment with the company continued. If shares are paid out under the program for a given period, the number of shares Mr. Howard will receive will be reduced on a pro rata basis depending on the length of his service during the applicable award cycle. Mr. Howard will not be entitled to shares for any cycle during which he was employed by Fannie Mae for less than 18 months. Shares payable to retirees are typically paid out shortly after the conclusion of an award cycle.

Fannie Mae will restate its previously issued financial statements for 2001 through 2004 and re–evaluate previously issued non–GAAP financial information. The Compensation Committee of the Board will consider the impact thereof on both unpaid performance shares and uncompleted performance share cycles.

- Annual cash bonus. If the company pays bonuses under its Annual Incentive Plan for 2004, pursuant to his agreement Mr. Howard will be entitled to be considered for a bonus. Mr. Howard would also be eligible to be considered for a pro–rated bonus for 2005. At this time, it cannot be determined whether Mr. Howard will receive a bonus for 2004 or 2005.

- Pension plans. Under Fannie Mae's pension plans, estimated monthly payments of $36,071 will be payable during the lives of Mr. Howard and his surviving spouse.

- Payout of compensation that Mr. Howard previously earned and deferred under Fannie Mae's deferred compensation plans. Under company plans, Mr. Howard elected to defer the receipt of earned salary and other compensation. The plans permit participants to invest the deferred compensation in various hypothetical portfolios, all of which are tied to the performance of mutual funds available in the market. As of November 30, 2004, Mr. Howard's deferred balance was approximately $4.0 million. This amount will be paid out to Mr. Howard in accordance with elections he previously made in installments of varying amounts through 2010. Pending payout, deferred amounts will be allocated by Mr. Howard among the hypothetical investment options in accordance with the plans and will receive a corresponding rate of return.

- Medical coverage. Mr. Howard is entitled to participate in the same medical coverage plan available to other Fannie Mae retirees and at the same reduced cost paid by other retirees.

- Life insurance. Consistent with Fannie Mae's executive life insurance program, Fannie Mae will pay the premiums on a life insurance policy for Mr. Howard with a benefit of $2,000,000 until January 2009, and a benefit of $1,000,000 thereafter.

–5–

Source: FEDERAL NATIONAL MOR, 8–K, December 27, 2004

- • Retirement savings plan. Mr. Howard will receive retirement savings he has accumulated in the company's retirement savings plan (a 401(k) plan) in accordance with the terms of that plan.

- • Charitable gift program. Consistent with Fannie Mae's charitable gift program available to all retirees, Mr. Howard will be eligible to have up to $10,000 in charitable contributions matched by the Fannie Mae Foundation per year, up to $500 of which may be matched at a rate of 2–for–1.

The company will provide the compensation and benefits described above based on Mr. Howard's resignation from the company as of January 31, 2005 pursuant to Section 4.2(b) of his employment agreement, which governs resignation other than for "Good Reason." Mr. Howard has asserted to the company that his resignation was instead for "Good Reason" under Section 4.2(a) of the employment agreement. If Mr. Howard's termination were for Good Reason, he would be entitled to the benefits described above relating to resignation under Section 4.2(b), except that:

- • Mr. Howard would be entitled to receive his salary through June 30, 2007. This would result in Mr. Howard being paid an additional approximately $1.7 million, subject to reduction for income from other employment or self–employment (other than board service).

- • Medical and dental coverage. Until June 30, 2007, Mr. Howard would be entitled to medical and dental coverage for himself and his spouse, and coverage for his dependents until they reach the age of 21 or so long as they remain his dependents, at no cost to Mr. Howard.

Under Mr. Howard's employment agreement, any dispute regarding the terms of the agreement will be resolved through arbitration, with the company bearing Mr. Howard's legal expenses unless he does not prevail.

*Additional Information*

Each employment agreement obligates the officer not to compete with the company in the United States, solicit any officer or employee of the company or its affiliates to terminate his or her relationship with the company or to engage in prohibited competition, or to assist others to engage in activities in which the officer would be prohibited from engaging, in each case for at least one year following termination. If Mr. Howard's termination were determined to have been for "Good Reason" under his employment agreement, he would be required to comply with this prohibition through June 30, 2007.

–6–

Source: FEDERAL NATIONAL MOR, 8–K, December 27, 2004

**Item 5.02 Departure of Directors or Principal Officers; Election of Directors; Appointment of Principal Officers.**

As referred to in Item 1.02 above, on December 21, 2004, Franklin Raines' retirement from his position as Fannie Mae's Chairman and Chief Executive Officer, including his membership on the Board of Directors, was effective immediately. On December 19, 2004, Mr. Howard notified the Board of Directors of his intention to resign his positions. On December 20, 2004, Mr. Howard delivered his resignation as an employee of the company effective January 31, 2005. Mr. Howard will serve on the Board of Directors until January 31, 2005.

On December 21, 2004, Fannie Mae's Board of Directors appointed the company's Vice Chairman and Chief Operating Officer, Daniel H. Mudd, interim Chief Executive Officer and Executive Vice President, Robert J. Levin, interim Chief Financial Officer. Upon Mr. Levin's appointment, Mr. Howard's duties as Chief Financial Officer ceased.

Daniel Mudd, age 46, has been Vice Chairman of the Board and Chief Operating Officer of Fannie Mae since February 2000. Prior to his employment with Fannie Mae, Mr. Mudd was President and Chief Executive Officer of GE Capital, Japan, a diversified financial services company and a wholly–owned subsidiary of the General Electric Company, from April 1999 to February 2000. He also served as President of GE Capital, Asia Pacific, from May 1996 to June 1999.

Robert Levin, age 49, has been Fannie Mae's Executive Vice President—Housing and Community Development since June 1998. He was Executive Vice President—Marketing from June 1990 to June 1998. He joined Fannie Mae in 1981.

Mr. Levin's sister is employed as a non–officer employee in Fannie Mae's Enterprise Systems Operations division. Since January 1, 2003, Mr. Levin's sister has been paid approximately $163,300 in bonus and salary. She also receives benefits under the company's compensation and benefit plans that are generally available to Fannie Mae employees, including Fannie Mae's employee stock purchase plan and employee stock ownership plan. The Enterprise Systems Operations division does not report, nor has it ever reported, to Mr. Levin.

*Employment Agreements with Messrs. Mudd and Levin*

Fannie Mae previously entered into agreements with Mr. Mudd and Mr. Levin, and has previously filed those agreements with the SEC. The company has not entered into new agreements with either of them in connection with their interim appointments. The information below relates to their existing agreements.

–7–

The employment agreements with Messrs. Mudd and Levin do not specify salary, bonus or other compensation arrangements, except as described below. Compensation arrangements for Messrs. Mudd and Levin are determined annually by the Compensation Committee of the Fannie Mae Board of Directors. In addition to their base salary, Messrs. Mudd and Levin participate in the Annual Incentive Plan and are eligible to receive variable long–term incentive awards, such as performance shares and stock options, as described in Fannie Mae's proxy for its annual 2004 shareholders meeting.

Mr. Mudd's employment agreement with Fannie Mae, as entered into in May 2004 and amended on June 30, 2004, was filed with Fannie Mae's quarterly report on Form 10–Q for the quarter ended June 30, 2004. The agreement was subsequently amended in September 2004. A copy of the September 2004 amendment was filed as an exhibit to a Form 8–K Fannie Mae filed on September 23, 2004.

Mr. Mudd's employment agreement with the company provides for employment through June 30, 2007. Mr. Mudd's salary (currently $746,209) is subject to periodic review and possible increases, but not decreases, by the Board. Mr. Mudd is entitled to participate in the company's Executive Pension Plan but at age 46 and his current years of service, he is not currently entitled to a retirement benefit under that plan. During the employment term, Mr. Mudd will also be eligible to be considered for awards under the company's stock option, restricted stock, annual incentive and performance share programs, and to receive life insurance benefits, all in accordance with the company's compensation philosophy and life insurance policies and programs. Mr. Mudd will also be eligible to receive certain fringe benefits specified in his employment agreement, including up to $25,000 in tax and investment assistance and advice per year, legal expenses incurred in negotiating his employment agreement, access to a car and driver for business related transportation, and a complete annual physical examination. He is also eligible to participate generally in company benefit programs.

Mr. Mudd's employment agreement provides that if Mr. Mudd is terminated by the company other than for cause, or if Mr. Mudd terminates his employment because of a reduction in base salary, certain changes adversely affecting his authority or position, or any of certain other specified "Good Reason" events, he would be entitled to receive base salary for the period through June 30, 2007 or until the first anniversary of termination of his employment, if later (subject to offset for income from other employment or self–employment, other than board service), a prorated Annual Incentive Plan payment for the year of termination, a prorated Performance Share program payment for any award cycle as to which at least 18 months had elapsed as of the date of termination, full vesting of any unvested restricted stock awarded on February 23, 2000, continued vesting for any other awards of restricted stock as if Mr. Mudd had remained employed through June 30, 2007, and, until June 30, 2007, medical and dental coverage for Mr. Mudd and his spouse and coverage for his dependents (so long as they remain his dependents or, if later, until they reach the age of 21), at no cost. The same benefits would be payable in the event Mr. Mudd's employment were to terminate at the end of the employment term by reason of a failure of the company to extend the agreement on comparable terms, or were to terminate by reason of serious illness or disability, subject to an offset against salary continuation for any employer–provided disability benefits. In the event of Mr. Mudd's death during the employment term,

–8–

his beneficiary would be entitled to an Annual Incentive Plan award for any year ended prior to his death plus a pro–rated award for the year of death, and a pro–rated Performance Share program payment for any award cycle as to which at least 18 months had elapsed as of the date of death, in each case of pro–rated awards based on the Board's determination of the likelihood that performance targets would have been achieved, plus vesting of any restricted stock on the same basis as described above in the case of an involuntary termination other than for cause. If Mr. Mudd were to terminate his employment voluntarily other than for "Good Reason" as defined in his agreement or were to be terminated for cause, he would be entitled only to accrued but unpaid base salary plus such vested benefits, if any, to which he would be entitled under the terms of separate benefit programs in which he participates. Mr. Mudd's employment agreement with the company also obligates him not to compete with the company in the United States, solicit any officer or employee of the company or its affiliates to terminate his or her relationship with the company or to engage in prohibited competition, or to assist others to engage in activities in which Mr. Mudd would be prohibited from engaging, in each case for at least one year following termination or, in the case of a termination without cause or a voluntary termination by Mr. Mudd with "Good Reason," until June 30, 2007, if longer. Disputes arising under the employment agreement are to be resolved through arbitration, with the company bearing Mr. Mudd's legal expenses unless he does not prevail. OFHEO approved the termination benefits in Mr. Mudd's agreement on November 17, 2004.

Under an agreement dated June 19, 1990 between Mr. Levin and Fannie Mae, which was filed as Exhibit 10.5 to Fannie Mae's Form 10 filed on March 31, 2003, if Mr. Levin is terminated for reasons other than for cause, he will continue to receive his base salary for a period of 12 months from the date of termination and will continue to be covered by Fannie Mae's life, medical, and long–term disability insurance plans for a 12–month period, or until re–employment that provides certain coverage, whichever occurs first. Any disability benefits that he receives during the 12–month period will reduce the amount otherwise payable by Fannie Mae, but only to the extent the benefits are attributable to payments made by Fannie Mae. For this purpose, a termination will be for cause if it is based upon reasonable evidence Mr. Levin has materially breached his duties by engaging in dishonest or fraudulent actions or willful misconduct.

**Item 8.01 Other Events.**

On December 21, 2004, Fannie Mae's Board of Directors appointed Stephen B. Ashley to serve as non–executive Chairman of the Board, effective immediately.

On December 21, 2004, the Office of Federal Housing Enterprise Oversight ("OFHEO") issued a letter to Fannie Mae's Board of Directors stating that Fannie Mae was significantly undercapitalized at September 30, 2004. In accordance with the provisions of the Federal Housing Enterprise Financial Safety and Soundness Act of 1992, Fannie Mae must submit a capital restoration plan proposal to OFHEO for review and approval, and is prohibited from making any capital distribution that would result in Fannie Mae being reclassified as critically undercapitalized. In addition, even if a capital distribution would not cause the company to become critically undercapitalized, the

–9–

Source: FEDERAL NATIONAL MOR, 8–K, December 27, 2004

company is prohibited from making the capital distribution unless OFHEO provides prior approval of the distribution after it finds that the distribution (i) will enhance the ability of the company to meet its capital requirements promptly, (ii) will contribute to long term safety and soundness, or (iii) is otherwise in the public interest. As a result, Fannie Mae must obtain OFHEO's prior approval before it may, among other actions, pay dividends on shares of its common stock. The letter further states that the reclassification to significantly undercapitalized may lead to structural changes and restrictions on growth, as well as OFHEO directives to terminate or modify any business activities that OFHEO believes pose excessive risk.

On December 23, 2004, Fannie Mae announced that the company received a letter from OFHEO that approved Fannie Mae's payment of dividends on all series of Fannie Mae preferred stock due to be paid on December 31, 2004. The letter also stated that, at this time, OFHEO is not prepared to issue an approval for subsequent periods and will continue to review dividend payment requests for each quarter based upon the facts and conditions existing at the time. Fannie Mae's news release regarding this matter is filed as Exhibit 99.1 to this report and is incorporated herein by reference.

**Item 9.01 Financial Statements and Exhibits.**

The exhibit index filed herewith is incorporated herein by reference.

–10–

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized.

FEDERAL NATIONAL MORTGAGE ASSOCIATION

By_____/s/ Ann M. Kappler_____
          Ann M. Kappler
          Executive Vice President and General Counsel

Date: December 27, 2004

Source: FEDERAL NATIONAL MOR, 8–K, December 27, 2004

EXHIBIT INDEX

The following exhibits are submitted herewith:

| Exhibit Number | Description of Exhibit |
|---|---|
| 99.1 | December 23, 2004 statement by Chuck Greener on December 22, 2004 letter from the Office of Federal Housing Enterprise Oversight. |
| 99.2 | December 21, 2004 news release by Fannie Mae. |

Source: FEDERAL NATIONAL MOR, 8–K, December 27, 2004

**EXHIBIT 99.1**

 **FannieMae.**

**Statement by Chuck Greener**
**Senior Vice President — Communications**
**Fannie Mae**
**December 23, 2004**

On December 22, 2004, Fannie Mae received a letter from our safety and soundness regulator, the Office of Federal Housing Enterprise Oversight (OFHEO), that approved Fannie Mae's payment of dividends on all series of Fannie Mae preferred stock due to be paid on December 31, 2004. In rendering its decision, OFHEO in its letter stated that the December 31 dividend payment would enhance Fannie Mae's ability to restore capital to minimum required levels, enhance the long–term safety and soundness of Fannie Mae, and is in the public interest.

OFHEO also stated that, at this time, it is not prepared to issue an approval for subsequent periods and will continue to review dividend payment requests for each quarter based upon the facts and conditions existing at the time. OFHEO said that, in each case, OFHEO would continue to assess the impact on safety and soundness, the impact on achievement and maintenance of appropriate capital levels, and the public interest.

We are appreciative of OFHEO's quick review and responsiveness on this issue.

**Contact:**     Janice Daue
              (202) 752–2131

Exhibit 99.2

**News Release**

December 21, 2004

**Fannie Mae Board of Directors Announces Chairman and Chief Executive Officer Raines and Chief Financial Officer Howard To Depart From Company, Selection of Interim CEO and CFO**

WASHINGTON, DC — Fannie Mae's (FNM/NYSE) Board of Directors announced today the retirement of Chairman and Chief Executive Officer Franklin D. Raines and the resignation of Vice Chairman and Chief Financial Officer J. Timothy Howard.

Effective immediately, board member Stephen B. Ashley will become the non–executive chairman of the board, Vice Chairman and Chief Operating Officer Daniel H. Mudd will serve as interim chief executive officer, and Executive Vice President Robert Levin will serve as interim chief financial officer. The executive search firm Spencer Stuart has been retained to work with the board. The board further announced that the audit committee has dismissed the firm KPMG LLP as the company's independent auditors, and has initiated a search for a new independent auditor.

"Fannie Mae is a great company deeply committed to its mission of expanding the dream of homeownership to all Americans and serving the nation's housing needs," said Ann Korologos, the presiding director of the non–management members of the board. "We appreciate the many contributions of Frank Raines and Tim Howard, their devotion to Fannie Mae and their commitment to its mission. Fannie Mae's Board of Directors takes these steps today to move the company forward to serve its critical mission in a safe and sound manner."

"We are confident in the leadership ability of Dan Mudd and Rob Levin to work with the board as well as the company's safety and soundness regulator, Congress, the housing industry, and all of the company's stakeholders. Together, we will continue responding to the issues identified by OFHEO to ensure that the Fannie Mae of tomorrow is safe, sound, stable and even more able to achieve its mission," Korologos added.

Mudd, as Vice Chairman and Chief Operating Officer, has been overseeing the company's single–family, multifamily, credit, housing and community development, e–Business, technology, corporate marketing and administrative divisions. Prior to joining Fannie Mae in 2000, he was President and Chief Executive Officer of GE Capital, Japan.

Levin joined Fannie Mae in May 1981, and has served as Executive Vice President in various roles at the company since 1990. During this time, Levin has overseen Fannie Mae's single–family mortgage business, multifamily mortgage business, and its mortgage–backed securities business. He also has been responsible for mortgage capital markets transactions, and disposition of real estate–owned properties. Among other various positions in the company, Levin served as senior vice president for corporate finance. Currently, Levin heads the company's Housing and Community Development division.

Ashley, a Fannie Mae board director since 1995, is a former president of the Mortgage Bankers Association of America, and has been Chairman and Chief Executive Officer of The Ashley Group, a group of commercial and multifamily real estate, brokerage, and investment companies, since January 1997.

The Board of Directors today further said it continues to move forward to comply with Fannie Mae's September 27, 2004 agreement with its safety and soundness regulator, the Office of Federal Housing Enterprise Oversight (OFHEO). Board member H. Patrick Swygert, who leads the board's compliance committee that was established to oversee implementation of the OFHEO agreement, said, "We are mindful of our obligations under the agreement with OFHEO, we are working diligently in cooperation with OFHEO to comply with the agreement, and we are making progress on implementing its terms."

– 1 –

Providing an update on the company's efforts to date to comply with the agreement, the Board said that measures taken so far include the hiring of independent organizational and compensation consultants; submission and approval of a detailed implementation plan for the agreement; and submission of detailed work plans for the organizational and compensation reviews. Board member Donald B. Marron will continue leading the work on the company's capitalization plan.

"The Board will be moving expeditiously to implement the letter and spirit of the September 27th agreement and continuing to make regular reports to OFHEO, maintaining a positive, constructive and candid dialogue with the regulator," Swygert said.

The Board further said that the independent investigation commissioned by its Special Review Committee is proceeding to look into the findings of OFHEO's September 21, 2004 special examination report. The investigation, led by former Senator Warren Rudman of the law firm of Paul, Weiss, Rifkind, Wharton & Garrison, is focused on: accounting issues, including accounting policies procedures and controls regarding FAS 91 and FAS 133; organization, structure and governance, including board oversight and management responsibilities and resources; and executive compensation. Paul, Weiss' work continues as it thoroughly examines these areas and other issues that may arise in the course of their review, reporting regularly to the Board.

"The Board of Directors is confident that Fannie Mae, working with OFHEO, will resolve the matters before us, make the necessary changes, and emerge as an even stronger company with an even greater future working in the best interest of our shareholders and investors," Director Korologos said.

*Fannie Mae is a New York Stock Exchange company and the largest non-bank financial services company in the world. It operates pursuant to a federal charter and is the nation's largest source of financing for home mortgages. Fannie Mae has pledged through its "American Dream Commitment" to expand access to homeownership for millions of first-time home buyers; help raise the minority homeownership rate to 55 percent; make homeownership and rental housing a success for millions of families at risk of losing their homes; and expand the supply of affordable housing where it is needed most. Since 1968, Fannie Mae has provided $6.3 trillion of mortgage financing for 63 million families.*

*Style Usage: Fannie Mae's Board of Directors has authorized the company to operate as "Fannie Mae," and the company's stock is now listed on the NYSE as "FNM." In order to facilitate clarity and avoid confusion, news organizations are asked to refer to the company exclusively as "Fannie Mae."*

– 2 –

Created by 10KWizard   www.10KWizard.com

**EXHIBIT 3**



# FORM 8–K

## FEDERAL NATIONAL MORTGAGE ASSOCIATION FANNIE MAE – FNM

**Filed: June 21, 2007 (period: June 15, 2007)**

Report of unscheduled material events or corporate changes.

# Table of Contents

**Item 5.02** Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain

SIGNATURE

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

# FORM 8–K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): **June 15, 2007**

# Federal National Mortgage Association

*(Exact name of registrant as specified in its charter)*

**Fannie Mae**

| | | |
|---|---|---|
| **Federally chartered corporation** | **000–50231** | **52–0883107** |
| *(State or other jurisdiction of incorporation)* | *(Commission File Number)* | *(IRS Employer Identification Number)* |

| | |
|---|---|
| **3900 Wisconsin Avenue, NW** | **20016** |
| **Washington, DC** | *(Zip Code)* |
| *(Address of principal executive offices)* | |

**Registrant's telephone number, including area code: 202–752–7000**

*(Former Name or Former Address, if Changed Since Last Report):* _____

Check the appropriate box below if the Form 8–K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a–12 under the Exchange Act (17 CFR 240.14a–12)

☐ Pre–commencement communications pursuant to Rule 14d–2(b) under the Exchange Act (17 CFR 240.14d–2(b))

☐ Pre–commencement communications pursuant to Rule 13e–4(c) under the Exchange Act (17 CFR 240.13e–4(c))

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

On June 15, 2007, the Board of Directors determined to make payouts under the company's long–term, incentive performance share program for the three–year award cycles ended in 2005 and 2006. The Board's decision followed its review of qualitative and quantitative analyses of company performance during these award cycles, including a review of the company's Form 10–K for the year ended December 31, 2005.

**Background**

Prior to 2005, Fannie Mae granted long–term incentive awards under its performance share program. Under the program, senior management received shares of common stock of Fannie Mae if the company met performance objectives over a period of three calendar years, with each three–year period constituting a single award cycle. In accordance with the program, the Board of Directors set both a financial goal (based on growth in core business earnings) and non–financial goals at the beginning of each three–year award cycle for the entire three–year period, with each set of goals weighted at 50 percent. Under the program, the Board of Directors established minimum, target and maximum payout levels for each set of goals. The Compensation Committee evaluated whether the goals were achieved and the amount of the award payout in January of the year following the end of the award cycle. Each participant typically then received one–half of the payout to be awarded immediately following the Compensation Committee's determination and the second half one year later.

The Compensation Committee and the Board of Directors have established no award cycles under the program since January 2004. In addition, as a result of the delay in the issuance of the company's audited financial statements for 2005 and 2006, the Compensation Committee and the Board decided to defer determination of awards for those cycles. On May 2, 2007, Fannie Mae filed with the SEC its Form 10–K for the year ended December 31, 2005.

Set forth below is a discussion of the status of performance share cycles that ended in the years 2005 and 2006.

**Performance Share Cycles ended on December 31, 2005 and December 31, 2006**

Based on qualitative and quantitative analyses relating to the company's performance during the 2005 and 2006 award cycles that were available to the Compensation Committee and the Board, the Compensation Committee and the Board reviewed the company's performance against the financial and non–financial goals originally established for each of the three–year periods covered by these award cycles. The Compensation Committee and the Board determined that the audited financial statements for 2004 and 2005, together with information available to them regarding 2006, provided a sufficient basis to make a determination with regard to the company's financial performance for both the 2005 and 2006 award cycles. Based on these reviews, the

Compensation Committee and the Board determined to pay the award for the 2005 award cycle at the 40% level and to pay the award for the 2006 award cycle at the 47.5% level to the current and former employees eligible to receive the award payments.

The payment of the awards to each of the company's "OFHEO–designated executive officers" is subject to approval of the Office of Federal Housing Enterprise Oversight, or OFHEO. The company's "OFHEO–designated executive officers" is a group of executive officers that is larger than the group of officers that Fannie Mae has determined are "executive officers" under the rules of the Securities and Exchange Commission. On June 19, 2007, the company received a letter from OFHEO requesting a report from the company's Board of Directors relating to the determination of the size and appropriateness of the proposed awards for the 2005 and 2006 award cycles, including information relating to the proposed payments to former employees. The Compensation Committee and the Board are in the process of preparing the report for submission to OFHEO.

Assuming the company receives the required OFHEO approval, each of the following named executive officers will receive the number of shares of common stock, having the dollar value, set forth opposite that officer's name:

| Named Executive Officer | 2005 Award Cycle | | 2006 Award Cycle | |
|---|---|---|---|---|
| | Number of Shares | Value(1) | Number of Shares | Value(1) |
| Daniel H. Mudd President and Chief Executive Officer | 11,438 | $792,195.88 | 15,960 | $1,105,389.60 |
| Robert J. Levin Executive Vice President and Chief Business Officer | 9,994 | $692,184.44 | 15,184 | $1,051,643.84 |
| Thomas A. Lund Executive Vice President—Single–Family Mortgage Business | 2,513 | $174,050.38 | 3,367 | $ 233,198.42 |
| Peter S. Niculescu Executive Vice President—Capital Markets | 6,238 | $432,043.88 | 8,968 | $ 621,123.68 |
| Michael J. Williams Executive Vice President and Chief Operating Officer | 8,806 | $609,903.56 | 11,150 | $ 772,249.00 |

(1)  The value of the shares represents the number of shares multiplied by the closing price of $69.26 per share of the common stock on June 15, 2007.

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized.

FEDERAL NATIONAL MORTGAGE
ASSOCIATION

By /s/ Beth A. Wilkinson
Beth A. Wilkinson
Executive Vice President and General Counsel

Date: June 21, 2007

Created by 10KWizard    www.10KWizard.com

**EXHIBIT 4**

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

KEVIN M. DOWNEY
(202) 434-5460
kdowney@wc.com

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

June 25, 2007

**By Facsimile and
Federal Express**

Beth Wilkinson, Esq.
Executive Vice President and General Counsel
Fannie Mae
3900 Wisconsin Avenue, N.W.
Washington, D.C. 20016-2892

Dear Ms. Wilkinson:

We represent Franklin D. Raines with regard to various matters arising out of his employment with Fannie Mae. As you know, an arbitrator selected by Mr. Raines and Fannie Mae determined after a contested hearing that Mr. Raines retired from Fannie Mae, effective June 22, 2005.

Under the terms of the Employment Agreement between Franklin D. Raines and Fannie Mae, commencing June 30, 2004, and the relevant Fannie Mae Stock Compensation Plans, Fannie Mae is obligated to pay Mr. Raines for Performance Share Awards under all completed Performance Share Cycles for which he was an Employee and a pro rata share of awards for those Award Periods during which he was an employee for part of a Performance Share Cycle.

I note Fannie Mae's June 21 filing with the Securities and Exchange Commission in which the company states that it has determined to distribute awards to employees under PSP Cycles 19 and 20. Under the terms of his contract and the relevant Stock Compensation Plans, Mr. Raines is entitled to appropriate distributions of shares under those cycles. This is to request that you deliver all

WILLIAMS & CONNOLLY LLP

Beth Wilkinson, Esq.
June 25, 2007
Page 2

such shares to him care of this law firm at the above address by the close of
business on Friday, June 29.

      As well, this is to bring to your attention that Mr. Raines has been unable to
exercise vested options in the UBS Financial Services Network pursuant to a an
"order" in the system that exercise of such options is blocked. This is to request that
this order be removed. The system also fails to acknowledge the vesting of 33,755
options which have, by the terms of his contract, vested. Please let me know by the
same date whether these errors have been corrected.

      Very truly yours,

      Kevin M. Downey

**EXHIBIT 5**



Beth A. Wilkinson

Executive Vice President
General Counsel and Corporate Secretary
Legal Department

3900 Wisconsin Avenue, NW
Washington, DC 20016-2892
202 752 1943
202 752 6952 (fax)
beth_a_wilkinson@fanniemae.com

June 29, 2007

**VIA FACSIMILE AND FEDERAL EXPRESS**

Mr. Kevin M. Downey, Esq.
Williams and Connolly LLP
725 Twelfth Street, N.W.
Washington, DC 20005

Dear Mr. Downey:

As you know, on June 15, 2007, Fannie Mae's Compensation Committee and Board of Directors determined to pay a PSP award for the 2005 award cycle at the 40% level and to pay a PSP award for the 2006 cycle at the 47.5% level to the current and former employees eligible to receive the award payments. The Board's PSP determination did not distinguish in any way between PSP participants. Thus, each eligible participant will receive the PSP award to which he or she is entitled, subject to the review by OFHEO discussed below.

On June 19, 2007, we received a letter from OFHEO requesting additional information concerning the proposed awards for the 2005 and 2006 award cycles. The Board has provided the requested report to OFHEO.

We are now awaiting OFHEO's approval of the proposed payments. Thus, pending that approval, we are not in a position to provide a distribution of shares to Mr. Raines by Friday, June 29th, as you have requested.

Sincerely,

**EXHIBIT 6**

Case 1:07-cv-01202-RJL     Document 3-4     Filed 07/02/2007     Page 65 of 65



## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FRANKLIN D. RAINES, | ) | |
| 3131 Connecticut Ave., N.W. | ) | |
| Washington, DC 20008 | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. _____ |
| | ) | |
| OFFICE OF FEDERAL HOUSING | ) | |
| ENTERPRISE OVERSIGHT, an Office | ) | |
| within the United States Department of | ) | |
| Housing and Urban Development, and | ) | |
| JAMES B. LOCKHART III, in his official | ) | |
| capacity as Director, | ) | |
| 1700 G Street, N.W. | ) | |
| Washington, DC 20552 | ) | |
| | ) | |
| Defendants. | ) | |

## TEMPORARY RESTRAINING ORDER

Based upon the motion of Franklin D. Raines for a temporary restraining order, it is this

_____ day of July, 2007 hereby

**ORDERED** that the Office of Federal Housing Enterprise Oversight ("OFHEO") and its

Director, James B. Lockhart III are enjoined from freezing, placing a hold on, or otherwise

interfering with or preventing, whether directly or indirectly, Mr. Raines's immediate receipt,

possession, or free transfer of 58,812 shares of Fannie Mae common stock that are owed to him

under the terms of his Employment Agreement and Fannie Mae's employment benefit plans.;

**ORDERED** that OFHEO shall file and serve papers, if any, in opposition to Mr. Raines's

motion for a preliminary injunction by no later than July _____, 2007;

**ORDERED** that Mr. Raines's motion for a preliminary injunction be and hereby is set

down for a hearing on July _____, 2007, at _____;

**ORDERED** that this Temporary Restraining Order shall remain in effect until this Court rules on Mr. Raines's motion for a preliminary injunction or until such other time that this Court determines.

_____

Hon._____
United States District Court Judge