IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FRANKLIN D. RAINES,<br>    *Plaintiff,*<br><br>    v.<br><br>OFFICE OF FEDERAL HOUSING<br>ENTERPRISE OVERSIGHT, and<br>JAMES B. LOCKHART, III, in his official<br>capacity as Director,<br>    *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:07-cv-01202<br><br>Judge Richard J. Leon |

**PLAINTIFF FRANKLIN D. RAINES'S REPLY MEMORANDUM
IN SUPPORT OF HIS MOTION FOR PRELIMINARY INJUNCTION**

.

Kevin M. Downey (D.C. Bar No. 438547)
Paul Mogin (D.C. Bar No. 358759)
Alex G. Romain (D.C. Bar No. 468508)
Joseph M. Terry (D.C. Bar No. 473095)
Daniel N. Marx (D.C. Bar No. 496786)

WILLIAMS & CONNOLLY LLP
    725 Twelfth Street, N.W.
    Washington, DC  20005
    (202) 434-5000

*Counsel for Plaintiff Franklin D. Raines*

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................ 1

ARGUMENT ............................................................................................................................... 3

I.      OFHEO POSSESSES ONLY LIMITED STATUTORY AUTHORITY TO
        REGULATE EXECUTIVE COMPENSATION. ................................................................ 3

II.     OFHEO'S INTERFERENCE WITH FANNIE MAE'S PAYMENT OF PSP
        AWARDS EXCEEDS THE AGENCY'S LIMITED STATUTORY
        AUTHORITY. ..................................................................................................................... 6

III.    NEITHER FANNIE MAE'S CAPITAL RESTORATION PLAN NOR THE
        CONSENT ORDER EXPANDS OFHEO'S LIMITED STATUTORY
        AUTHORITY. ..................................................................................................................... 8

        A.      OFHEO Cannot Expand Its Congressionally Delegated Authority by
                Agreement with Fannie Mae. ................................................................................ 10

        B.      Neither Fannie Mae's Capital Restoration Plan nor the Consent Order
                Authorizes OFHEO's Current Interference in Fannie Mae's Payment
                of the PSP Awards. ............................................................................................... 12

IV.     NEITHER FANNIE MAE'S CAPITAL RESTORATION PLAN NOR THE
        CONSENT ORDER CAN ABROGATE MR. RAINES'S CONTRACTUAL
        RIGHTS TO COMPENSATION UNDER HIS EMPLOYMENT
        AGREEMENT. ................................................................................................................... 16

V.      OFHEO'S CURRENT REVIEW OF PREVIOUSLY APPROVED
        EXECUTIVE COMPENSATION IS CONTRARY TO THE AGENCY'S
        OWN REGULATIONS. ...................................................................................................... 18

VI.     OFHEO'S INFORMAL ORDER CONSTITUTES FINAL AGENCY
        ACTION. ............................................................................................................................. 19

VII.    MR. RAINES WILL SUFFER IRREPARABLE HARM IF OFHEO IS NOT
        ENJOINED. ........................................................................................................................ 22

CONCLUSION ............................................................................................................................ 24

# INTRODUCTION

In opposing Plaintiff Franklin D. Raines's motion for preliminary injunction,[1] OFHEO has concocted a novel way to do what this Court, in *Brendsel v. Office of Federal Housing Enterprise Oversight*, 339 F. Supp. 2d 52 (D.D.C. 2004), and *Clarke v. Office of Federal Housing Enterprise Oversight*, 355 F. Supp. 2d 56 (D.D.C. 2004), ordered the agency not to do: informally and indefinitely freeze executive compensation on the basis of alleged misconduct, without any hearing or opportunity to be heard.

As in the Freddie Mac cases, OFHEO has sent a letter to Fannie Mae ordering the enterprise to withhold compensation that is now due to Mr. Raines under his employment agreement. *See* Letter from James B. Lockhart III to Stephen Ashley (June 19, 2007) (attached in redacted form as Ex. 8 to Opp.) ("June 19, 2007 Letter"). That letter, which was directed to Mr. Stephen Ashley, as Chairman of Fannie Mae's Board of Directors, explicitly invokes OFHEO's statutory authority over executive compensation, 12 U.S.C. § 4518 (2000), and professes the agency's concern that certain payments from Fannie Mae's Performance Share Plan ("PSP") to Mr. Raines and other eligible individuals may "constitute excessive compensation under 12 U.S.C. § 4518." *Id.* at 1. OFHEO's letter further states that, with regard to Mr. Raines and other individuals "who were mentioned in OFHEO's report of special examination," a determination must be made whether "their *conduct* should prevent any or all payments as representing excessive compensation." *Id.* at 2 (emphasis added).

---

[1] *See* Franklin D. Raines's Motion for Temporary Restraining Order and Preliminary Injunction, No. 1:07-cv-01292-RJL (D.D.C. July 2, 2007) (Dkt. No. 3) ("Mot."); Defendants' Opposition to Plaintiffs' Motions for Temporary Restraining Order and Preliminary Injunction, No. 1:07-cv-01292-RJL (D.D.C. July 5, 2007) (Dkt. No. 5) ("Opp.").

Despite the clear language of its June 19, 2007 letter—which orders Fannie Mae to withhold executive compensation indefinitely, relies on the agency's compensation authority under Section 4518, and refers to alleged misconduct—OFHEO now purports to distinguish *Brendsel* and *Clarke* on the basis of Fannie Mae's Capital Restoration Plan and the related Consent Order. That OFHEO expressly relied on Section 4518 in its informal letter order directing Fannie Mae not to pay PSP awards, but now forswears that statutory provision as the source of its compensation authority, exposes the agency's arguments about the Capital Restoration Plan and the Consent Order as *post hoc* rationalizations for conduct identical to that enjoined by the Court in the Freddie Mac cases.[2] Regardless, as the Court recognized in *Brendsel* and *Clarke*, Congress granted OFHEO only limited statutory authority over executive compensation, and neither Fannie Mae's Capital Restoration Plan, the Consent Order, nor any other agreement between OFHEO and Fannie Mae authorizes the agency to compromise Mr. Raines's rights under his employment agreement with Fannie Mae.

OFHEO is—once again—"simply overreaching" by deliberately exceeding its limited statutory authority over executive compensation. *Brendsel*, 339 F. Supp. 2d at 62. Therefore, OFHEO should be enjoined from further interfering with Fannie Mae's payment of PSP awards due to Mr. Raines under his employment agreement with the company.

---

[2] It comes as no surprise that OFHEO initially attempted to conceal from Mr. Raines and his counsel even the unredacted portions of the June 19, 2007 letter, given the similarity between that letter and the informal letter order that OFHEO sent to Freddie Mac, which the Court found to constitute an unlawful interference with Freddie Mac's payment of compensation to former executives.

## ARGUMENT

### I.    OFHEO POSSESSES ONLY LIMITED STATUTORY AUTHORITY TO REGULATE EXECUTIVE COMPENSATION.

The Court has previously recognized that OFHEO possesses only limited statutory

authority to regulate executive compensation.

> As part of its supervisory powers OFHEO has the authority to
> prohibit the enterprises from paying its executives compensation
> that is unreasonable or in excess of industry standards even though
> it can not actually set compensation levels for executives.  12
> U.S.C. §§ 4513(b)(8), 4518(a).  In addition, OFHEO was given the
> authority to approve termination packages *prior* to one of the
> enterprises entering into a compensation agreement.  12 U.S.C. §
> 4518(b).

*Brendsel*, 339 F. Supp. 2d at 56–57 (emphasis in original).  The Court has ruled that neither

(i) Section 4513, (ii) Section 4518, (iii) the agency's cease-and-desist authority, nor (iv) any

other "general supervisory authority" permits OFHEO to withhold compensation that is due

under an employment agreement without any hearing or opportunity for the aggrieved employee

to be heard.  *Id.* at 60–66 (internal quotations omitted).

Notwithstanding OFHEO's expansive understanding of its own power over executive

compensation, the Court has dismissed, as inconsistent with the Federal Housing Enterprises

Financial Safety and Soundness Act of 1992, 12 U.S.C. §§ 4501–4641 (2000) ("Safety and

Soundness Act"), OFHEO's claim to possess "plenary authority."  *Id.* at 61–62 (finding "it

impossible for this Court, based on the statute's plain language, to conclude that OFHEO's

power to review executive compensation is truly 'plenary'"); *see also Clarke*, 355 F. Supp. 2d at

64 (confirming that neither section 4513 nor section 4518 grants OFHEO "plenary authority to

review compensation and take 'whatever actions are necessary'").  Rather the Court has ruled:

> whatever action OFHEO planned to take vis-a-vis [a former
> enterprise employee] would need to be tied to its authority to

3

> prohibit the payment of compensation that is unreasonable and/or
> excessive in relation to industry standards.

*Brendsel*, 339 F. Supp. 2d at 62 (emphasis omitted).  Furthermore, the Court has found that

OFHEO's limited statutory authority does *not* include reviewing executive compensation on the

basis of alleged misconduct.

> [T]he implication of [OFHEO's position], suggesting that any
> wrongdoing . . . would factor into a possible future review of . . .
> compensation, does not even comport with its authority under
> sections 4513(b) and 4518 and is inconsistent with the explicit
> prohibition on the Director's setting specific compensation levels
> for employees and officers at . . . Fannie Mae.

*Id.* at 63.  In fact, the Court has expressly criticized OFHEO for interfering with compensation

on the basis of "alleged incompetence and misconduct," rather than "the reasonableness of . . .

benefits as compared to compensation in similar businesses."  *Clarke*, 355 F. Supp. 2d at 64.[3]

The Court has also criticized the manner in which OFHEO has attempted to interfere with

executive compensation at the enterprises; informal letters, for example, "do[] not reflect any of

the procedural safeguards set forth in the [Safety and Soundness Act]."  *Id.* at 65; *see Brendsel*,

339 F. Supp. 2d at 65 (concluding that "[i]t is inconceivable to this Court that Congress intended

to give" OFHEO such sweeping executive compensation authority "without [any] procedural

safeguards").  Congress provided important procedural safeguards, which OFHEO has ignored in

freezing Fannie Mae's PSP awards, in the cease-and-desist provisions of the Safety and

Soundness Act.  For example, OFHEO may only issue a formal cease-and-desist order based on

a formal notice of charges and after a full evidentiary hearing, *see* 12 U.S.C. § 4631 (2000); the

---

[3] In *Brendsel*, the Court contrasted the statutory authority of certain banking regulators, such as
FDIC, which includes fraud and misconduct as relevant factors in the determination of whether
compensation is excessive, noting that "OFHEO's statute contains no such consideration for
wrongdoing."  339 F. Supp. 2d. at 63 n.15 (*citing* 12 U.S.C. § 1831p-1(c)(2)(F),(G)).

Director may issue a temporary cease-and-desist order, but such an order may be challenged in federal court, *see* 12 U.S.C. § 4632 (2000).  These procedural safeguards must be respected, not only because they have been mandated by Congress, but also because "the public has a profound interest in ensuring that . . . those whose assets might be frozen by OFHEO are accorded a fair modicum of due process."  *Brendsel*, 339 F. Supp. 2d at 67.

As the Court succinctly stated in *Brendsel*:

> [W]hile the plain language of the [Safety and Soundness] Act permits OFHEO some latitude in taking prospective action to prohibit payment of excessive compensation, it does not explicitly authorize OFHEO to freeze assets of an employee in advance of an administrative hearing unrelated to the reasonableness of an individual's executive compensation.

*Id.* at 63.  Yet that is what OFHEO has done—again—with regard to the PSP awards that Fannie Mae owes Mr. Raines under his employment agreement.

The limited scope of OFHEO's statutory authority over executive compensation must be considered not only on its own terms, as defined by the Safety and Soundness Act, but also as it relates to Fannie Mae's independent statutory authority, as described in the Charter Act:

> The board of directors of the corporation shall have the power to select and appoint or employ such officers, attorneys, employees, and agents, to vest them with such powers and duties, and *to fix and to cause the corporation to pay such compensation to them for their services, as the board of directors determines reasonable and comparable with compensation for employment in other similar businesses* (including other publicly held financial institutions or major financial services companies) involving similar duties and responsibilities, except that a significant portion of potential compensation of all executive officers (as such term is defined in paragraph (3)(C)) of the corporation shall be based on the performance of the corporation; and any such action shall be without regard to the Federal civil service and classification laws.

12 U.S.C. § 1723a(d)(2) (2000) (emphasis added).  Previously, OFHEO has acknowledged that it plays only "a defined role with regard to oversight of Enterprise executive compensation

practices" and that, "[i]n fulfilling its congressionally defined role, OFHEO does not set

executive salaries or dictate an Enterprise's choice of a compensation structure." Executive

Compensation, 66 Fed. Reg. 47,550, 47,551 (Sept. 12, 2001) (codified at 12 C.F.R. pt. 1770); *see*

12 U.S.C. § 4518(b) (2000) ("[T]he Director may not prescribe or set a specific level or range of

compensation."). Congress, in assigning related but exclusive powers to OFHEO and Fannie

Mae, respectively, struck a delicate balance between regulator and regulated enterprise, one that

OFHEO threatens to upset.

## II.    OFHEO'S INTERFERENCE WITH FANNIE MAE'S PAYMENT OF PSP AWARDS EXCEEDS THE AGENCY'S LIMITED STATUTORY AUTHORITY.

OFHEO's current interference with Fannie Mae's payment of PSP awards is a transparent

attempt to withhold executive compensation from individuals, including Mr. Raines, whom

OFHEO has publicly accused of misconduct, and to do so without providing any hearing or

opportunity to be heard. OFHEO's informal letter order to Fannie Mae, which the agency

attempted to conceal from Mr. Raines and his counsel, refers explicitly to reviewing "former

employees eligible for these PSP grants who were mentioned in OFHEO's report of special

examination *to determine if their conduct should prevent any or all payments* as representing

excessive compensation based on the situation during the time periods for which these grants

were calculated." June 19, 2007 Letter at 2 (emphasis added); *see id.* (emphasizing "employee

conduct" as a relevant factor in assessing the "reasonableness of [PSP] payments").[4]

To suggest otherwise, i.e., that OFHEO is only now reviewing the PSP awards due to Mr.

Raines for comparability and reasonableness, would be contrary to substantial documentary

---

[4] In its Opposition, OFHEO effectively concedes that its informal and indefinite freeze on Fannie Mae's PSP awards for Cycles 19 and 20 is unrelated to any concerns about the comparability of executive compensation, but is instead an extension of the agency's special examination activities. *See* Opp. at 13.

evidence. Mr. Raines entered into his most recent employment agreement with Fannie Mae, the contract which entitles him to PSP awards for Cycles 19 and 20, in May 2004. *See* Employment Agreement between Fannie Mae and Franklin D. Raines (attached as Ex. 1 to Mot.). OFHEO explicitly reviewed and, in November 2004, *approved* that agreement. *See* Letter from Armando Falcon to Joe K. Pickett (Nov. 17, 2004) (stating that "OFHEO has reviewed the new three-year Employment Agreement . . . between Fannie Mae and Chairman and CEO Franklin Raines" and further that "[t]he termination benefits provided under the Agreement for Mr. Raines are approved") (attached as Ex. 1). In addition, after Mr. Raines's departure from the company in December 2004, OFHEO again reviewed his employment agreement; invoking 12 C.F.R. Part 1770, the same regulatory authority cited in its June 19, 2007 letter, OFHEO demanded and received from Fannie Mae "information detailing and explaining termination benefits being paid to Franklin D. Raines." Letter from Alfred M. Pollard to Ann Kappler (Dec. 23, 2004) (attached as Ex. 2).

Furthermore, OFHEO has long possessed (or at least has had access to) all of the information necessary to evaluate the comparability and reasonableness of Mr. Raines's compensation, including his particular entitlement to PSP awards for Cycles 19 and 20. OFHEO's own regulations required Fannie Mae to provide "[c]ategories of information relating to [the] prohibition of excessive compensation," such as Fannie Mae's proxy statements. 12 C.F.R. § 1770.4(b)(8) (2007). Fannie Mae's 2003 proxy statement includes a report from the Compensation Committee that explains Fannie Mae's compensation philosophy and describes in detail Mr. Raines's salary, bonus and variable long-term incentive compensation, including his eligibility for PSP awards. *See* Fannie Mae Form Def. 14A (Apr. 17, 2003) at 16–19 (attached as Ex. 3). The 2003 proxy statement further discloses, on a Long-Term Incentive Plan Awards

Table, that for the 2003–2005 Award Cycle (Cycle 19), the company has set a target award for

Mr. Raines of 107,505 shares. *See id.* at 26. Fannie Mae's 2004 proxy statement provides a

similar report regarding Raines's compensation and discloses, on the same table, that for the

2004–2006 Award Cycle (Cycle 20), the company has set a target award for Mr. Raines of

99,967 shares. *See* Fannie Mae Form Def. 14A (Apr. 23, 2004) at 18–21, 26 (attached as Ex. 4).

Therefore, OFHEO has known about (or should have known about) the PSP awards now at issue

for more than three years.

By informally and indefinitely freezing PSP awards to which Mr. Raines is entitled under

his employment agreement, pending some judgment as to whether such compensation is

"excessive" on the basis of alleged misconduct by Mr. Raines, OFHEO exceeds its limited

statutory authority under the Safety and Soundness Act.  OFHEO's action also disregards a clear

limitation that Congress has imposed on OFHEO's regulation of executive compensation, i.e.,

that the Director cannot prescribe or set a specific level or range of executive compensation.

Furthermore, the disregard of that limitation is, at the same time, a usurpation of the authority

expressly assigned by Congress to Fannie Mae under the Charter Act to set executive

compensation.  OFHEO is trying to control how much Fannie Mae pays to Mr. Raines and,

thereby, retroactively set his compensation to a lower level that OFHEO deems appropriate.[5]

## III.    NEITHER FANNIE MAE'S CAPITAL RESTORATION PLAN NOR THE CONSENT ORDER EXPANDS OFHEO'S LIMITED STATUTORY AUTHORITY.

Rather than abide by the Court's rulings in *Brendsel* and *Clarke*, OFHEO endeavors to

distinguish those decisions by arguing that, in the Freddie Mac cases, it acted under its

---

[5] Congress has decided to assign related but distinct powers over executive compensation to
OFHEO and Fannie Mae, respectively, and OFHEO cannot contravene that congressional
distribution by reallocating that statutory authority, even with the acquiescence of the enterprise.

compensation authority, *see* 12 U.S.C. §§ 4513, 4518 (2000), and its cease-and-desist authority, *see* 12 U.S.C. §§ 4631, 4632, but now proceeds pursuant to Fannie Mae's Capital Restoration Plan and the related Consent Order. *See, e.g.*, Opp. at 20 ("OFHEO clearly has the authority to review the PSP benefits pursuant to the Consent Order and the Capital Restoration Plan, making excessive compensation and cease and desist authority irrelevant to the analysis of this case."). In addition to being inconsistent with the documentary evidence,[6] OFHEO's claim that it now acts pursuant to Fannie Mae's Capital Restoration Plan and the related Consent Order fundamentally misconstrues the source and scope of its limited statutory authority over executive compensation.[7]

---

[6] As noted at the outset, *see supra* at 1–2, OFHEO's informal letter order focuses on the "core question of whether payments under these cycles would constitute excessive compensation *under 12 U.S.C. § 4518*." June 19, 2007 Letter at 1 (emphasis added). The letter belies OFHEO's effort in its opposition to distance itself from Section 4518, which this Court has ruled grants only limited statutory authority over executive compensation and which, therefore, cannot justify OFHEO's withholding of PSP awards based on alleged misconduct by former employees.

[7] OFHEO's other two purported distinctions—i.e., (i) that it has not singled out Mr. Raines and Mr. Howard for special treatment and (ii) that it has not frozen compensation—are irrelevant and inaccurate, respectively. OFHEO's conduct with regard to Mr. Raines and Mr. Howard is illegal; that illegality is not cured by multiplication. The only reason that Mr. Raines has confined his challenge to OFHEO's improper interference with his own compensation is that he lacks standing to assert the rights of other persons who are also eligible, but have not yet received, PSP awards for Cycles 19 and 20. Furthermore, the key facts in this case—however characterized by OFHEO—are essentially identical to those in *Brendsel* and *Clarke*: terminated executives are due compensation under their employment agreements, and the enterprise is prepared to pay, but OFHEO has interfered by ordering that compensation be withheld indefinitely. Thus, Messrs. Raines and Howard now stand where Messrs. Brendsel and Clarke once stood: but for OFHEO's actions, they have not received compensation to which they are entitled under their employment agreements, and they do not know when (if ever) they will receive it.

### A.    OFHEO Cannot Expand Its Congressionally Delegated Authority by Agreement with Fannie Mae.

Only Congress can delegate regulatory authority to OFHEO, and OFHEO may not range beyond its delegated authority. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it."); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) ("[A]n administrative agency . . . may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" (*quoting ETSI Pipeline Project v. Missouri,* 484 U.S. 495, 517 (1988)).[8]

Because Congress has not authorized OFHEO to judge whether executive compensation is excessive in light of alleged misconduct, OFHEO may not assume that power for itself, either unilaterally or by agreement with Fannie Mae.  It is entirely irrelevant, therefore, that Fannie Mae's Capital Restoration Plan contains a provision regarding OFHEO's "prior approval for all payment of bonuses or other non-salary compensation awards for executive officers."  Fannie Mae Capital Restoration Plan (Feb. 10, 2005) at 5 (attached in redacted form as Ex. 4 to Opp.). Nor does it matter that the Consent Order incorporates unspecified "commitments" from the Capital Restoration Plan.  Consent Order art. III, ¶ 1 (attached as Ex. 7 to Opp.).  Neither of these

---

[8] *Accord Transohio Sav. Bank v. Director, OTS*, 967 F.2d 598, 621 (D.C. Cir. 1992) ("Agency actions beyond delegated authority are 'ultra vires,' and courts must invalidate them."); *Office of Consumers' Counsel v. FERC*, 655 F.2d 1132, 1148–49 n.32 (D.C. Cir. 1980) ("[I]t is axiomatic that no order or regulation issued by an administrative agency can confer on it any greater authority than it has under statute."); *Nat'l Ass'n of Regulatory Utility Comm'rs v. FCC*, 533 F.2d 601, 617 (D.C. Cir. 1976) ("'[W]ide latitude' in the exercise of delegated powers is not the equivalent of untrammelled freedom to regulate activities over which the statute fails to confer . . . [administrative] authority." (footnote omitted)).  In *Brendsel*, the Court also quoted *Gibas v. Saginaw Mining Co.*, 748 F.2d 1112, 1117 (6th Cir. 1984), in which the Sixth Circuit observed: "administrative agencies are vested only with the authority given to them by Congress."  339 F. Supp. 2d at 64.

agreements between OFHEO and Fannie Mae can give the agency authority that Congress did not bestow.

Furthermore, nothing in the statutory provisions requiring an undercapitalized enterprise to submit a capital restoration plan for OFHEO's approval, *see* 12 U.S.C. § 4615 (2000), or the related provisions describing the contents and procedures for such a plan, *see* 12 U.S.C. § 4622 (2000), gives OFHEO the authority to do indirectly what it cannot do directly.  Because the statutory provisions regarding executive compensation do not authorize OFHEO to review, approve or otherwise set compensation on the basis of alleged misconduct (much less, informally and indefinitely freeze compensation, without any hearing or opportunity to be heard), one cannot reasonably read the provisions regarding capital restoration plans to grant that power, especially where OFHEO dictates by administrative fiat that such plans must provide for OFHEO's approval of any non-salary compensation.[9]  To interpret the general provisions of the Safety and Soundness Act regarding capital restoration plans to expand OFHEO's specific, but limited, authority over executive compensation would be inconsistent with the statutory text; it would also violate the familiar canon of construction that "a more specific statute will be given precedence over a more general one."  *Busic v. United States*, 446 U.S. 398, 406 (1980) (*citing Preiser v. Rodriguez*, 411 U.S. 475, 489–90 (1973)).

---

[9] Fannie Mae's original plan did not contain any provision permitting OFHEO to review non-salary compensation.  OFHEO rejected that plan and "require[d] several changes and additional enhancements," including that a revised version provide that "Fannie Mae must seek approval from OFHEO for all payment of bonuses or other non-salary or stock-based awards."  Letter from Armando Falcon to Daniel H. Mudd (Jan. 27, 2005) at 1 (attached in redacted form as Ex. 3 to Opp.).  Fannie Mae's revised plan, which OFHEO accepted, explicitly states that OFHEO "directed" the company to include the compensation review provision.  Capital Restoration Plan at 5.

Finally, even apart from the fundamental point that the Capital Restoration Plan and the Consent Order cannot expand OFHEO's congressionally delegated power over executive compensation, the broad compensation-approval provision of the Capital Restoration Plan that OFHEO has invoked in this case could not constitute a constitutionally permissible delegation of authority. Delegations of power to executive agencies may not be standardless, but must contain some "'intelligible principle' to guide the [agency's] exercise of authority." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001). Further, where "the scope of the agency's claimed power to roam [is] immense," as with OFHEO's purported power to approve or reject all non-salary compensation payments by Fannie Mae (even those under employment agreements that the agency previously approved), "the standards must be correspondingly more precise." *Michigan v. EPA*, 213 F.3d 663, 680 (D.C. Cir. 2000) (per curiam) (internal quotations and citation omitted); *accord Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. OSHA*, 938 F.2d 1310, 1317 (D.C. Cir. 1991). Yet the provision of the Capital Restoration Plan requiring OFHEO to approve all non-salary compensation is wholly standardless. *See* Capital Restoration Plan at 5. Because the provision contains no intelligible principle guiding OFHEO's exercise of its purported review and approval authority, it would allow OFHEO to approve or reject, in whole or in part, any non-salary compensation awarded by Fannie Mae to its employees presumably for any reason. Such a broad, standardless delegation would be unconstitutional. Accordingly, OFHEO cannot rely on the Capital Restoration Plan as a source of delegated compensation authority to withhold PSP awards from Mr. Raines.

**B.    Neither Fannie Mae's Capital Restoration Plan nor the Consent Order Authorizes OFHEO's Current Interference in Fannie Mae's Payment of the PSP Awards.**

Even if a capital restoration plan could conceivably expand OFHEO's limited statutory authority over executive compensation (which it cannot), Fannie Mae's Plan would not empower

12

OFHEO to freeze the PSP awards due to Mr. Raines.  As its title suggests, the purpose of Fannie

Mae's Capital Restoration Plan was to *restore* the enterprise's capital.  Specifically, the Plan,

which Fannie Mae submitted on February 10, 2005, and OFHEO approved on February 17,

2005, explains how the company "would (a) achieve [its] minimum capital requirements; and (b)

provide for a 30 percent capital surplus by September 30, 2005."  Capital Restoration Plan at 3.

Consistent with the Plan, Fannie Mae restored its minimum capital *and* satisfied

OFHEO's 30-percent surplus capital requirement on schedule, by September 30, 2005, as

publicly reported in the company's October 7, 2005 Form 8-K filing.  *See* Fannie Mae Form 8-K

(Oct. 7, 2005) at 2 ("Fannie Mae believes that we exceeded the 30 percent capital surplus

requirement over our minimum capital requirement as of September 30, 2005, in compliance

with the September 27, 2004 agreement with our regulator[.]") (attached as Ex. 5).  Fannie

Mae's achievement was also publicly acknowledged by OFHEO in its November 1, 2005 press

release.  *See* OFHEO Announces Fannie Mae Achieves 30 Percent Capital Surplus (Nov. 1,

2005) at 1 ("In agreements between OFHEO and Fannie Mae resulting in a Capital Restoration

Plan, Fannie Mae was required to achieve a 30 percent capital surplus over the minimum capital

requirement by September 30, 2005.  Fannie Mae certified its third quarter 2005 minimum

capital report demonstrating the achievement of the target for September 30, 2005.") (attached as

Ex. 6).  Given the fact that Fannie Mae realized the goals of its Capital Restoration Plan almost

*two years ago*, by meeting its minimum capital requirements and satisfying OFHEO's 30-percent

surplus requirement, it is unclear whether the Plan remains effective at all and, if so, on what

statutory basis.[10]

---

[10] OFHEO's approach appears to be that, once an enterprise is alleged to be significantly
undercapitalized and forced to submit a capital restoration plan, the agency can then exercise

Even assuming the continuing validity of select capital components of the Capital Restoration Plan, the same could not be said of its executive compensation provision. At OFHEO's insistence, Fannie Mae included in the Plan a provision requiring OFHEO to approve non-salary compensation; the company did so, however, only as a "cost-cutting" device to increase retained earnings and, thereby, promote the restoration of its regulatory capital. As described in the Plan:

> Cost-cutting actions began in January [2005] with the nonpayment of 2004 non-salary cash award for the top 43 senior managers. As OFHEO has directed, Fannie Mae has also committed to seek the agency's prior approval for all payments of bonuses or other non-salary compensation awards for executive officers.

Capital Restoration Plan at 5.[11] OFHEO cannot credibly contend that its current interference with the company's payment of PSP awards due to Mr. Raines (and others) is related to capital *restoration*. Fannie Mae is adequately capitalized—and has been for nine consecutive quarters, since January 2005. *See* OFHEO Announces First Quarter 2007 Minimum and Risk-Based Capital Classifications for Fannie Mae and Freddie Mac: Reaffirms Fannie Mae Q1–4 2005 as Adequately Capitalized (June 28, 2007) (attached as Ex. 7).

---

expansive powers over the enterprise in perpetuity, regardless of whether adequate capital is restored and maintained. *See* Opp. at 21 (referencing, as a justification for current regulatory action regarding Fannie Mae, which is adequately capitalized, "the special enforcement powers of the Director *with regard to a significantly undercapitalized enterprise*" (emphasis added) and citing 12 U.S.C. § 4616(b)(4) (2000)).

[11] It appears that Fannie Mae's decision, in January 2005, to defer payment of PSP awards for Cycles 19 and 20 was never really about retained earnings and capital restoration, but rather a result of the company's lack of reliable financial data. *See* Fannie Mae Form 8-K (June 21, 2007) at 2 (attributing the decision to defer determination of PSP awards for Cycles 19 and 20 to the "delay in the issuance of the company's audited financial statements for 2005 and 2006") (attached as Ex. 3 to Mot.).

In light of the dollar amounts of Fannie Mae's regulatory capital, on the one hand, and the PSP awards to which Mr. Raines is entitled, on the other, OFHEO's invocation of the Capital Restoration Plan as a basis on which to interfere with Fannie Mae's payment of this compensation smacks of pretext. As of March 31, 2007, OFHEO reported that Fannie Mae possessed more than *$42 billion* in core capital, an amount far in excess of Fannie Mae's minimum capital requirements and even OFHEO's 30-percent surplus capital requirement. *See id.* at 3. In contrast, the combined PSP awards due to Mr. Raines for Cycles 19 and 20 are valued, based on yesterday's stock price, at less than *$4 million*—or less than 0.01 percent of Fannie Mae's core capital.[12] Given these figures, OFHEO cannot credibly contend that the company's release of the PSP awards for Cycles 19 and 20 would threaten the company's adequate capitalization.

Finally, the Consent Order likewise does not expand OFHEO's limited statutory authority over executive compensation. Unlike the Capital Restoration Plan, the Consent Order, which OFHEO entered into with Fannie Mae on May 23, 2006, does not even mention OFHEO's review or approval of non-salary executive compensation, whether for capital restoration or any other purpose. OFHEO's argument about the Consent Order appears to be wholly derivative of its argument about the Capital Restoration Plan. OFHEO has not offered any explanation of why, aside from incorporating the unspecified "commitments set forth in the capital restoration plan as approved by OFHEO on February 17, 2005," Consent Order art. III, ¶ 1, the Consent Order would serve as an independent source of authority for the agency to freeze Mr. Raines's compensation. Notably, the Consent Order incorporates the Capital Restoration Plan's "commitments" in Article III concerning "capital plans," not in Article VII addressing

---

[12] 58,812 shares (for Cycles 19 and 20) x $64.67 (yesterday's stock price) = $3,803,372.04.

"compensation," which catalogues only prospective steps that Fannie Mae will undertake regarding its compensation practices.[13] That placement highlights why it is inappropriate for OFHEO to continue to exercise purported compensation authority, introduced in the Capital Restoration Plan and then incorporated by the Consent Order, years after the company fully restored its regulatory capital. In short, nothing in the Consent Order authorizes OFHEO to review, much less prohibit, Fannie Mae's payment of the PSP awards due to Mr. Raines under his employment agreement with the company.

## IV.    NEITHER FANNIE MAE'S CAPITAL RESTORATION PLAN NOR THE CONSENT ORDER CAN ABROGATE MR. RAINES'S CONTRACTUAL RIGHTS TO COMPENSATION UNDER HIS EMPLOYMENT AGREEMENT.

OFHEO's position also overlooks the principle that an agreement or consent decree cannot override the rights of third parties. In *Martin v. Wilks*, 490 U.S. 755 (1989), the Supreme Court ruled that a voluntary settlement and consent decree between the City of Birmingham and black firefighters, arising from litigation involving allegations of racial discrimination in hiring and promotion, could not abrogate the legal rights, such as contractual rights under employment agreements, of white firefighters who were not parties to the relevant agreements. As a "general rule," the Court explained, "a person cannot be deprived of his legal rights in a proceeding to which he is not a party." *Id.* at 759; *accord Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846 (1999) (*citing Martin*); *Richards v. Jefferson County*, 517 U.S. 793, 798 (1996) (same).

> This rule is part of our "deep-rooted historic tradition that everyone should have his own day in court." *A judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings.*

---

[13] For example, the compensation section of the Consent Order between Fannie Mae and OFHEO provides: "Fannie Mae's compensation practices for officers and employees shall include financial and non-financial metrics and shall not exclusively be tied to earnings-per-share." Consent Order art. VII, ¶ 1.

*Martin*, 490 U.S. at 762 (*quoting* 18A Charles A. Wright, Arthur R. Miller & Edward H. Cooper,

*Federal Practice and Procedure* § 4449, at 346–47 (2d ed. 2002) (emphasis added)).  The Court

made clear that this rule applies with full force in the context of voluntary settlements, such as

the Consent Order between OFHEO and Fannie Mae, to which Mr. Raines is a stranger.

> A voluntary settlement in the form of a consent decree . . . cannot
> possibly "settle," voluntarily or otherwise, the conflicting claims of
> [other individuals] who do not join in the agreement.

*Id.* at 768; *see also id.* at 768 ("[P]arties who choose to resolve litigation through settlement may

not dispose of the claims of a third party . . . without that party's agreement." (alterations in

original) (*quoting Local No. 93, Int'l Ass'n of Firefighters v. Cleveland*, 478 U.S. 501, 529

(1986)).

     Indeed, on this point, the Supreme Court was unanimous.  In dissent, Justice Stevens

differed with the majority as to other issues but endorsed the conclusion that consent decrees

cannot override the legal rights of third parties.

> [T]he Court quite rightly concludes that the white firefighters . . .
> could not be deprived of their legal rights . . . because they had
> neither intervened nor been joined as parties [in the prior litigation
> between the City of Birmingham and the black firefighters].  *The
> consent decrees obviously could not deprive them of any
> contractual rights*, such as seniority, or accrued vacation pay, *or of
> any other legal rights*, such as the right to have their employer
> comply with federal statutes like Title VII.

*Martin*, 490 U.S. at 770 (Stevens, J., dissenting) (emphasis added) (internal citations omitted).

     *Martin v. Wilks* forecloses OFHEO's suggestion that its various agreements with Fannie

Mae—whether the Capital Restoration Plan, which Fannie Mae proposed and OFHEO approved,

or the Consent Order, which the parties entered—somehow abrogate Mr. Raines's contractual

rights to be paid the compensation that is due to him, in the form of PSP awards for Cycles 19

and 20, under his employment agreement.  Because Mr. Raines is a stranger to OFHEO's

agreements with Fannie Mae, those agreements cannot deprive him of his contractual rights.

That is especially true because OFHEO has afforded Mr. Raines no due process at all, much less

his day in federal court, to which he would be entitled if Director Lockhart had issued a

temporary cease-and-desist order under Section 4632.

## V.     OFHEO'S CURRENT REVIEW OF PREVIOUSLY APPROVED EXECUTIVE COMPENSATION IS CONTRARY TO THE AGENCY'S OWN REGULATIONS.

Having previously approved Mr. Raines's employment agreement with Fannie Mae—and

specifically, the termination provisions that now entitle him to receive his pro rata share of PSP

awards for Cycles 19 and 20—OFHEO cannot revisit that approval.  OFHEO's approval of Mr.

Raines's compensation, as articulated in its November 11, 2004 letter, was unconditional.  Thus,

OFHEO's current interference with Mr. Raines's compensation, as directed by its June 19, 2007

letter, breaches OFHEO's past consent.

Moreover, "Federal agencies must 'follow their own rules.'"  *SEC v. Selden (In re*

*Subpoenas)*, 445 F. Supp. 2d 11, 14 (D.D.C. 2006) (*quoting Steenholdt v. FAA*, 314 F.3d 633,

639 (D.C. Cir. 2003)); *see Am. Fed. of Gov't Employees, Local 3090 v. Fed. Labor Relations*

*Auth.*, 777 F.2d 751, 759 (D.C. Cir. 1985) ("[U]nless and until it amends or repeals a valid

legislative rule or regulation, an agency is bound by such a rule or regulation.") (*citing United*

*States v. Nixon*, 418 U.S. 683, 694–96 (1974)).  "[I]t is a well-settled rule that an agency's failure

to follow its own regulations is fatal to the deviant action."  *Mine Reclamation Corp. v. FERC*,

30 F.3d 1519, 1524 (D.C. Cir. 1994) (internal quotations omitted).

Here, OFHEO's purported re-review of Mr. Raines's compensation in July 2007, more

than three years after Mr. Raines entered the operative employment agreement with Fannie Mae

in May 2004 and more than two-and-a-half years after OFHEO approved that agreement in

November 2004, violates OFHEO's own executive compensation regulations.  *See* 12 C.F.R. pt.

18

1770.  In response to comments received from Fannie Mae and Freddie Mac regarding its

compensation regulations, OFHEO stated:

> OFHEO . . . reviews termination benefits . . . in exercising
> its prior approval authority.  Such a review is performed when any
> agreement that includes termination benefits is entered into, as well
> as at the time the executive officer leaves his or her employment
> with an Enterprise, if there have been benefit enhancements or
> modifications since the time the package was agreed upon.  *Upon
> determining that an officer's termination benefits package, as
> previously approved by OFHEO, has not changed in structure or
> terms, such package will not be subject to subsequent review or
> disapproval.*

Executive Compensation, 66 Fed. Reg. at 47,553 (emphasis added).  Because there has been no

change in the structure or terms of Mr. Raines's compensation, that "package" is "not subject to

subsequent review or disapproval" by OFHEO.  Put simply, OFHEO has failed to follow its own

rules, and that failure is fatal to OFHEO's current effort to freeze compensation due to Mr.

Raines under an employment agreement that OFHEO previously reviewed and approved.

## VI.    OFHEO'S INFORMAL ORDER CONSTITUTES FINAL AGENCY ACTION.

Finality, as the Court observed in *Brendsel*, depends on "'whether the agency has

completed its decisionmaking process, and whether the result of that process is one that will

directly affect the parties.'"  339 F. Supp. 2d at 59 (*quoting Franklin v. Mass.*, 505 U.S. 788, 797

(1992)).  "[This] inquiry is a 'pragmatic' and 'flexible' one."  *Nat'l Ass'n of Home Builders v.

U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1279 (D.C. Cir. 2005) (*quoting Abbott Labs. v.

Gardner*, 387 U.S. 136, 149–50 (1967)).

OFHEO's informal letter order to Fannie Mae, directing the company to withhold PSP

awards, had a "direct effect" on Mr. Raines.  *See Bennett v. Spear*, 520 U.S. 154, 178 (1997)

(holding that, to be final, "the action must be one by which rights or obligations have been

determined, or from which legal consequences will flow" (internal quotations omitted)).  Under

his employment agreement, Mr. Raines is entitled to PSP awards for Cycles 19 and 20, and Fannie Mae is prepared to distribute those shares. But for OFHEO's explicit order that Fannie Mae "defer[]" any such payment, June 19, 2007 Letter at 1, Mr. Raines would have already taken possession of his shares. There can be no dispute, therefore, that the order has had "direct and appreciable consequences" for Mr. Raines. *Bennett*, 520 U.S. at 178.

Nor can OFHEO characterize its freeze of the PSP awards as "merely tentative." *Id.* OFHEO has not indicated what it *may* do regarding the PSP shares; it expressly ordered Fannie Mae not to pay. OFHEO has also made the definitive decision not to provide Mr. Raines with any hearing or opportunity to be heard. Moreover, OFHEO's informal letter order was issued by Director Lockhart, as the head of the agency, so it is presumed to be final. *See Nat'l Automatic Laundry & Cleaning Council v. Shultz*, 443 F.2d 689, 701 (D.C. Cir. 1971) (holding that courts should accept the ruling or order of the head of an agency as presumptively final); *cf. Franklin*, 505 U.S. at 798 (suggesting that the ruling of a "subordinate official" is more likely to be non-final).

That OFHEO's order requires Fannie Mae to withhold executive compensation *indefinitely* does not render that action non-final. The fact that an "agency always retains the power to change its policies" does not preclude a finding of final agency action. *Sabella v. United States*, 863 F. Supp. 1, 4 (D.D.C. 1994). "If the possibility of unforeseen amendments were sufficient to render an otherwise fit challenge unripe, review could be deferred indefinitely." *Am. Petrol. Inst. v. EPA*, 906 F.2d 729, 739–40 (D.C. Cir. 1990) (per curiam). Director Lockhart's decision was sufficiently definitive to demand that Fannie Mae defer any PSP awards indefinitely. It makes no difference that he may, at some later time, change his mind.

In characterizing its conduct as incomplete, OFHEO mischaracterizes the record by claiming that "the only action that OFHEO has taken is to instruct Fannie Mae to provide it with information necessary to conduct a review of proposed PSP benefits." Opp. at 23. OFHEO's June 19, 2007 letter proves otherwise; it not only demands information (much of which has been available to OFHEO since 2004) but also directs Fannie Mae not to pay any PSP awards. *See* June 19, 2007 Letter at 1 ("*Payments to employees* by the Board under the Performance Share Program Cycles 19 and 20 *should be deferred* at this time.") (emphasis added); *see id.* at 2 ("[T]he Board should not undertake [the transfer of funds] without first providing [additional information to OFHEO] and receiving OFHEO's approval for such payments."). By its own terms, OFHEO's letter is "sufficiently final to demand compliance with its announced position." *Nat'l Res. Def. Council v. EPA*, 22 F.3d 1125, 1132 (D.C. Cir. 1994) (*quoting Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986)). And Fannie Mae has, in fact, complied.

An agency may "not . . . avoid judicial review," *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990), by "choosing the form" in which its expresses agency action, *Ciba-Geigy*, 801 F.2d at 438 n.9. Yet that is exactly what OFHEO has tried to do. One need only contrast OFHEO's informal letter order to Fannie Mae with a temporary cease-and-desist order under Section 4362. Both actions are, in a sense, temporary or provisional in that they anticipate some later judgment. But if the Director had issued a temporary cease-and-desist order regarding the PSP awards at issue, Mr. Raines would now be entitled to a hearing in federal court. Therefore, OFHEO cannot completely avoid judicial review simply by framing its informal action as "non-final."[14]

---

[14] OFHEO's passing suggestion that this issue is not ripe for review, *see* Opp. at 26 n.17, requires little discussion. As the Court explained in *Brendsel*, analyzing ripeness "requires the

## VII.    MR. RAINES WILL SUFFER IRREPARABLE HARM IF OFHEO IS NOT ENJOINED.

Preventing payment of Mr. Raines's PSP awards without any hearing or opportunity to be heard violates Mr. Raines's constitutional due process rights.  If OFHEO continues this conduct, Mr. Raines will suffer irreparable injury because "a prospective violation of a constitutional right constitutes irreparable injury for these purposes."  *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) ("[S]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself.").  In fact, irreparable harm is presumed from OFHEO's continued deprivation of Mr. Raines's constitutional rights.  *See Student Press Law Ctr. v. Alexander*, 778 F. Supp. 1227, 1234 (D.D.C. 1991) (*citing Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  Thus, the Court need go no further in determining whether irreparable injury will flow from OFHEO's actions.

---

balancing of factors such as 'whether the issue presented is a purely legal one, whether consideration that that issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." 339 F. Supp. 2d at 59 (*quoting Ciga-Geigy*, 801 F.2d at 434)).  The issue presented here—whether OFHEO's informal order freezing the PSP awards exceeds the agency's limited statutory authority over executive compensation and improperly abrogates Mr. Raines's contractual rights under his employment agreement with Fannie Mae—is a "purely legal one," so ripeness may be presumed without any further analysis. *Nat'l Res. Def. Council*, 22 F.3d at 1133; *see Am. Petrol. Inst.*, 906 F.2d at 739 (noting that "a 'purely legal question' . . . is 'presumptively reviewable'" (*quoting Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 92 (D.C. Cir. 1986)).  Furthermore, no additional factual development is necessary to resolve this issue.  There is no dispute about what OFHEO has done—only whether the agency has the authority to do it.  Thus, there is no justification for delaying judicial review.  Finally, for the reasons discussed in Part VI of this memorandum, OFHEO's informal order constitutes sufficiently "final" agency action.  The Court had "no problem in concluding" that the essentially identical issue presented in *Brendsel* was "sufficiently ripe for judicial review." 339 F. Supp. 2d at 59.  That same conclusion is appropriate here.

Aside from the inherent constitutional injury to Mr. Raines resulting from OFHEO's conduct, Mr. Raines will also suffer irreparable monetary losses, given the uncertainty of stock prices, if OFHEO's withholding of Mr. Raines's PSP shares is not enjoined by the Court. OFHEO has informally and indefinitely frozen 58,812 shares of Fannie Mae common stock to which Mr. Raines is entitled under his employment agreement. While no one can predict with certainty the fluctuations of the stock price, OFHEO has irreparably harmed Mr. Raines by depriving him of the ability to transfer those shares when their value is greatest. The decline in Fannie Mae's stock price, since the filing of this action, proves this point. On July 2, 2007, Fannie Mae's stock closed at $66.65, and Mr. Raines's shares—which he could have transferred, if he possessed them—were valued at $3,919,819.80. Since then, however, the stock price has fluctuated but ultimately fallen, closing yesterday at $64.67. Thus, were the Court to order the immediate release of these shares, Mr. Raines will already have lost $116,447.76 as a result of OFHEO's actions. The uncertainty about whether Fannie Mae's stock price will continue to decline, potentially depriving Mr. Raines of the entire value of the PSP awards to which he is rightfully entitled, is sufficient to warrant a preliminary injunction.

Nor can Mr. Raines be adequately compensated with damages for his monetary loss because OFHEO, as a government agency, is immune from suit. *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."). Therefore, were the value of Fannie Mae's stock to decline further (or simply not recover), and Mr. Raines's PSP awards be less valuable when finally approved by OFHEO (if ever), Mr. Raines would have no recourse. As this Court recognized in *Brendsel*, he would not have a viable action against OFHEO or Fannie Mae, which would undoubtedly cite OFHEO's directive in its defense. *See* 339 F. Supp. 2d at 66–67. Mr. Raines's inability to

obtain adequate relief from OFHEO or Fannie Mae in the future justifies enjoining OFHEO now.

*See id.* at 67; *see also Kan. Health Care Ass'n v. Kan. Dep't of Soc. & Rehab. Servs.*, 31 F.3d

1536, 1543 (10th Cir. 1994) ("Because the Eleventh Amendment bars a legal remedy in

damages, and the court concluded no adequate state administrative remedy existed, the court

held that the plaintiffs' injury was irreparable.  We agree.").

## CONCLUSION

For the foregoing reasons, and for the reasons stated in Mr. Raines's moving papers, Mr.

Raines respectfully requests that the Court issue a preliminary injunction, enjoining OFHEO

from freezing, placing a hold on, or otherwise interfering with or preventing Mr. Raines's

immediate receipt of the PSP awards for Cycles 19 and 20 (specifically, 58,812 shares),

according to the terms of his employment agreement.


Dated:  July 12, 2007                    Respectfully submitted,

                                         WILLIAMS & CONNOLLY LLP

                                         _____
                                         Kevin M. Downey (D.C. Bar No. 438547)
                                         Paul Mogin (D.C. Bar No. 358739)
                                         Alex G. Romain (D.C. Bar No. 468508)
                                         Joseph M. Terry (D.C. Bar No. 473095)
                                         Daniel N. Marx (D.C. Bar No. 496786)

                                            725 Twelfth Street, N.W.
                                            Washington, DC  20005
                                            (202) 434-5000
                                            kdowney@wc.com

                                         *Counsel for Plaintiff Franklin D. Raines*

24

## CERTIFICATE OF SERVICE

I certify that, on July 12, 2007, I electronically filed the foregoing Defendant Franklin D. Raines's Reply Memorandum in Support of His Motion for a Preliminary Injunction with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the counsel of record in this matter who are registered on the CM/ECF system.

/s/ Daniel N. Marx_____
Daniel N. Marx

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FRANKLIN D. RAINES,** ) | |
| *Plaintiff,* ) | |
| ) | |
| v. ) | **Case No. 1:07-cv-01202** |
| ) | |
| **OFFICE OF FEDERAL HOUSING** ) | **Judge Richard J. Leon** |
| **ENTERPRISE OVERSIGHT, and** ) | |
| **JAMES B. LOCKHART, III, in his official** ) | |
| **capacity as Director,** ) | |
| *Defendants.* ) | |

## DECLARATION OF KEVIN M. DOWNEY

I, **KEVIN M. DOWNEY**, hereby state as follows:

1.      I am a partner in the law firm of Williams & Connolly LLP, and I represent Plaintiff Franklin D. Raines in the above-captioned matter.  I submit this declaration in support of Mr. Raines's Reply Memorandum in Support of His Motion for Preliminary Injunction.

2.      Attached as Exhibit 1 is a true and correct copy of a letter from Armando Falcon to Joe K. Pickett, dated November 17, 2004.

3.      Attached as Exhibit 2 is a true and correct copy of a letter from Alfred M. Pollard to Ann Kappler, dated December 23, 2004.

4.      Attached as Exhibit 3 is a true and correct copy of Fannie Mae's Form Def. 14A, which was filed with the U.S. Securities & Exchange Commission on April 17, 2003.

5.      Attached as Exhibit 4 is a true and correct copy of Fannie Mae's Form Def. 14A, which was filed with the U.S. Securities & Exchange Commission on April 23, 2004.

6.      Attached as Exhibit 5 is a true and correct copy of Fannie Mae's Form 8-K, which was filed with the U.S. Securities & Exchange Commission on October 7, 2005.

7.      Attached as Exhibit 6 is a true and correct copy of a news release issued by OFHEO, titled "OFHEO Announces Fannie Mae Achieves 30 Percent Capital Surplus" and dated November 1, 2005.

8.      Attached as Exhibit 7 is a true and correct copy of a news release issued by OFHEO, titled "OFHEO Announces First Quarter 2007 Minimum and Risk-Based Capital Classifications for Freddie Mac and Fannie Mae: Reaffirms Fannie Mae Q1–4 2005 as Adequately Capitalized" and dated June 28, 2007.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 12, 2007
Washington, DC

_____
Kevin M. Downey

# EXHIBIT 1



# OFFICE OF FEDERAL HOUSING ENTERPRISE OVERSIGHT
*1700 G STREET, NW,   WASHINGTON, DC  20552   (202) 414-3800*
*Office of the Director*

Mr. Joe K. Pickett
Chair, Compensation Committee
    of the Board of Directors
Fannie Mae
3900 Wisconsin Avenue, NW
Washington DC  20016-2892

Dear Mr. Pickett:

OFHEO has reviewed the new three-year Employment Agreement (Agreement) between Fannie Mae and Chairman and CEO Franklin Raines.  The termination benefits contained in this Agreement are subject to OFHEO's prior approval under Section 309(d)(3)(B) of Fannie Mae's Charter Act.

The staffs of OFHEO and Fannie Mae have worked over the past several months to resolve issues of concern regarding certain provisions of the Agreement that relate to termination benefits provided thereunder.  The Agreement was first submitted to OFHEO in a letter with accompanying materials from Senior Vice President and General Counsel Anne Kappler to Patrick Lawler dated May 3, 2004.  It was amended as described in a June 30, 2004 letter from Judith Dunn to Mr. Lawler, and further amended as described in a September 17, 2004 letter from Anne Mulcahy to Mr. Raines.

The termination benefits provided under the Agreement for Mr. Raines are approved. This approval does not extend to any new or additional termination benefits that may accrue to Mr. Raines as a result of other actions by Fannie Mae.

With respect to portions of the Agreement other than those dealing with termination benefits, I am concerned about what factors may be used to determine the annual bonus amounts. In the past, Fannie Mae has based bonuses largely on the Enterprise's success in meeting earnings per share targets.  The results of our special examination are persuasive on this matter; reliance in determining bonus amounts on metrics that are potentially subject to management manipulation should be avoided.  I appreciate our conversations on this matter.

Sincerely,

Armando Falcon,
Director

cc: Franklin D. Raines

EXHIBIT 2

DEC 23 2004 16:05 FR FANNIE MAE-WASH DC    202 752 4439 TO 96636363    P.02/03



**OFFICE OF FEDERAL HOUSING ENTERPRISE OVERSIGHT**
1700 G STREET NW  WASHINGTON DC 20552  (202) 414-3800
*Office of the General Counsel*

December 23, 2004

Ann Kappler
Executive Vice President and General Counsel
Fannie Mae
Legal Department
3900 Wisconsin Avenue, N.W.
Washington, D.C. 20016-2899

Dear Ms. Kappler:

Pursuant to statute and OFHEO regulation at 12 CFR Part 1770, please provide information detailing and explaining termination benefits being paid to Franklin D. Raines and J. Timothy Howard under the determination of the Board that they should retire and resign, respectively. As noted in the preamble to its regulation, OFHEO reviews termination benefits in the employment agreement of an executive officer when the agreement is entered into, as well as at the time the officer leaves. Review includes consideration of the effect on termination benefits if the officer departs prior to the expiration of the employment term, either on a voluntary or an involuntary basis. Of specific concern is whether, at the time of termination, there have been benefits enhancements or modifications since the termination package was agreed upon; 66 FR 47553 (September 12, 2001). Accordingly, no termination benefits should be paid by Fannie Mae to either Mr. Raines or Mr. Howard until OFHEO has completed its review.

In particular, please provide information on actions taken by the Board that accelerate, add to or otherwise would provide additional or less benefits than provided in the employment agreements of Messrs. Raines and Howard than previously were approved by OFHEO. Such information should include Compensation Committee and Board resolutions and any related materials that address the basis of termination of each officer and his associated benefits.

Information provided should include specific breakdowns regarding termination benefits, such as deferred compensation, 401(k), SERP, and vested and unvested options. With respect to options, provide a Black-Scholes estimate for options held by each officer, and the value if all "in the money" options were exercised. Additionally, provide information regarding the annual pension benefits that Mr. Raines and Mr. Howard will receive and the pro rata AIP eligibility for 2004 for each. Also, the amount of PSP compensation each is entitled to in each of the 3 year cycles —

DEC 23 2004 16:06 FR FANNIE MAE-WASH DC   202 752 4439 TO 96636363          P.03/03

2

looking back in time as well as forwards. Moreover, please advise whether Mr. Howard will be entitled to receive salary between now and the end of his employment with Fannie Mae.

If you have any questions regarding this directive, please contact Tina Dion at (202) 414-3838.

Sincerely,

Alfred M. Pollard.
General Counsel

cc:  Joseph Pickett
     Chair, Compensation Committee

EXHIBIT 3



# FEDERAL NATIONAL MORTGAGE ASSOCIATION FANNIE MAE (FNM)

3900 WISCONSIN AVE N.W.
WASHINGTON, DC 20016
202–752–7000
http://www.fanniemae.com

# DEF 14A

**2003 NP**
**Filed on 04/17/2003 – Period: 05/20/2003**
File Number 000–50231



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Table of Contents
# Compensation Committee Report on Executive Compensation

This is the 2002 report of the Fannie Mae Compensation Committee. The Committee is composed entirely of independent directors. The Compensation Committee charter setting forth the Committee's organization, purpose, and duties is available at www.fanniemae.com.

## Fannie Mae's Compensation Philosophy and Approach

Fannie Mae became a shareholder–owned corporation in 1968, and since that time has become one of the world's largest financial institutions. In carrying out its mission, Fannie Mae has become the country's largest source of financing for home mortgages and the largest issuer of private–sector corporate debt and mortgage–backed securities.

Because of the scope and complexity of Fannie Mae's activities and the importance of its mission, it is imperative that the corporation always be in a position to attract and retain the best possible talent. To this end, Fannie Mae's Board of Directors has adopted a compensation policy designed to help the corporation compete with other large, sophisticated financial services companies for the talent Fannie Mae needs.

In formulating and implementing Fannie Mae's compensation philosophy, the Board of Directors, through its Compensation Committee, also has carefully considered its statutory obligations under the Fannie Mae Charter Act (the "Charter Act"). The Charter Act states that the Board of Directors shall pay its executive officers compensation which the Board determines to be "reasonable and comparable with compensation for employment in other similar businesses (including other publicly held financial institutions or major financial services corporations) involving similar duties and responsibilities." Moreover, the Charter Act requires that "a significant portion of potential compensation of all executive officers…of [Fannie Mae] shall be based on the performance of [Fannie Mae]." The Compensation Committee has based its compensation philosophy on these statutory requirements and has established review processes to ensure that this philosophy is implemented rigorously and carefully.

Accordingly, the central tenets of Fannie Mae's compensation philosophy are pay for performance and comparability. Pay for performance is reflected strongly in the structure of Fannie Mae's compensation programs. It is the core principle underlying the programs. Other than base salary, all major elements of Fannie Mae's compensation program for the most senior members of the executive officer group are tied to annual and long–term performance goals. Furthermore, through the use of stock vesting over multi–year terms, Fannie Mae tightly aligns the interests of executives with those of shareholders.

The Committee acts to ensure that Fannie Mae's compensation is reasonable and comparable with the compensation of executives in other similar businesses that involve similar duties and responsibilities. Each year, the Compensation Committee reviews compensation survey data to analyze current compensation practices at companies comparable to Fannie Mae in terms of asset size, line of business, market capitalization, and other factors. Specific Fannie Mae officer positions are compared to positions involving similar duties and responsibilities. The market data reviewed by the Committee for specific officer positions comes from companies included in the S&P Financials Index shown in the stock performance graph, as well as other publicly held financial institutions and major financial services companies that compete for executives whose skills and experience are sought by Fannie Mae. The Committee utilizes as a third party resource a nationally recognized executive compensation consulting firm to assist in this comparability analysis.

In 2002, the Committee also asked its executive compensation consultant to provide a comprehensive assessment of Fannie Mae's compensation philosophy to assist the Committee in its analysis of that pay philosophy, market comparability, and types of long–term incentives used. Based on that review, the Committee decided to continue to target cash compensation (i.e., salary and annual bonus) at approximately the 50th percentile of the market data and positions total compensation (cash plus stock–based awards) at approximately the 65th percentile. The market data is used to determine specific salary, bonus, and variable long–term incentive award targets by officer position. The proportion of the total compensation package tied

16

**Table of Contents**

to performance measures increases with the rank of the executive officer.

In implementing Fannie Mae's compensation philosophy, the Committee each year conducts an assessment of corporate and individual performance. Each officer's individual performance is assessed on both individual business results and the demonstration of specific leadership qualities throughout the year. Evaluation of leadership qualities are assessed through the collection of reviews from both the officer's subordinates and superiors. In the final step of the performance review process, an overall performance rating is assigned reflecting a balance of business results and demonstration of leadership.

The performance rating is used to determine actual pay for salary, bonus, and variable long–term incentive awards relative to the targets. The Committee has final authority over compensation decisions for senior vice presidents, and the full non–management board determines compensation for executive vice presidents and the Office of the Chairman.

The company's executive compensation program has three primary tools: base salary, an annual bonus award, and variable long–term incentive stock awards. The program ties a large portion of each officer's total compensation to performance over different time periods. To achieve a balanced result, Fannie Mae's pay for performance approach provides a cash payment for achieving annual financial goals and stock based awards for medium and long–term performance generating increases in shareholder returns. This program is expressly designed not to put too much reliance on any one form of compensation.

*Base Salary.* Base salary for executive officers is determined principally by the Committee's judgment as to the market for comparable positions, informed by an annual market comparability review conducted by its third party consultant. Final salary determinations also reflect individual performance, leadership, and experience level. In general, the Committee seeks to target annual total cash (salary plus bonus) to the 50th percentile of the comparative market.

*Annual Incentive Plan.* The Annual Incentive Plan puts a portion of each executive officer's annual compensation at risk. Financial goals established by the Board at the beginning of the year and achievement against these goals determine the funding of the bonus pool from which the actual bonuses are paid. For 2002, the corporate financial goal was an aggressive earnings per share ("EPS") growth measure that Fannie Mae exceeded.

*Variable Long–Term Incentive Awards.* Variable long–term incentive awards are delivered in the form of stock options, and performance shares or restricted stock. All variable long–term incentive compensation programs are paid solely in Fannie Mae common stock, thereby reinforcing the shared interests of officers and shareholders. Officers at the senior vice president level and above receive half of the value of their annual variable long–term incentive award in the form of performance shares and half in the form of stock options.

*Performance Shares.* Performance shares are pay for performance incentive awards that compensate senior management for meeting performance objectives over a three–year period. Each year, the Committee establishes designated award periods ("cycles") of three years. At the beginning of each cycle, at the Committee's request, the Board establishes program targets based on both financial and non–financial goals. The financial goals currently are tied to growth in EPS and the non–financial goals are tied to Fannie Mae's strategic plan. The Committee has established a scorecard to measure Fannie Mae's achievement of the strategic plan in the following areas:

- leadership in increasing access to affordable housing;
- leading presence in the secondary mortgage market;
- optimal interest rate, credit, and policy risk management;
- development of a corporate culture to enhance strategy execution; and
- development of an e–commerce infrastructure to increase capabilities and lower costs.

The EPS goals and the strategic goals are given equal weighting (*i.e.*, 50 percent each) in determining award payout. The Committee determines actual achievement against these goals at the conclusion of each cycle. An actual award payout can range from 40 percent of the performance shares granted for threshold

17

**Table of Contents**

achievement to 150 percent for goal achievement at maximum levels. No payment is made if achievement is below the pre–determined threshold. Fannie Mae exceeded the EPS growth goals established for the three–year performance share cycle that concluded in 2002. The Committee also determined that Fannie Mae met or exceeded each of the 2000–2002 performance share cycle's strategic non–financial goals set forth above.

*Stock Options.* Stock Options link the interests of executives and shareholders by providing value to the executive only when the stock price increases over a number of years. Stock options vest over a four–year period at the rate of 25% per year and generally have a ten–year term. The number of stock options received by Fannie Mae executive officers is targeted, when combined with performance shares, to bring total compensation to the 65th percentile of the comparative market.

*Chief Executive Officer Compensation*

All of the executive compensation processes and policies described above are applied in setting the compensation and assessing the performance of Mr. Raines. In addition to the multi–rater feedback for all officers, all nonmanagement members of the Board participate in the review of Mr. Raines' performance.

Without Mr. Raines present, the nonmanagement members of the Board discussed the Committee's review of Mr. Raines' performance for 2002. They assessed Mr. Raines' performance against a broad range of leadership criteria including: strategic thinking, providing vision and direction, accelerating change, intellectual honesty, integrity, motivating and energizing people, teamwork and partnering, influencing ideas and initiatives, delivering results, valuing all people, and developing management. The Board considered feedback from subordinates and Board members obtained through the same survey instrument used to collect performance feedback for other officers. Mr. Raines' performance also was measured against the financial and non–financial goals established for Fannie Mae's strategic plan.

All of this information was used to make the performance–based compensation decisions for Mr. Raines. Overall, the Board concluded that the performance of Fannie Mae under Mr. Raines' leadership exceeded targets set in advance and met or exceeded that of comparable companies. The Committee specifically noted the following 2002 achievements in determining Mr. Raines' compensation for 2002 and variable long–term incentive award grants:

- record financial results;
- record–breaking business volumes;
- near record low credit losses;
- strong portfolio margin performance and interest–rate risk management;
- record service to underserved families— Fannie Mae passed the halfway mark of its ten–year, $2 trillion American Dream Commitment just three years after its launch;
- Fannie Mae met each of the housing goals established by the Department of Housing and Urban Development and its own goal to lead the market in service to minority families;
- expansion of corporate transparency, through implementation of voluntary commitments and increased investor disclosures, including the voluntary commitment to register Fannie Mae's common stock with the SEC;
- investment in Fannie Mae's future through the implementation of a new core technology infrastructure and development of new mortgage products and lender services; and
- continued progress in Fannie Mae's executive leadership initiatives, including development of a new officer performance assessment and management process.

The Committee's specific 2002 compensation determinations with respect to Mr. Raines are as follows and are reflected in the Summary Compensation Table at page 24.

*Base Salary.* For 2002, the Board set Mr. Raines' cash base salary at $992,250, unchanged since 2000, and slightly below the midpoint of the market. For the purposes of calculating his pension and life insurance benefits, however, the Board set a reference annual base salary for Mr. Raines at $1,093,956, reflecting a five percent increase over the prior year. Consistent with Fannie Mae's pay for performance philosophy, the difference between Mr. Raines' cash base salary and reference annual base salary is awarded as additional long–term, equity–based compensation.

*Annual Bonus.* For 2002, Mr. Raines' annual bonus was determined against goals set at the

18

Table of Contents

beginning of the year based on corporate financial performance for the year, measured by growth in EPS. Fannie Mae significantly exceeded that goal and Mr. Raines' bonus for the year reflects his contributions to that performance.

***Variable Long−Term Incentive Compensation.*** The information provided in the proxy statement on variable long−term compensation reflects two actions taken by the Committee. First, the Committee awarded the long−term incentive payouts reported in the Summary Compensation Table at page 24. These stock payouts reflect the achievement of performance share programs' financial and strategic goals for multi−year periods.

Second, in line with Fannie Mae's pay for performance goals and to continue to align Mr. Raines directly with the long−term interests of shareholders, the Committee granted Mr. Raines performance shares for the three−year period beginning in January 2003 and stock options, vesting over four years, based on his performance evaluation. The awards are set forth in the tables at pages 25 and 26.

*Conclusion*
The Committee believes both the design of Fannie Mae's plans and the actual total compensation levels described in this proxy statement reflect adherence to the Board of Directors' obligations under the Charter Act and careful thinking about what is appropriate from both competitive and shareholder perspectives, and clearly reflect Fannie Mae's compensation philosophy.

**The Compensation Committee**
Anne M. Mulcahy, Chairman
Ann McLaughlin Korologos
Joe K. Pickett

19

**Table of Contents**

*Aggregated Option Exercises in Last Fiscal Year and Fiscal Year End Option Values*
The following table shows the aggregate number of shares underlying options exercised in 2002 and the value at year–end of outstanding options, whether or not exercisable.

| Name | Shares Acquired on Exercise (#) | Value Realized (1) ($) | Number of Securities Underlying Unexercised Options December 31, 2002 Exercisable/ Unexercisable (#) | | Value of Unexercised In–the–Money Options December 31, 2002 (2) Exercisable/ Unexercisable ($) | |
|---|---|---|---|---|---|---|
| Franklin D. Raines | — | $ — | 1,000,630 / | 618,843 | $ 1,441,600 / | $390,793 |
| Daniel H. Mudd | — | — | 124,090 / | 284,399 | 663,207 / | 2,011,068 |
| Jamie S. Gorelick | — | — | 296,110 / | 227,281 | 1,661,516 / | 177,120 |
| Timothy Howard | 20,000 | 1,246,362 | 408,624 / | 161,395 | 9,899,535 / | 103,527 |
| Robert J. Levin | 20,900 | 1,025,314 | 386,333 / | 123,664 | 9,899,535 / | 103,527 |

*Notes to Option Exercises/Year End Values*

(1)  "Value Realized" is the difference between the exercise price and the market price on the exercise date, multiplied by the number of options exercised. "Value Realized" numbers do not necessarily reflect what the executive might receive when he or she sells the shares acquired by the option exercise, since the market price of the shares at the time of sale may be higher or lower than the price on the exercise date of the option.

(2)  "Value of Unexercised In–the–Money Options" is the aggregate, calculated on a grant by grant basis, of the product of the number of unexercised options at the end of 2002 multiplied by the difference between the exercise price for the grant and the year–end market price ($64.33), excluding grants for which the difference is equal to or less than zero.

*Long–Term Incentive Plan Awards Table*

| Name | Number of Performance Shares (1) (#) | Performance or Other Period Until Maturation or Payout | | Estimated Future Payouts Under Non–Stock Price Based Plans | | |
|---|---|---|---|---|---|---|
| | | Award Cycle | Payout Period (if any) | Threshold (#) | Target (#) | Maximum (#) |
| Franklin D. Raines | 107,505 | 2003–2005 | 2006, 2007 | 43,002 | 107,505 | 161,258 |
| Daniel H. Mudd | 28,596 | 2003–2005 | 2006, 2007 | 11,438 | 28,596 | 42,894 |
| Jamie S. Gorelick (2) | | | | | | |
| Timothy Howard | 28,162 | 2003–2005 | 2006, 2007 | 11,265 | 28,162 | 42,243 |
| Robert J. Levin | 24,984 | 2003–2005 | 2006, 2007 | 9,994 | 24,984 | 37,476 |

*Notes to Long–Term Incentive Plan Awards Table*

(1)  Contingent grants of performance shares were made as part of Fannie Mae's variable long–term awards program on January 21, 2003 for the 2003–2005 cycle, for which distributions will be made in 2006 and 2007. Actual awards range from 40 percent to 150 percent of a participant's performance shares based on equally weighted goals for growth in EPS and performance in strategic areas. If Fannie Mae does not meet the requirement to achieve 40 percent awards, no award will be paid. The value of an actual award depends on the level of achievement and the value of Fannie Mae's common stock at the end of the cycle. The fair value of a performance share for the 2003–2005 cycle is subject to a limit of three times the fair market value of Fannie Mae's common stock on January 21, 2003, the date of grant. The fair market value of Fannie Mae's common stock on the date of grant was $69.43.

(2)  As announced by Fannie Mae on January 10, 2003, Ms. Gorelick will leave Fannie Mae on June 30, 2003

EXHIBIT 4



# FEDERAL NATIONAL MORTGAGE ASSOCIATION FANNIE MAE (FNM)

3900 WISCONSIN AVE N.W.
WASHINGTON, DC 20016
202–752–7000
http://www.fanniemae.com

# DEF 14A

**NOTICE & PROXY STATEMENT**
**Filed on 04/23/2004 – Period: 05/25/2004**
File Number 000–50231



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Table of Contents

# Compensation Committee Report on Executive Compensation

The Compensation Committee of Fannie Mae's Board of Directors is composed of four directors. In the business judgment of the Board of Directors, each Committee member meets the independence requirements of the NYSE listing standards and Fannie Mae's Corporate Governance Guidelines. The Compensation Committee met seven times in 2003.

The Compensation Committee charter setting forth the Committee's organization, purpose, and duties is available at www.fanniemae.com.

## Fannie Mae's Compensation Philosophy and Approach

Fannie Mae became a shareholder–owned corporation in 1968, and since that time has become one of the world's largest financial institutions. In carrying out its mission, Fannie Mae has become the country's largest source of financing for home mortgages and the largest issuer of private–sector corporate debt and mortgage–backed securities.

Because of the scope and complexity of Fannie Mae's activities and its role in the U.S. economy and housing finance system, and the importance of its mission, it is imperative that the corporation always be in a position to attract and retain the best possible talent. To this end, Fannie Mae's Board of Directors has adopted a compensation policy designed to help the corporation compete with other large, sophisticated financial services companies for the talent Fannie Mae needs.

In formulating and implementing Fannie Mae's compensation philosophy, the Board of Directors, through its Compensation Committee, also has carefully considered its statutory obligations under the Fannie Mae Charter Act. The Charter Act states that the Board of Directors shall pay its executive officers compensation that the Board determines to be "reasonable and comparable with compensation for employment in other similar businesses (including other publicly held financial institutions or major financial services corporations) involving similar duties and responsibilities." Moreover, the Charter Act requires that "a significant portion of potential compensation of all executive officers…of [Fannie Mae] shall be based on the performance of [Fannie Mae]." The Compensation Committee has based its compensation philosophy on these statutory requirements and has established review processes to ensure that this philosophy is implemented rigorously and carefully.

Accordingly, the central tenets of Fannie Mae's compensation philosophy are pay for performance and comparability. Pay for performance is reflected clearly in the structure of Fannie Mae's compensation programs. It is the core principle underlying the programs. Other than base salary, all major elements of Fannie Mae's compensation program for the most senior members of the executive officer group are tied to annual and long–term performance goals. Furthermore, through the use of stock vesting over multi–year terms, Fannie Mae tightly aligns the interests of executives with those of shareholders over extended periods of time.

The Committee acts to ensure that Fannie Mae's compensation is reasonable and comparable with the compensation of executives in other similar businesses that involve similar duties and responsibilities. Each year, the Compensation Committee reviews compensation survey data to analyze current compensation practices at companies comparable to Fannie Mae in terms of asset size, line of business, market capitalization, and other relevant factors. Specific Fannie Mae officer positions are compared to positions involving similar duties and responsibilities. The market data reviewed by the Committee for specific officer positions comes from companies included in the S&P Financials Index shown in the performance graph on page 3, as well as other publicly–held financial institutions and major financial services companies that compete for executives whose skills and experience are sought by Fannie Mae. The Committee uses as an advisor a nationally–recognized executive compensation consulting firm, Johnson & Associates, to assist in this comparability analysis.

At the Committee's request, the executive compensation consultant conducted a comprehensive assessment of Fannie Mae's compensation philosophy to assist the Committee in its analysis of that pay philosophy, market comparability, and types of long–term incentives used. Based on that review, the Committee decided to continue to target cash compensation (*i.e.*, salary and annual bonus) at approximately the 50th percentile of the market data and

18

**Table of Contents**

positions total compensation (cash plus stock–based awards) at approximately the 65th percentile. The market data is used to determine specific salary, bonus, and variable long–term incentive award targets by officer position. The proportion of the total compensation package tied to performance measures increases with the rank of the executive officer.

In addition to Johnson & Associates, as authorized by its charter, the Committee retained an outside advisor wholly independent of management to assist it and provide the Committee with advice and support on certain compensation matters. The outside advisor is Roger Brossy of Semler Brossy Consulting Group, and he reports directly to the Committee.

In implementing Fannie Mae's compensation philosophy, the Committee each year conducts an assessment of corporate and individual performance. Individual performance reviews are rigorous. Each officer's individual performance is assessed on both individual business results and the demonstration of specific leadership qualities throughout the year. Evaluation of leadership qualities is assessed through the collection of reviews from the officer's subordinates, peers and superiors. In the final step of the performance review process, an overall performance rating is assigned reflecting a balance of business results and demonstration of leadership.

The performance rating is used to determine actual pay for salary, bonus, and variable long–term incentive awards relative to the targets. The Committee has final authority over compensation decisions for senior vice presidents, and the full non–management board determines compensation for executive vice presidents and the members of Office of the Chairman.

Our executive compensation program has three primary tools: base salary, an annual bonus award, and variable long–term incentive awards. The program ties a large portion of each officer's total compensation to performance over different time periods. To achieve a balanced result, Fannie Mae's pay for performance approach provides a cash payment for achieving annual financial goals and stock–based awards for medium and long–term performance generating increases in shareholder returns. This program is expressly designed not to put too much reliance on any one form of compensation.

*Base Salary.* Base salary for executive officers is determined principally by the Committee's judgment as to the market for comparable positions, informed by an annual market comparability review conducted by Fannie Mae's third–party consultant. Final salary determinations also reflect individual performance, leadership, and experience level. In general, the Committee seeks to target annual total cash (salary plus bonus) to the 50th percentile of the comparative market.

*Annual Incentive Plan.* The Annual Incentive Plan puts a portion of each executive officer's annual cash compensation at risk. Financial goals, measured by earnings per share ("EPS") growth, established by the Board at the beginning of the year and achievement against these goals determine the funding of the bonus pool from which the actual bonuses are paid.

*Variable Long–Term Incentive Awards.* Variable long–term incentive awards are delivered in the form of stock options, and performance shares or restricted stock. All variable long–term incentive compensation programs are paid solely in Fannie Mae common stock, thereby reinforcing the shared interests of officers and shareholders. Officers at the senior vice president level and above receive half of the value of their annual variable long–term incentive award in the form of performance shares and half in the form of stock options.

*Performance Shares.* Performance shares are pay for performance incentive awards that compensate senior management for meeting performance objectives over a three–year period. Each year, the Committee establishes designated award periods ("cycles") of three years. At the beginning of each cycle, at the Committee's request, the Board establishes program targets based on both financial and non–financial goals. The financial goals currently are tied to growth in EPS and the non–financial goals are tied to Fannie Mae's strategic plan. The Committee has established a scorecard to measure Fannie Mae's achievement of the strategic plan in the following areas:

- leadership in increasing access to affordable housing;
- leading presence in the secondary mortgage market;

19

**Table of Contents**

- optimal interest rate, credit, and policy risk management;
- development of a corporate culture to enhance strategy execution; and
- development of an e–commerce infrastructure to increase capabilities and lower costs.

The EPS goals and the strategic goals are given equal weighting (*i.e.*, 50 percent each) in determining award payout. The Committee determines actual achievement against these goals at the conclusion of each cycle. An actual award payout can range from 40 percent of the performance shares granted for threshold achievement to 150 percent for goal achievement at maximum levels. No payment is made if achievement is below the pre–determined threshold. Fannie Mae began a new three–year performance share cycle in January 2004.

*Stock Options.* Stock options link the interests of executives and shareholders by providing value to the executive only when the stock price increases over a number of years. Stock options generally vest over a four–year period at the rate of 25% per year and have a ten–year term. The number of stock options received by Fannie Mae executive officers as a group is targeted, when combined with performance shares, to bring total compensation to the 65 [th] percentile of the comparative market.

### Chief Executive Officer Compensation

All of the executive compensation processes and policies described above are applied in setting the compensation and assessing the performance of Mr. Raines. In addition to reviews from a range of officers at the company, all non–management members of the Board participate in the review of Mr. Raines' performance.

Without Mr. Raines present, the non–management members of the Board discussed the Committee's review of Mr. Raines' performance for 2003. They assessed Mr. Raines' performance against a broad range of leadership criteria including: strategic thinking, providing vision and direction, accelerating change, intellectual honesty, integrity, motivating and developing people, teamwork and partnering, influencing ideas and initiatives, fostering diversity and delivering results. The Board considered feedback from Mr. Raines' subordinates and Board members obtained through the same survey instrument used to collect performance feedback for other officers. Mr. Raines' performance also was measured against the financial and non–financial goals established for Fannie Mae's strategic plan.

All of this information was used to make the performance–based compensation decisions for Mr. Raines. Overall, the Board concluded that the performance of Fannie Mae under Mr. Raines' leadership exceeded targets set in advance and met or exceeded that of comparable companies. Specifically noted were the following 2003 achievements:

- total business volume grew by 68 percent for a new record of $1.4 trillion;
- core business earnings per share grew more than 15 percent, producing Fannie Mae's 17th consecutive year of double–digit growth;
- core taxable equivalent revenues grew by 24 percent, to $14.8 billion;
- the mortgage portfolio business grew by 13 percent in a highly competitive market for purchasing mortgages;
- the mortgage guaranty business (outstanding Fannie Mae mortgage–backed securities) grew by 26 percent;
- strong and concrete efforts to maintain "best in class" corporate governance;
- expansion of corporate transparency, through implementation of voluntary commitments and increased investor disclosures, including the completion of the landmark registration of Fannie Mae's common stock under the Securities Exchange Act of 1934 with the SEC; and
- investment in Fannie Mae's future through the development of a new core technology infrastructure and new mortgage products and lender services.

Additionally, the Committee took note of Mr. Raines' leadership of Fannie Mae and achievement of its housing and other goals in a challenging business environment and intensive policy environment. The Committee also took note of Mr. Raines' leadership on behalf of housing and his strong leadership in the national business community on corporate governance.

The Committee's specific 2003 compensation determinations with respect to Mr. Raines are as follows and are reflected in the Summary Compensation Table at page 25.

20

Table of Contents

***Base Salary.*** For 2003, the Board set Mr. Raines' cash base salary at $992,250, unchanged since 2000, and slightly below the midpoint of the market. For the purposes of calculating his pension and life insurance benefits, however, the Board set a reference annual base salary for Mr. Raines at $1,153,030, reflecting a 5.4 percent increase over the prior year. Consistent with Fannie Mae's pay for performance philosophy, the difference between Mr. Raines' cash base salary and reference annual base salary is awarded as additional long–term, equity–based compensation.

***Annual Bonus.*** For 2003, Mr. Raines' annual bonus is measured against targets set at the beginning of the year based on corporate financial performance for the year, measured by growth in EPS. Fannie Mae significantly exceeded those targets and Mr. Raines' bonus for the year reflects his contributions to that performance.

***Other Annual Compensation.*** The Board also approved other benefits for Mr. Raines, including his reimbursement for tax counseling and financial planning services and personal use of company transportation. The value of these benefits was considered by the board in setting Mr. Raines' total compensation.

***Variable Long–Term Incentive Compensation.*** The information provided in this proxy statement on variable long–term compensation reflects two actions taken by the Committee. First, the Committee awarded the long–term incentive payouts reported in the Summary Compensation Table at page 25. These stock payouts reflect the achievement of performance share program goals from 1999 through 2003. During that time and under Mr. Raines' leadership, Fannie Mae reached financial and strategic milestones including: record financial performance, significant revenue growth in both of our business segments, and early achievements of the $2 trillion American Dream Commitment goal and the Trillion Dollar Commitment.

Second, in line with Fannie Mae's pay for performance goals and to continue to align Mr. Raines' compensation directly with the long–term interests of shareholders, the Committee granted Mr. Raines performance shares and stock options vesting over multi–year periods, based on his performance evaluation. The Committee awarded Mr. Raines 314,634 stock options based on Fannie Mae's and Mr. Raines' outstanding performance in 2003. Mr. Raines proposed to the Committee and it concurred that, for no additional compensation, he retain only 135,020 of those options. Those awards are reflected in the tables at pages 26 and 27.

*Conclusion*

The Committee believes both the design of Fannie Mae's compensation programs and the actual total compensation levels described in this proxy statement reflect adherence to the Board of Directors' obligations under the Charter Act and careful thinking about what is appropriate from both a competitive and shareholder perspectives, and clearly reflect Fannie Mae's compensation philosophy.

**The Compensation Committee**
Anne M. Mulcahy, Chairman
Ann Korologos
Joe K. Pickett
Taylor C. Segue

21

Table of Contents

*Aggregated Option Exercises in Last Fiscal Year and Fiscal Year End Option Values*

The following table shows the aggregate number of shares underlying options exercised in 2003 and the value at year–end of outstanding options, whether or not exercisable.

| Name | Shares Acquired on Exercise (#) | Value Realized (1) ($) | Number of Securities Underlying Unexercised Options December 31, 2003 Exercisable/ Unexercisable (#) | Value of Unexercised In–the–Money Options December 31, 2003 Exercisable/ Unexercisable (2) ($) |
|---|---|---|---|---|
| Franklin D. Raines | — | — | 1,215,304/715,900 | $ 7,448,575/4,437,208 |
| Daniel H. Mudd | — | — | 197,035/294,372 | 1,919,109/3,706,686 |
| Timothy Howard | 51,200 | $ 2,678,162 | 406,295/201,404 | 10,391,077/1,210,253 |
| Thomas E. Donilon | — | — | 69,314/144,123 | 134,241/660,987 |
| Robert J. Levin | 51,200 | 2,603,295 | 368,999/162,243 | 10,391,077/1,118,410 |

*Notes to Option Exercises/Year End Values*

(1) "Value Realized" is the difference between the exercise price and the market price on the exercise date, multiplied by the number of options exercised. "Value Realized" numbers do not necessarily reflect what the executive might receive when he or she sells the shares acquired by the option exercise, since the market price of the shares at the time of sale may be higher or lower than the price on the exercise date of the option.

(2) "Value of Unexercised In–the–Money Options" is the aggregate, calculated on a grant by grant basis, of the product of the number of unexercised options at the end of 2003 multiplied by the difference between the exercise price for the grant and the year–end market price ($75.06), excluding grants for which the difference is equal to or less than zero.

*Long–Term Incentive Plan Awards Table*

| Name | Number of Performance Shares (1) (#) | Performance or Other Period Until Maturation or Payout | | Estimated Future Payouts Under Non–Stock Price Based Plans | | |
|---|---|---|---|---|---|---|
| | | Award Cycle | Payout Period (if any) | Threshold (#) | Target (#) | Maximum (#) |
| Franklin D. Raines | 99,967 | 2004–2006 | 2007, 2008 | 39,987 | 99,967 | 149,951 |
| Daniel H. Mudd | 33,599 | 2004–2006 | 2007, 2008 | 13,440 | 33,599 | 50,399 |
| Timothy Howard | 33,599 | 2004–2006 | 2007, 2008 | 13,440 | 33,599 | 50,399 |
| Thomas E. Donilon | 28,363 | 2004–2006 | 2007, 2008 | 11,345 | 28,363 | 42,545 |
| Robert J. Levin | 31,967 | 2004–2006 | 2007, 2008 | 12,787 | 31,967 | 47,951 |

*Notes to Long–Term Incentive Plan Awards Table*

(1) Contingent grants of performance shares were made as part of Fannie Mae's variable long–term awards program on January 23, 2004 for the 2004–2006 cycle, for which distributions will be made in 2007 and 2008. Actual awards range from 40 percent to 150 percent of a participant's target performance shares based on equally weighted goals for growth in EPS and performance in strategic areas. If Fannie Mae does not meet the requirement to achieve 40 percent awards, no award will be paid. The value of an actual award depends on the level of achievement and the value of Fannie Mae's common stock at the end of the cycle. The fair value of a performance share for the 2004–2006 cycle is subject to a limit of three times the fair market value of Fannie Mae's common stock on January 23, 2004, the date of grant. The fair market value of Fannie Mae's common stock on the date of grant was $78.315.

27

EXHIBIT 5



# FEDERAL NATIONAL MORTGAGE ASSOCIATION FANNIE MAE (FNM)

3900 WISCONSIN AVE N.W.
WASHINGTON, DC 20016
202–752–7000
http://www.fanniemae.com

# 8–K

**LIVE FILING**
**Filed on 10/07/2005 – Period: 10/07/2005**
File Number 000–50231



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 8–K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of Earliest Event Reported):  October 7, 2005

# Federal National Mortgage Association

(Exact name of registrant as specified in its charter)

| Federally Chartered Corporation | 000–50231 | 52–0883107 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |
| 3900 Wisconsin Avenue, NW, Washington, District of Columbia | | 20016 |
| (Address of principal executive offices) | | (Zip Code) |

Registrant's telephone number, including area code:  202–752–7000

Not Applicable

Former name or former address, if changed since last report

Check the appropriate box below if the Form 8–K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
[ ] Soliciting material pursuant to Rule 14a–12 under the Exchange Act (17 CFR 240.14a–12)
[ ] Pre–commencement communications pursuant to Rule 14d–2(b) under the Exchange Act (17 CFR 240.14d–2(b))
[ ] Pre–commencement communications pursuant to Rule 13e–4(c) under the Exchange Act (17 CFR 240.13e–4(c))

**Top of the Form**
**Item 8.01 Other Events.**

Fannie Mae (formally the Federal National Mortgage Association) is providing an update on three ongoing matters–the estimated financial impact on the company from the Gulf Coast hurricanes, our Capital Restoration Plan, and the process we have established for disclosing issues that arise in the course of our accounting review.

## IMPACT OF GULF COAST HURRICANES

Fannie Mae estimates that its after–tax losses as of September 30, 2005, as a result of Hurricanes Katrina and Rita are expected to be in a range of $250 million to $550 million.

We will continue to assess the financial impact of Hurricanes Katrina and Rita as more information becomes available to us. Our exposure to losses as a result of Hurricanes Katrina and Rita arises primarily from our guaranty of principal and interest payments due to holders of Fannie Mae MBS secured by property in the affected areas, our portfolio holdings of mortgages and mortgage–related securities secured by property in the affected areas, and real estate that we own in the affected areas.

The company's preliminary estimates of the financial impact of Hurricanes Katrina and Rita involve the exercise of considerable judgment and assumptions about uncertain matters. For example, our estimates could be impacted negatively or positively if insurance recoveries, including flood insurance, the number of properties damaged, the extent of the damage, or property values are less or more than we have assumed. These preliminary estimates are inherently imprecise due to a variety of factors, including our inability to access portions of the affected areas and the limited availability of reliable data regarding the condition of properties in the affected areas. Further, the estimated range does not reflect potential issues with the pace of economic recovery in the regions affected by Hurricanes Katrina and Rita. Accordingly, the range we have estimated is based on current information, and may change as new information becomes available.

## CAPITAL RESTORATION PLAN

Fannie Mae believes that we exceeded the 30 percent capital surplus requirement over our minimum capital requirement as of September 30, 2005, in compliance with the September 27, 2004 agreement with our regulator, the Office of Federal Housing Enterprise Oversight (OFHEO). Our belief reflects ongoing discussions with OFHEO, and incorporates our current assessment of accounting issues we are reviewing and their estimated financial impact, as well as our preliminary estimate of after–tax losses related to the Gulf Coast hurricanes. We will continue working closely with OFHEO to finalize our capital estimation by October 30, 2005, the due date for our formal submission.

## PROCESS REGARDING ISSUES ARISING IN ACCOUNTING REVIEW

We continue our comprehensive review of our accounting policies and practices, including regular discussions with OFHEO and our new independent auditor, Deloitte & Touche, and reporting to the Audit Committee of our Board of Directors. For issues arising in the course of the review, our policy has been to address them in our regulatory filings, particularly Form 12b–25s filed with the Securities and Exchange Commission. We will continue to provide disclosure of issues when the issues have been identified and resolved in accordance with our accounting policy review procedures. In addition, we will continue to provide OFHEO, the Audit Committee, and the independent reviewers at Paul, Weiss with regular updates of issues being considered in the course of the accounting review.

## INFORMATION ABOUT FORWARD–LOOKING STATEMENTS

This statement includes forward–looking statements, including statements regarding our estimate of our after–tax losses resulting from Hurricanes Katrina and Rita, our attainment of our capital surplus requirement, and our assessment of accounting issues we are reviewing and their estimated financial impact. Statements that are not historical facts, including statements about our beliefs and expectations, are forward–looking statements. These statements are based on beliefs, estimates and assumptions by management, and on information currently available to management. Forward–looking statements speak only as of the date they are made, and we undertake no obligation to update publicly any of them in light of new information or future events. A number of important factors could cause actual results to differ materially from those contained in any forward–looking statement. Examples of such factors include, but are not limited to, the final resolution and financial impact of accounting issues being addressed during the restatement, the factors described above and other uncertainties inherent in management's assumptions and estimates underlying our estimate of after–tax losses relating to the Gulf Coast hurricanes.

**Top of the Form**

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Federal National Mortgage Association

*October 7, 2005*

*By:*  *David C. Hisey*
_____

*Name: David C. Hisey*
*Title: Senior Vice President and Controller*

EXHIBIT 6



**Office of Federal Housing Enterprise Oversight (OFHEO)**
**1700 G Street, NW 4th Floor**
**Washington, DC 20552**
**Phone: 202-414-3800**
**Fax: 202-414-3823**

FOR IMMEDIATE RELEASE                    Contact: Corinne Russell 202.414.6921
November 01, 2005                                     Stefanie Mullin 202.414.6376
                                                                        www.ofheo.gov

### OFHEO ANNOUNCES FANNIE MAE ACHIEVES 30 PERCENT CAPITAL SURPLUS

**WASHINGTON, D.C.**— Stephen Blumenthal, Acting Director of the Office of Federal Housing Enterprise Oversight (OFHEO), safety and soundness regulator for Fannie Mae and Freddie Mac (the Enterprises), announces that Fannie Mae achieved the 30 percent capital surplus as required by OFHEO.

In agreements between OFHEO and Fannie Mae resulting in a Capital Restoration Plan, Fannie Mae was required to achieve a 30 percent capital surplus over the minimum capital requirement by September 30, 2005. Fannie Mae certified its third quarter 2005 minimum capital report demonstrating the achievement of the target for September 30, 2005, taking into account current assessments of accounting deficiencies and estimates of other potential impacts to capital. OFHEO actively monitors Fannie Mae's compliance with the Plan on a weekly basis and has reviewed the certified numbers.

Fannie Mae achieved an estimated $9.1 billion surplus through earnings retention and asset sales as of September 30, 2005 after accounting for estimated accounting errors and hurricane losses. This resulted in an additional $752 million over the required 30 percent surplus. Based on current information, this surplus is sufficient to absorb uncertainties in the estimated impact to capital of potential additional accounting errors, which may arise during the restatement process.

OFHEO's next quarterly capital classification will be issued by December 31, 2005 once all capital-related data, including the Risk-based Capital Report, is received. At this time, the existing classification issued on September 28, 2005 of "adequately capitalized" remains unchanged.

*Technical questions regarding these results should be directed to: rbcquestions@ofheo.gov.*
*Media questions regarding these results should be directed to Corinne Russell at: crussell@ofheo.gov or*
*202.414.6921 or Stefanie Mullin at: stefanie.mullin@ofheo.gov or 202.414.6376.*

### ###

EXHIBIT 7



**Office of Federal Housing Enterprise Oversight (OFHEO)**

<u>CONTACT:</u>  Corinne Russell (202) 414-6921
Stefanie Mullin  (202) 414-6376
<u>www.ofheo.gov</u>

# NEWS RELEASE

<u>FOR IMMEDIATE RELEASE</u>
June 28, 2007

## OFHEO ANNOUNCES FIRST QUARTER 2007
## MINIMUM AND RISK-BASED CAPITAL CLASSIFICATION
## FOR FANNIE MAE and FREDDIE MAC
### Reaffirms Fannie Mae Q1-4 2005 as Adequately Capitalized

**WASHINGTON, DC** — James B. Lockhart III, Director of the Office of Federal Housing Enterprise Oversight (OFHEO), the safety and soundness regulator for Fannie Mae and Freddie Mac, classified Fannie Mae and Freddie Mac as adequately capitalized as of March 31, 2007. Fannie Mae's classification is based on estimated numbers submitted by Fannie Mae and not financial statements released to shareholders. Freddie Mac's classification is based upon numbers consistent with their First Quarter Financial Statements and Information Statement Supplement released on June 14, 2007.

Fannie Mae had a 10.2 percent surplus above the OFHEO-directed requirement, which is 30 percent above the required minimum capital. Freddie Mac's surplus above the OFHEO-directed requirement was 5.9 percent. Both Enterprises' percentages were down from December 31, 2006.

The Federal Housing Enterprises Financial Safety and Soundness Act of 1992 requires the OFHEO Director to determine the capital level and classification of the Enterprises not less than quarterly, and to report the results to Congress. OFHEO classifies the Enterprises as adequately capitalized, undercapitalized, significantly undercapitalized or critically undercapitalized. The Enterprises are required by federal statute to meet both minimum and risk-based capital standards to be classified as adequately capitalized.

**Fannie Mae**

Fannie Mae's first quarter 2007 classification of adequately capitalized remains subject to change as the company continues its ongoing accounting review and issuance of public statements. Fannie Mae's quarterly numbers carry forward its 2004 and 2005 accounting adjustments, and incorporate ongoing estimates of additional accounting changes for 2006 and 2007. This process of including ongoing adjustments in disclosures, coupled with ongoing supervisory activities, provides OFHEO additional assurance that the company is maintaining a capital surplus in excess of the OFHEO-directed requirement.

Fannie Mae's surplus as a percent of the OFHEO-directed requirement decreased slightly to 10.2 percent from 10.9 percent the prior quarter. The slight change is due mainly to growth in MBS outstanding and the resulting increase in the capital requirement. Fannie Mae continues to operate under growth restrictions for its retained portfolio and has maintained compliance with this agreement throughout the quarter. There are no restrictions on its issuance of guaranteed MBS.

Fannie Mae resubmitted capital reports to OFHEO following Fannie Mae's public disclosure of 2005 financial results and its 2005 Annual Report on May 3, 2007. After analysis of these results, Director Lockhart is reaffirming the previous capital classification of adequately capitalized for all four quarters of 2005. All capital data for these historical quarters can be found on OFHEO's website in the historical charts at http://www.ofheo.gov/CapClass.asp.

Although progress is evident and OFHEO is classifying Fannie Mae as adequately capitalized for the first quarter 2007, significant work remains before Fannie Mae becomes a timely financial filer and corrects its internal control and operational weaknesses.

OFHEO supports Fannie Mae's current practice of managing the surplus above the OFHEO-directed requirement to compensate for its internal control and operational weaknesses, and to account for the sensitivity of the capital surplus to potential market valuation losses arising from changes in interest rates, market volatility, and credit loss expectations.

**Freddie Mac**

Freddie Mac's first quarter 2007 classification of adequately capitalized is based upon results consistent with its June 14, 2007 Information Statement Supplement.

Freddie Mac's surplus as a percent of the OFHEO-directed requirement decreased to 5.9 percent from 7.7 percent the prior quarter due primarily to growth in the retained portfolio. Freddie Mac has agreed to growth restrictions on its retained portfolio as of July 1, 2006 and remains in compliance with these restrictions. There are no restrictions on its issuance of guaranteed MBS.

Although the filing of the First Quarter 2007 Financial Statements and Information Statement Supplement continues to demonstrate progress for Freddie Mac in returning to timely and accurate financial reporting, internal control and operational weaknesses remain evident. Significant work remains before Freddie Mac becomes a timely filer and SEC registrant.

OFHEO supports Freddie Mac's current practice of managing the surplus above the OFHEO-directed requirement to compensate for its internal control and operational weaknesses, and to account for the sensitivity of the capital surplus to potential market valuation losses arising from changes in interest rates, market volatility, and credit loss expectations.

## FIRST QUARTER CAPITAL RESULTS

**Minimum and Critical Capital**

Fannie Mae's adjusted[1] <u>OFHEO-directed capital</u> requirement on March 31, 2007 was $38.4 billion and its adjusted <u>statutory minimum capital</u> requirement was $29.5 billion.  Fannie Mae's adjusted core capital of $42.3 billion exceeded the adjusted OFHEO-directed capital requirement by $3.9 billion.  Fannie Mae's adjusted core capital exceeded the adjusted <u>statutory critical capital</u> requirement by $27.0 billion.

Freddie Mac's reported <u>OFHEO-directed capital</u> requirement on March 31, 2007 was $34.2 billion and its reported <u>statutory minimum capital</u> requirement was $26.3 billion.  Freddie Mac's reported core capital of $36.2 billion exceeded the OFHEO-directed minimum capital requirement by $2.0 billion.  Freddie Mac's core capital exceeded the <u>statutory critical capital</u> requirement by $22.8 billion.

| Enterprise Minimum Capital Requirement (Billions of Dollars) [a] | | | | |
|---|---|---|---|---|
| | **Fannie Mae** | | **Freddie Mac** | |
| | 31-Mar-07 [b,c,d] | 31-Dec-06 [b,c,d] | 31-Mar-07 [c] | 31-Dec-06 [c] |
| Minimum Capital - Statutory Requirement | 29.524 | 29.332 | 26.304 | 25.844 |
| Minimum Capital - OFHEO Directed Requirement | 38.381 | 38.131 | 34.196 | 33.597 |
| Core Capital | 42.277 | 42.295 | 36.230 | 36.170 |
| Surplus (Deficit) (based on OFHEO Directed Requirement) | 3.896 | 4.163 | 2.034 | 2.573 |
| Surplus as a Percent of OFHEO Directed Requirement | 10.2% | 10.9% | 5.9% | 7.7% |

| Enterprise Critical Capital Requirement (Billions of Dollars) [a] | | | | |
|---|---|---|---|---|
| | **Fannie Mae** | | **Freddie Mac** | |
| | 31-Mar-07 [b,d] | 31-Dec-06 [b,d] | 31-Mar-07 | 31-Dec-06 |
| Critical Capital Level | 15.247 | 15.134 | 13.484 | 13.237 |
| Core Capital | 42.277 | 42.295 | 36.230 | 36.170 |
| Surplus (Deficit) | 27.030 | 27.161 | 22.746 | 22.933 |

a. Numbers may not add due to rounding.

b. Subject to revision based upon results of ongoing financial restatement and audit processes.

c. OFHEO has directed both Fannie Mae and Freddie Mac to maintain an additional 30% capital in excess of the statutory minimum capital requirement. These requirements have been an additional requirement since January 28, 2004, for Freddie Mac and since September 30, 2005, for Fannie Mae. The OFHEO-directed minimum capital requirement and capital surplus numbers stated in these charts reflect the inclusion of the additional 30% OFHEO-directed capital requirement.

d. Fannie Mae's minimum capital, critical capital, and core capital are adjusted for accounting errors identified to date.

---

[1] The term "adjusted" reflects that Fannie Mae's minimum capital submissions adjust book capital based upon estimated accounting change impacts, including the roll-forward of 2004 adjustments.

During the first quarter of 2007, Fannie Mae's minimum capital surplus decreased by $0.3 billion to $3.9 billion, approximately 10.2 percent over the OFHEO-directed minimum capital requirement of $38.4 billion. The OFHEO-directed minimum requirement rose $0.3 billion primarily due to growth in MBS outstanding which contributed to the reduction in the reported capital surplus. Core capital remained at $42.3 billion for the quarter ended March 31, 2007 as Fannie Mae's redemption of $0.7 billion in preferred stock was offset by an equal increase in retained earnings, net of dividend payments totaling $0.5 billion.

Freddie Mac's minimum capital surplus decreased $0.5 billion to $2.0 billion, approximately 5.9 percent over the OFHEO-directed minimum capital requirement of $34.2 billion. The OFHEO-directed minimum capital requirement increased $0.6 billion due to growth in the retained portfolio and MBS outstanding. For the quarter ended March 31, 2007, core capital remained at $36.2 billion with preferred stock issuance of $0.5 billion offset by a similar change in retained earnings, including losses of $0.2 billion and dividend payments of $0.4 billion. Net income losses were primarily the result of mark-to-market losses on the company's derivatives portfolio and on the company's single-family credit guarantee business.

Changes in critical capital mirrored changes in minimum capital for both Enterprises.

**Risk-Based Capital**

**As of March 31, 2007, Fannie Mae's <u>risk-based capital</u> requirement was $20.5 billion. Fannie Mae's total capital of $42.6 billion on that date exceeded the requirement by $22.1 billion.**

**As of March 31, 2007, Freddie Mac's <u>risk-based capital</u> requirement was $13.8 billion. Freddie Mac's total capital of $36.8 billion on that date exceeded the requirement by $23.0 billion.**

| | Enterprise Risk-Based Capital Requirement (Billions of Dollars) [a] | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Fannie Mae [b] | | | | Freddie Mac | | | |
| | 31-Mar-07 | | 31-Dec-06 | | 31-Mar-07 | | 31-Dec-06 | |
| Interest Rate Scenario | Up | Down | Up | Down | Up | Down | Up | Down |
| Risk Based Capital Requirement | 20.536 | 14.630 | 26.370 | 9.134 | 13.784 | 9.742 | 15.320 | 12.934 |
| Total Capital | 42.627 | | 43.046 | | 36.765 | | 36.742 | |
| Surplus (Deficit) | 22.092 | | 16.176 | | 22.981 | | 21.422 | |

a. Numbers may not add due to rounding.

b. Subject to revision based upon results of ongoing financial restatement and audit processes.

By statute, stress test interest rate levels are a function of the average 10-year Constant Maturity Treasury (CMT) over the most recent nine months. The nine-month average of the 10-year CMT fell to 4.74%, 13 basis points lower than the nine-month average at the end of the fourth quarter of 2006. As a result, 10-year CMT levels at the end of the first year in the risk-based capital stress test decreased from 8.51% to 8.29% in the up-rate stress test, and from 2.43% to 2.37% in the down-rate stress test.

While market rate levels changed little quarter over quarter, interest rates rose appreciably in the first two months before reversing course in March. Expected prepayment speeds decreased and the duration of fixed-rate mortgage assets increased intra-quarter. These outcomes caused Fannie Mae to lengthen its debt book through debt issuance and the use of derivatives in order to maintain an equal duration exposure of assets and liabilities. Freddie Mac made opportunistic purchases as Option Adjusted Spreads (OAS) widened, which caused its asset duration to lengthen slightly over the quarter. Similarly, Freddie Mac adjusted its funding and derivative portfolio to maintain an equal duration exposure of assets and liabilities.

Fannie Mae's rebalancing actions decreased exposure in the up-rate binding scenario and increased exposure in the down-rate scenario. Fannie Mae's risk-based capital requirement in the up-rate stress test fell to $20.5 billion; $6.3 billion lower than the fourth quarter. By contrast, the risk-based capital requirement in the down-rate stress test increased to $14.6 billion; $5.5 billion higher than the fourth quarter. Overall, Fannie Mae's risk-based capital surplus increased from $16.2 billion to $22.1 billion.

Freddie Mac's risk-based capital requirements were $13.8 billion in the up-rate stress test and $9.7 billion in the down-rate stress test or $1.5 billion and $3.2 billion lower than the fourth quarter, respectively. During the quarter, Freddie Mac's risk-based capital surplus increased from $21.4 billion to $23.0 billion. Lower CMT levels at the end of the first year of the stress test reduced exposures in the up-rate scenario, while rebalancing actions reduced exposures in the down-rate scenario. The up-rate stress test remained the binding scenario in the first quarter of 2007.

## QUALIFICATIONS AND COMPLIANCE

Fannie Mae's capital classification is based upon Fannie Mae's best estimates of its financial condition, as certified and represented as true and correct to the best of Fannie Mae management's belief and knowledge. The first quarter 2007 capital classification remains subject to revision pending Fannie Mae's submission of audited financial statements and corresponding regulatory capital reports.

Fannie Mae remains subject to the requirements imposed by the Consent Order dated May 23, 2006 and the Capital Restoration Plan approved February 17, 2005. The Capital Restoration Plan required Fannie Mae to achieve a 30 percent capital surplus over the minimum capital requirement by September 30, 2005 (OFHEO-directed capital requirement). Fannie Mae is required to maintain a capital surplus above the OFHEO-directed requirement on an ongoing basis. Fannie Mae met the initial September 30, 2005 achievement of 30 percent surplus and it has continued to maintain the surplus through the first quarter 2007.

Freddie Mac's capital classification is based upon its financial condition, as certified and represented as true and correct by Freddie Mac's management, and consistent with the publicly disclosed Information Statement Supplement issued on June 14, 2007. OFHEO imposed a capital surcharge of 30 percent of the minimum capital requirement for Freddie Mac in January 2004 due to increased operational risk. Freddie Mac has continued to maintain its minimum capital surplus in excess of the OFHEO-directed capital requirement through the first quarter 2007.

## FIRST QUARTER QUALIFYING SUBORDINATED DEBT RESULTS

Additionally, OFHEO is releasing qualifying subordinated debt positions of Fannie Mae and Freddie Mac in accordance with the September 1, 2005 Agreements between OFHEO and the Enterprises. (See 9/2/05 release at http://www.ofheo.gov/News.asp?FormMode=Releases&ID=237)

Fannie Mae's total capital and qualifying subordinated debt for the first quarter 2007 exceeded the requirements outlined in the Agreement dated September 1, 2005.

Freddie Mac's total capital and qualifying subordinated debt for the first quarter 2007 exceeded the requirements outlined in the Agreement dated September 1, 2005.

| Enterprise Qualifying Subordinated Debt Disclosure (Billions of Dollars) [a] | | | | |
|---|---|---|---|---|
| | Fannie Mae | | Freddie Mac | |
| | 31-Mar-07 | 31-Dec-06 | 31-Mar-07 | 31-Dec-06 |
| Total Capital & Qualifying Subordinated Debt | 50.172 | 50.705 | 41.383 | 42.602 |
| Capital Requirement at 4% for On-Balance Sheet Assets and at 0.45% for Net MBS / PCs Outstanding | 41.940 | 41.798 | 38.093 | 37.576 |
| Surplus (Deficit) | 8.232 | 8.908 | 3.290 | 5.026 |

Footnote:

a. Qualifying Subordinated Debt is defined as subordinated debt that contains the interest deferral feature.  The interest deferral requires the deferral of interest payments for up to 5 years if:

1) The corporation's core capital falls below 125% of critical capital, or

2) The corporation's core capital falls below minimum capital AND, pursuant to the corporation's request, the Secretary of the Treasury exercises discretionary authority to purchase the company's obligations under Section 306(c) of the Freddie Mac Charter Act and Section 304(c) of the Fannie Mae Charter Act.

## DEFINITION OF CAPITAL STANDARDS

**Core Capital** is the sum of outstanding common stock, perpetual, noncumulative preferred stock, paid-in capital, and retained earnings. Core capital does not include Accumulated Other Comprehensive Income (AOCI), which is captured as part of stockholder's equity.

**Total Capital** is the sum of Core Capital plus the allowance for loan losses.

**Minimum capital** represents an essential amount of capital needed to protect an Enterprise against broad categories of business risk. For purposes of minimum capital, an Enterprise is considered by law adequately capitalized if core capital — common stock; perpetual noncumulative preferred stock; paid in capital; and retained earnings — equals or exceeds minimum capital. The minimum capital standard is 2.5 percent of assets plus 0.45 percent of adjusted off-balance-sheet obligations, including guaranteed mortgage securities.

**The OFHEO-directed capital requirement** is the amount of capital the Enterprise needs to maintain to compensate for increased operational risks including systems, accounting, and internal control risks. The level is prescribed by the Director of OFHEO. At this time, both Enterprises are required to hold 30 percent over the statutory minimum capital requirement. This is calculated by multiplying the minimum capital requirement by 1.3 times.

**OFHEO's risk-based capital requirement** is the amount of total capital — core capital plus a general allowance for loan losses less specific reserves — that an Enterprise must hold to absorb projected losses flowing from future adverse interest-rate and credit-risk conditions specified by statute, plus 30 percent mandated by statute to cover management and operations risk. The risk-based capital standard is based on stress test results calculated for the two statutorily prescribed interest rate scenarios, one in which 10-year Treasury yields rise 75 percent (up-rate scenario) and another in which they fall 50 percent (down-rate scenario). Changes in both scenarios are generally capped at 600 basis points. The risk-based capital level for an Enterprise is the amount of total capital that would enable it to survive the stress test in whichever scenario is more adverse for that Enterprise, plus 30 percent of that amount to cover management and operations risk.

The **critical capital** level is the amount of core capital below which an Enterprise must be classified as critically undercapitalized and generally must be placed in conservatorship. Critical capital levels are computed consistent with the Federal Housing Enterprises Safety and Soundness Act of 1992 as follows: One-half of the portion of minimum capital requirement associated with on-balance-sheet assets plus five-ninths of the portion of the minimum capital requirement associated with off-balance-sheet obligations.

QUALIFYING SUBORDINATED DEBT

Qualifying subordinated debt is defined as subordinated debt that contains the interest deferral feature described below:
> The interest deferral requires the deferral of interest payments for up to 5 years if:
> o   The corporation's core capital falls below 125 percent of critical capital, or
> o   The corporation's core capital falls below minimum AND, pursuant to the corporation's request, the Secretary of the Treasury exercises discretionary authority to purchase the company's obligations under Section 306(c) of the Freddie Mac Charter Act and Section 304(c) of the Fannie Mae Charter Act.

The September 1, 2005 agreement requires that:
> Subordinated debt will be issued in a quantity such that the sum of total capital (core capital plus general allowance for losses) plus the outstanding balance of qualified subordinated debt will equal or exceed the sum of outstanding net MBS times 0.45 percent and total on-balance sheet assets times 4 percent.

Technical questions regarding these results should be directed to: rbcquestions@ofheo.gov.

###
*OFHEO's mission is to promote housing and a strong national finance system by ensuring the safety and*
*soundness of Fannie Mae and Freddie Mac.*